**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Diane Mann, as Trustee for the Estate of LeapSource, Inc., et al.

Plaintiffs,

vs.

GTCR Golder Rauner, L.L.C., a Delaware limited liability company., et al.,

Defendants.

No. CIV 02-2099-PHX RCB

O R D E R

On October 21, 2002, Defendants GTCR Golder Rauner, L.L.C., et al., filed their notice of removal in this action, attaching Plaintiffs' (Diane Mann, as Trustee for the Estate of LeapSource, Inc., et al.) First Amended Complaint. Notice (doc. 2). On November 20, 2002, Plaintiffs filed a motion to remand (doc. 8) this action to the Superior Court of Arizona in Maricopa County. On February 7, 2003, that motion was denied. Order (doc. 51). Thereafter, on June 11, 2004, Plaintiffs filed their Fourth Amended Complaint ("FAC"). (doc. 121).

On August 22, 2005, Defendants GTCR Golder Rauner, L.L.C., GTCR Fund VI, L.P., GTCR VI Executive Fund, L.P., GTCR Associates VI, Joseph P. Nolan, Bruce V. Rauner, Daniel Yih, David A. Donnini and Philip A. Canfield ("GTCR") filed a motion for summary judgment on all joint venture-related claims (Counts 11, 12, 14, 15, 16, and 22). Motion (doc. 239). On August 23, 2005, Defendant Kirkland & Ellis ("K&E") joined GTCR's motion and filed their own motion for summary judgment on Counts 12 and 14 of Plaintiffs' Fourth Amended Complaint. K&E Joinder and Motion (doc. 242). GTCR's motion was fully briefed and argued orally, however, Plaintiffs did not respond to K&E's motion. For this reason, on October 18, 2005, K&E moved for entry of judgment in their favor on Counts 12 and 14. Mot. Entry of Judg. (doc. 269). Having carefully considered the arguments presented by the parties, the court now rules.

**I. Background Facts**

As noted above, this action was originally filed in the Superior Court of Arizona in Maricopa County, alleging numerous state law based claims arising out of the financial demise of LeapSource, Inc. ("LeapSource"). LeapSource was a Phoenix-based "business process outsourcing" ("BPO") company, formed to provide accounting and employee benefit services to mid-sized businesses. The defendants in this action include a number of individuals and companies who were involved in various transactions related to the start-up and operation of LeapSource. GTCR Golder Rauner, LLC, is a Chicago-based venture capital firm. Beginning in September 1999, three partnerships (GTCR Fund VI, L.P., GTCR VI Executive Fund, L.P., GTCR Associates VI) in which GTCR was a general partner made a series of investments by purchasing stock in LeapSource.

Individual Plaintiff Christine Kirk was recruited by Defendants from her prior position as a partner with Arthur Andersen. She then recruited fellow Andersen employees to work for LeapSource, including fellow partners, some of whom were also given the opportunity to acquire shares of LeapSource.

On August 18, 1999, GTCR sent Kirk a draft Summary of Understanding ("SOU") that stated some of the terms on which GTCR would be willing to provide funding to a corporation to be formed with Kirk and her management team. After considering another venture capital proposal from Bank of America, it is alleged that on August 30, 1999, the GTCR entities and Plaintiffs engaged in a joint venture to make preparations for LeapSource to commence operations (the Kirk-GTCR Joint Venture). Plaintiffs assert that the alleged terms of the Kirk-GTCR Joint Venture were:

> (1) that GTCR would provide the financing required to successfully establish the new venture, with the understanding that the amounts required would be in the range of $50-100 million;
>
> (2) that GTCR's commitment was a long-term commitment to the success of the new venture, and that the new venture would be supported through a start up period that was expected to take two years, until it was successfully established as a leading provider of BPO services, and ready to go public or to be acquired when it would be advantageous to the new venture;
>
> (3) that the new venture would be expected to lose substantial amounts of money during its start up period (operating with negative EBITDA), that GTCR understood the magnitude of the financial commitment required to support the new venture during its start up period (because GTCR actually had similar loss experiences with other start-up companies), was "well equipped" to handle such losses, and was willing to finance the new venture through the start up period;
>
> (4) that GTCR's funding commitment was not conditioned upon the new venture's losses reaching

or exceeding any particular amount over the first
two years;

(5) that GTCR would not financially abandon the
new venture, but would stick by the new venture
even during bad times, in a way that other venture
capital firms would not (in one meeting expressed
by Rauner that, if Kirk would agree to leave
Andersen and join GTCR in this new BPO joint
venture, GTCR would be her "partner for life," and
in another conversation with Nolan, when the
possibility of obtaining financing from another
firm was mentioned, that "They won't stick by you
in bad times like we will.";

(6) that the purpose of the new venture would be
to create and develop a new BPO firm, to pursue
related opportunities, and to grow the business of
the new BPO firm through acquisitions, alliances,
and operations, as contemplated in the business
plan prepared by Chris Kirk and others, and
provided to GTCR;

(7) that Chris Kirk would be permitted to assemble
a management team to implement the business plan
and to manage the new venture, with the
understanding that a qualified team of
professionals and others would have to be brought
into the management teams to provide and to sell
the outsourcing services;

(8) that the new venture would need to hire and
train scores of employees even before outsourcing
contracts were signed (with Joe Nolan suggesting
that the appropriate number of people to bring on
board at the outset would be 100);

(9) that the new venture would have to be equipped
to provide the same level and depth of outsourcing
services that Andersen provided to its clients;

(10) that the management team put together by
Chris Kirk would be permitted to manage the new
venture (also expressed in other words that GTCR
did not get involved in management and would adopt
a "hands off" policy toward the management of the
new venture);

(11) that the members of the management team would
have an ownership interest in the new venture,
with common stock in a new entity to be formed
pursuant to the new venture divided equally
between GTCR and the management team, and with
GTCR receiving preferred stock in return for its
financial investment;

(12) that the members of the management team would be assured of compensation at levels comparable to the compensation that they had been receiving at Andersen (and Chris Kirk, Kim Hartmann, and Julie McCollum specifically discussed their individual compensation as described below);

(13) that GTCR would indemnify the management team against the costs of any action that might be taken by Andersen as a result of the management team's departure from Andersen;

(14) that, because of the non-competitive provisions in the management team's agreements with Andersen, the new venture would not be permitted to start selling outsourcing services for a period of months after their departure from Andersen, which would further extend the start up period discussed previously (when the new venture would be losing money and requiring continuing financial support from GTCR);

(15) that a new company would be formed to provide outsourcing services, and would be a "standard GTCR play," intended to replicate the AnswerThink experience, which meant to start the business with a substantial number of experienced employees from Andersen so that the new venture could stake out a leading position in the BPO services industry;

(16) that Kirk's $400,000 annual salary had been accepted by the GTCR's Board of Directors, that GTCR would make Kirk whole for any bonus distribution withheld by Andersen, and would pay her a one-year's severance package if she was terminated without cause;

(17) that GTCR would make Hartmann whole with respect to any compensation that she expected to receive from Andersen but did not receive because she left before October 1999, up to $1 million, and that GTCR would pay Hartmann a one-year severance package equal to her annual salary of $300,000; and

(18) that McCollum would be made whole on any earned but unpaid bonus she would have received had she stayed at Andersen (with the understanding that McCollum expected to receive a bonus from Andersen in the amount of $80,000), and that GTCR would provide McCollum with a one-year severance package equal to her salary of $360,000.

Resp. (doc. 253) at 11-13.

Between August 30, 1999 and September 14, 1999, Kirk negotiated with GTCR over the terms of the SOU. After exchanging numerous drafts and making a number of changes, the parties executed the final version dated September 14, 1999. Thereafter, on September 16, 1999, LeapSource was incorporated--then named "KirkCo, Inc." At this time, LeapSource had no employees, and its only shareholder other than the above-mentioned GTCR entities was Christine V. Kirk ("Kirk"), LeapSource's start-up CEO. This group (which is composed primarily of the individual Plaintiffs in this action) worked to gradually grow the LeapSource business; however, for reasons which are highly contested in this action, the company failed and filed for chapter 7 bankruptcy liquidation.

The plaintiffs in this action include the LeapSource bankruptcy trustee, as well as eight individuals who served in principal positions with LeapSource (including Kirk). See Notice of Rem. (doc. 1) Exbt. A, Amended Complaint. Plaintiffs' complaint alleges various causes of action against the various defendants both collectively and individually. On September 30, 2003, the Court granted in part and denied in part a motion to dismiss filed by GTCR. Order (doc. 72) at 68. The Court granted dismissal of Counts 1, 2, 3, 5, 13, 26, 27, and 29, and partial dismissal of Counts 7, 8, 24 and 25. Id. at 68-71. The Court denied dismissal of all the other contested claims. Id. Now, the Court reviews GTCR's motion for summary judgment, which seeks summary judgment on all of Plaintiffs' joint venture-related claims (Counts 11, 12, 14, 15, 16, and 22). Motion (doc. 239).

As an introductory matter, the FAC obviously alleges plaintiffs' claims against the defendants. These claims are made

by different plaintiffs and groups of plaintiffs against various groups of defendants. For purposes of this order only, plaintiff-subgroups are referred to as “Mann,” (the bankruptcy trustee), and the “individual Plaintiffs” or "Plaintiffs" referring to Christine Kirk, (“Kirk”), Kimberly Hartmann, Julie B. McCollum, Kelly Powers, Indu Gupta, Bobby D. Scott, and Patrice E. Walker.[1] Defendant-subgroups are referred to as "GTCR" to indicate GTCR Golder Rauner, LLC, GTCR Fund VI, LP, GTCR VI Executive Fund, LP, GTCR Associates VI, Joseph P. Nolan, Bruce V. Rauner, Daniel Yih, David A. Donnini and Philip A. Canfield, and "K&E" to refer to Kirkland and Ellis.

**II. Standard of Review**

To grant summary judgment, the Court must determine that the record before it contains "no genuine issue as to any material fact" and, thus, "that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether to grant summary judgment, the Court will view the facts and inferences from these facts in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case

---

[1] Plaintiffs do not claim that individual Plaintiff Thomas Gilman joined the alleged joint venture. FAC (doc. 121) at ¶¶ 159-162.

necessarily renders all other facts immaterial." Id. at 323. In such a case, the moving party is entitled to a judgment as a matter of law. Id.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A material fact is any factual dispute that might affect the outcome of the case under the governing substantive law. Id. at 248. A factual dispute is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the nonmoving party. Id.

A party opposing a motion for summary judgment cannot rest upon mere allegations or denials in the pleadings or papers, but instead must set forth specific facts demonstrating a genuine issue for trial. See id. at 250. Finally, if the nonmoving party's evidence is merely colorable or is not significantly probative, a court may grant summary judgment. See, e.g., California Architectural Build. Prods., Inc. v. Franciscan Ceramics, 818 F.2d 1466, 1468 (9th Cir. 1987).

**III. Discussion**

In its motion, GTCR asks the Court to grant summary judgment on all of Plaintiffs' joint venture-related claims. Specifically, GTCR requests summary judgment on Counts 11, 12, 14, 15, 16, and 22 of the FAC. GTCR argues that all of these claims fail because no joint venture ever existed between the parties. "What plaintiffs have labeled the 'Kirk-GTCR Joint Venture' for purposes of this litigation is nothing more than ***negotiations*** that resulted in the

parties' definitive written agreements governing LeapSource." Motion (doc. 239) at 15.

**A. Existence of a Joint Venture**

Individual Plaintiffs allege claims against GTCR based on its alleged breach of a joint venture agreement. Under Arizona law, a joint venture is formed when two or more parties agree to pursue a particular enterprise in the hope of sharing a profit. Arizona Public Service Co. v. Lamb, 84 Ariz. 314, 317 (1958). To establish a joint venture, there must be: "(1) an agreement; (2) a common purpose; (3) a community of interest; (4) an equal right of control; and (5) participation in profits and losses." Estate of Hernandez v. Flavio, 187 Ariz. 506, 509 (1997). Where there is a question as to the existence or nature of a joint venture, each case must be resolved upon its own facts. See Mercer v. Vinson, 85 Ariz. 280, 286 (1959).

Plaintiffs allege that they engaged in two separate business relationships to carry out the business of LeapSource. The first relationship was a joint venture between the individual Plaintiffs and GTCR. The other relationship was formed later when LeapSource was incorporated, in order to carry out the purposes of the joint venture. Plaintiffs claim that they engaged in separate agreements governing each of these relationships. The FAC first claims:

> ¶ 146. . . . On August 30, 1999, [Kirk] notified Nolan that, in reliance on the representations and promises made by GTCR, she would leave Anderson [her former employer] and join the new BPO joint venture with GTCR. In response, Nolan said that GTCR would send to Kirk a written agreement of their understanding.
>
> ¶ 147. At this point, a joint venture came into existence (the "Kirk-GTCR Joint Venture").

FAC (doc. 121). As a result, on August 30, 1999, Plaintiffs allege

that the joint venture came into existence which created legal rights and obligations between the parties. "In reliance upon the representations and promises made by GTCR[,] Kirk, Hartmann, McCollum, Walker, Powers, Scott and Gupta left their positions at Andersen and began work on the new joint venture with GTCR." Resp. (doc. 253) at 4.

Thereafter, as contemplated, a new company was created in order to carry out the objectives of the Kirk-GTCR Joint Venture. The complaint makes clear that this new company, originally named KirkCo, was incorporated in Delaware on September 16, 1999, and renamed "LeapSource." Id. at ¶ 170. Hence, LeapSource was formed as an instrumentality of the Kirk-GTCR Joint Venture. Id. at ¶ 171. In order to implement the joint venture through LeapSource, a number of agreements were entered between the parties. As stated in the FAC:

> ¶ 175. . . . on September 27, 1999, LeapSource and/or Individual Plaintiffs entered into five major agreements in order to implement GTCR's $65 million funding commitment to the Kirk-GTCR Joint Venture, and to launch the operations of the Company under Kirk as CEO. These agreements included the "Purchase Agreement," "Stockholders Agreement," "Senior Management Agreement," "Registration Agreement," and "Professional Services Agreement" (collectively, the "Agreements").

FAC (doc. 121).

While the FAC alleges that GTCR breached the joint venture agreement, GTCR contends that there was no joint venture to be breached. GTCR asserts that no joint venture existed between the parties because (1) the parties never intended to associate as joint venturers, (2) the parties never agreed to an equal right of control, and (3) the parties never agreed to participate in profits and losses. Motion (doc. 239) at 16. In their motion, GTCR does

not challenge the existence of "an agreement," a "common purpose," or a "community of interest" between the parties; the first, second and third elements required to establish a joint venture.

**1. The Parties' Intentions**

GTCR asserts that no joint venture ever existed between itself and Plaintiffs because the parties did not "intend" to form a joint venture. In their motion, GTCR argues that, based on the SOU, the parties did not intend to create a joint venture. First, GTCR contends that the Kirk-GTCR Joint Venture could not have come into existence on August 30, 1999, because the terms of the alleged joint venture remained under negotiation until September 14, 1999, when Defendant Nolan signed the SOU on behalf of GTCR. Motion (doc. 239) at 16; FAC (doc. 121) at ¶ 159. Second, GTCR argues that the SOU itself demonstrates that the purpose of the parties' on-going negotiations was to form a corporation that would provide BPO services. Motion (doc. 239) at 16. GTCR notes that neither the SOU nor any other document exchanged between the parties referenced a "joint venture." Id. at 16-17. Third, GTCR argues that the SOU itself made clear that its terms were not independently binding, and that they served only to memorialize terms that would ultimately be included in definitive agreements. Id. at 17.

> *This agreement is not binding until the execution of a definitive legal agreement and completion of due diligence (including reference checks). GTCR and Management will hold terms in confidence.*

DSOF (doc. 240) at Exbt. 4.

Finally, GTCR asserts that Plaintiffs' testimony is insufficient to prove that they had the requisite intent to form a

joint venture. Motion (doc. 239) at 17. GTCR notes that Kirk never told anyone that she intended to create a joint venture that would exist throughout the life of LeapSource. Id. In addition, GTCR contends that the individual Plaintiffs' testimony indicates that each of them knew "virtually nothing about the terms of the alleged joint venture and had little if any communication with GTCR." Id. at 18. Regardless, GTCR asserts that it never heard of nor joined a joint venture with the individual Plaintiffs, but if any joint venture were ever formed, it did not survive the execution of the five written agreements dated September 27, 1999. Id. at 18-19.

In response, Plaintiffs assert that intent is not an element required to form a joint venture. Resp. (doc. 253) at 9. Citing the Uniform Partnership Act, Plaintiffs contend that such a partnership may be formed despite the intent of the parties involved. Id.

> Except as otherwise provided in subsections B and C, the associations of two or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intended to form a partnership.

A.R.S. § 29-1012(A). Plaintiffs also cite numerous sections from the individual Plaintiffs' depositions where they spoke about certain aspects of the joint venture, indicating that they did know of its existence. Resp. (doc. 253) at 10-11. Moreover, Plaintiffs assert, and GTCR does not dispute, that it is inappropriate to resolve issues of credibility, motive, and intent on motions for summary judgment. Id. at 6-7.

Under Arizona law, a joint venture, which "arises out of express or implied contract, is founded upon mutual understanding

and agreement between the adventurers...and arises only where they intend to associate themselves as such." Helfenbein v. Barae Investment Co., 19 Ariz. App. 436, 439 (1973). Generally, it is inappropriate to resolve issues of credibility, motive, and intent on motions for summary judgment. See Box v. A & P Tea Co., 772 F.2d 1372, 1378 (7th Cir. 1985); Hardin v. Pitney-Bowes, Inc., 451 U.S. 1008 (1981) (dissenting opinion of Justice Rehnquist); State v. Ashton Co., 4 Ariz. App. 599, 602 (1967). Thus, the Court concludes that the parties' intent remains a genuine issue of material fact.

**2. Equal Right of Control**

Under Arizona law, parties to a joint venture must have an equal right of control over the venture. See Estate of Hernandez, 187 Ariz. at 509. Here, GTCR argues that no such right existed between the parties, thus indicating that there was no Kirk-GTCR Joint Venture. Motion (doc. 239) at 19.

On December 4, 2002, GTCR moved to dismiss Plaintiffs' joint venture claims on this same basis. Mot. to Dismiss (doc. 16). At that time, GTCR argued that under the Senior Management Agreement ("SMA") each of the individual Plaintiffs was an at-will employee of LeapSource, and, therefore, was subject to termination at any time, even without cause. Id. at 9. They asserted that such a relationship is inconsistent with a joint venture. Id., citing North Am. Van Lines v. Emmons, 50 S.W.3d 103, 117 (Tex. App. 2001); Glynn v. Roy Al Boat Mgmt. Corp., 57 F.3d 1495, 1499 (9th Cir. 1995). For example, even though Kirk was the company's CEO, she reported to LeapSource's board of directors (a majority of which were appointed by the GTCR entities), she could be terminated

without cause, and the board could override her management decisions. Mot. to Dismiss (doc. 16) at 9. As a result, since the Plaintiffs could be fired without cause, and even the CEO's decisions could be overridden by the board, GTCR contended that there was no equal right of control over the purported joint venture. Id. at 9.

In their response, Plaintiffs asserted that GTCR's argument confused the terms of the Kirk-GTCR Joint Venture with the LeapSource agreements. Mot. to Dismiss Response (doc. 48) at 15. In other words, Plaintiffs disputed that the SMA, a LeapSource governing document (which creates an employment at-will relationship for Plaintiffs), governs the separate joint venture. Id.

Plaintiffs argued that the joint venture was formed before LeapSource and that the execution of the LeapSource documents came later. Order (doc. 72) at 21. In other words, Plaintiffs argued that the at-will relationship created under the SMA only governed the relationship of the parties as far as the LeapSource entity was concerned, but that no at-will relationship existed under the joint venture agreement. Id. The Court, in its order, noted that this description of the parties' relationship created an odd situation. Order (doc. 72) at 21-22.

> This rather odd situation presents the hypothetical question of what would occur if a Plaintiff were fired by the LeapSource board–would they continue as co-adventurers in the joint venture?
>
> It appears that LeapSource was intended to be the vehicle through which the joint venture was to be carried out. FAC ¶ 171 ("LeapSource was formed as an instrumentality of the Kirk-GTCR Joint Venture, to provide [BPO services] to clients"); ¶ 175

> (LeapSource agreements entered in order to implement GTCR’s funding commitment and to launch the operations of the company under Kirk); see also ¶ 467-69. As a result, the court is unclear how the employees could have equal management responsibilities under the joint venture agreement, but not under the LeapSource agreements--especially when LeapSource was formed as the instrumentality for carrying out the joint venture agreement.

Id. However, the Court, finding that it could not sufficiently evaluate the issue at that time, denied the dismissal of Plaintiffs' joint venture-related claims on this basis. Id. at 23.

In its current motion, GTCR argues that the evidence regarding the alleged Kirk-GTCR Joint Venture is now in and shows that the parties did not hold the requisite equal right of control. Motion (doc. 239) at 20. First, GTCR cites Kirk's deposition testimony, noting that she points to GTCR as the controller of the joint venture. Id. In addition, GTCR notes that Plaintiff Gupta, Hartmann, and McCollum all testified that they had no control over the alleged joint venture. Id. at 21.

Second, GTCR asserts that the SOU, that Kirk contends embodied some of the terms of the joint venture agreement, relates solely to the corporation created from the alleged joint venture. Id. Moreover, GTCR notes that the SOU "did not provide plaintiffs with an equal right of control." Id.

> All corporate "financial and operating objectives" were to be decided by the corporation's Board of Directors, and "GTCR will have the right to control the Board."

Motion (doc. 239) at 21, citing Exbt. 4 (doc. 240) at 1-2.

In contrast, Plaintiffs assert that they have satisfied this element required to establish the existence of a joint venture.

Resp. (doc. 253) at 16-19.  They argue that the law does not
require that the parties actually exercise equal control over the
affairs of the joint venture.  Id. at 17.  "[T]hey are free by
their agreement to allow each of the parties to play a different
role in the business venture, with more or less or no control over
the operations of the venture."  Id.  In support of their argument,
Plaintiffs cite Ellingson v. Sloan, 22 Ariz. App. 383 (1974).

    In Ellingson, the court considered whether a joint venture
existed between three parties involved in a real estate development
project.  Id. at 385.  One of the three parties, Ellingson, refused
to execute a promissory note to another party, Sloan, arguing that
no enforceable contract existed between them.  Id. at 386.
Specifically, Ellingson contended that the arrangement between the
parties could not be characterized as a joint venture, because it
did not provide for Sloan's participation in any losses nor for
mutual control of the enterprise.  Id.  The court did not agree.
Id.

    On the issue of equal control, the court found that Sloan did
have an equal right of control over the affairs of the parties.
Ellingson, 22 Ariz. App. at 387.  Listed among the acts that Sloan
conducted in relation to the real estate venture, the court noted
that Sloan had: (1) changed architects; (2) engaged a new building
contractor;  (3) established that the site was suitable for a
library; (4) obtained on and off ramps to the freeway; (5)
negotiated with the City of Tempe concerning the construction of
cluster type apartments; (6) worked as manager of the joint
venture; (7) met weekly with the First National Bank over a period
of eighteen months to report on the joint venture's activities and

prevent foreclosure of the delinquent mortgage; and (8) eventually found the ultimate purchaser of the property. Id. at 385-86. "Indeed, he was the most active participant in managing both the direction and course of the joint venture." Id.

> The requisite of equality in joint control does not render impossible the delegation of the duties of management to one of the participants in a joint venture. The rights of the parties with respect to the management and control of the enterprise may be fixed by agreement so as to effectively place control in the hands of one of the joint venturers, and, once having been fixed, may be changed by agreement.

Id. at 387, n. 1.

Thus, Plaintiffs assert that GTCR's citation of sections of some of the individual Plaintiffs' deposition testimony does not establish that Plaintiffs had no control or right of control over the joint venture under the standard defined in Ellingson. Resp. (doc. 253) at 17. "[T]he fact that (as GTCR points out in its Motion) GTCR had the right to control the board of LeapSource..., and the fact that GTCR in fact had substantial control over the fate of the venture because of its control of the purse strings, do not preclude the finding that a joint venture existed." Id. Furthermore, Plaintiffs seem to assert that individual Plaintiffs Kirk and Hartmann exhibited the necessary equal control, because they were given the duties of assembling a management team to implement the business plan, and help build a leading practice BPO company, respectively. Id. at 18.

In addition, Plaintiffs assert that the SOU did not embody all of the terms of the joint venture. Id. at 18. According to Plaintiffs, the SOU was merely the only document that Kirk could recall at her deposition as an example of one of the written

documents that contained some of the alleged joint venture terms. Id. at 19. They note that her interrogatory responses, made under oath six months earlier, provided additional detail of the joint venture terms. Id.

In determining whether the parties held an equal right of control, "[t]he test is whether there is a right of mutual control over the subject matter of the venture, that is, the means by which the parties intend to obtain their objective." Ellingson, 22 Ariz. App. at 386-87. "Either expressly or impliedly, the agreement must indicate that 'each of the parties to such a joint adventure has authority to act for all in respect to the control of the means or agencies employed to execute such a common purpose.'" Estate of Hernandez, 187 Ariz. at 509, citing West v. Soto, 85 Ariz. 255, 262 (1959). Each party to the joint venture must have an "equal right to direct and govern the movements and conduct of each other with respect thereto. Each must have some voice and right to be heard in its control or management." Estate of Hernandez, 187 Ariz. at 509, citing Maloy v. Taylor, 86 Ariz. 356, 359 (1959).

In the case at bar, Plaintiffs assert that there were two independent business activities that occurred between the parties; the Kirk-GTCR Joint Venture and LeapSource. Plaintiffs argue that the Kirk-GTCR Joint Venture was created between all the parties on August 30, 1999 and continued on after LeapSource was incorporated on September 16, 1999. However, upon review of the parties' arguments and evidence, the Court does not agree.

Plaintiffs have not sufficiently shown that each of them held an equal right of control over the alleged joint venture. Although Plaintiffs are correct in their assertion that Ellingson allows

joint venturers to delegate the duties of management to one
participant, such facts are not clearly on par with those in this
case.   Plaintiffs, in response to GTCR's motion for summary
judgment, assert that the fact that GTCR had the right to control
the board of LeapSource, and had substantial control of the purse
strings, do not preclude the finding that a joint venture existed.
This conclusory statement is not enough to establish the existence
of an equal right of control, and survive summary judgment.   A
party opposing a motion for summary judgment cannot rest upon mere
allegations or denials in the pleadings or papers, but instead must
set forth specific facts demonstrating a genuine issue for trial.
See Anderson, 477 U.S. at 250.

     Plaintiffs attempt to show such evidence by noting that
individual Plaintiffs Kirk and Hartmann exhibited equal control
when they were given the duties of "assembling a management team"
and "helping build a leading BPO company," respectively.   Such
evidence may call into question whether Kirk held an equal right of
control over the alleged venture, as "assembling a management team"
is a precise, tangible service she could provide. Without a
management team, it is arguable that the alleged joint venture
would not continue.   In addition, Kirk clearly acted at the
forefront of all negotiations with GTCR.   For example, the record
indicates that she was the main individual Plaintiff that
participated in negotiations with GTCR. DSOF (doc. 240) at ¶¶ 1, 2,
4, 5, 7, 9; PSOF (doc. 271) at ¶¶ 1, 2, 4, 5, 7, 9.   Moreover, Kirk
indicated her influence upon the joint venture when, in early
September 1999, she threatened to withdraw from the negotiations
with GTCR if their commitment to fund the future BPO was not

clarified. FAC (doc. 121) at ¶ 155. Providing such services that would likely determine the future of the alleged joint venture seems to fall within the context of Ellingson and its idea of "mutual control." 22 Ariz. App. at 386-87.

On the other hand, Hartmann's claimed duty of "helping build a leading BPO company" is not as tangible and does not establish that Hartmann had a right of "mutual control" or "management" over the subject matter of the venture. Moreover, Plaintiffs do not point to any evidence in the record that indicates that Hartmann provided this service to any entity other than LeapSource. Plaintiffs provide no evidence that any of the other individual Plaintiffs provided any service or management to the alleged joint venture that would equate to an equal right of control.

Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In determining whether to grant summary judgment, the Court will view the facts and inferences from these facts in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Here, the Court finds that Plaintiffs have failed to make a showing sufficient to establish that the individual Plaintiffs, except possibly Kirk, held an equal right of control in the alleged Kirk-GTCR Joint Venture. Accordingly, the Court concludes that only Kirk's equal right of control in the alleged Kirk-GTCR Joint Venture remains a genuine issue of material fact.

. . .

**3. Participation in Profits and Losses**

GTCR further argues that the sharing of profits or losses was never contemplated nor did it occur within the alleged joint venture. Motion (doc. 239) at 22. Again, GTCR cites statements made by the individual Plaintiffs indicating that the alleged joint venture had no profits or losses of which they could share, nor did they consider themselves as sharing in any such profits or losses. Id., citing Exbt. 19 (doc. 240) at 122; Exbt. 21 (doc. 240) at 96; Exbt. 23 (doc. 240) at 298; Exbt. 24 (doc. 240) at 124.

Again, Plaintiffs respond to this argument by asserting that GTCR has misinterpreted this element of a joint venture. Resp. (doc. 253) at 19. Plaintiffs contend that under both the current and prior versions of the Uniform Partnership Act, the division of profits and losses does not require equal sharing of monetary profits and losses. Id. Instead, Plaintiffs assert that the contribution of services by one or more of the parties is sufficient to satisfy the requirement of "participation" in profits and losses of the venture. Id.

> The term 'losses' is not limited to monetary losses, but includes time expenditures and out-of-pocket expenses, especially where one party in a joint venture furnishes property and the other only services.

Id., citing Ellingson, 22 Ariz. App. at 386. In Ellingson, the court concluded that "[b]y agreeing to an exchange of services for a share of the profits to be derived from the joint venture, the parties provided for Sloan's participation in any losses." 22 Ariz. App. at 386.

Here, Plaintiffs compare the facts in Ellingson with those in the case at bar. "[T]he plaintiffs who resigned from Arthur

Andersen to join GTCR in building an industry-leading BPO generally provided services to the joint venture, although some of them also paid expenses of creating the new business venture, while GTCR committed to provide the money required[.]" Resp. (doc. 253) at 20.

As previously stated, Kirk provided services to the alleged Kirk-GTCR Joint Venture. Specifically, Kirk agreed to assemble a management team and acted as the main negotiator with GTCR regarding the future BPO. The Court believes that such an agreement may fall within the context of the rule defined in Ellingson. Thus, the Court concludes that Plaintiffs have established that Kirk's participation in the profits and losses of the alleged Kirk-GTCR Joint Venture remains a genuine issue of material fact.

**4. Effect of the Creation of LeapSource on the Alleged Joint Venture**

Next, GTCR argues that the joint venture ended when LeapSource was incorporated and the alleged joint venture did nothing after such date of incorporation. Motion (doc. 239) at 22. First, GTCR argues that under Arizona law, "a joint venture agreement terminates when 'the purposes of the agreement have been accomplished.'" Id., citing Marmis v. Solot Co., 117 Ariz. 499, 503-04 (1978). They also cite an opinion issued by the Pennsylvania Supreme Court holding that "where the 'sole business' of the parties was carried on by the corporation, and where '[n]o such business was previously carried on by...the stockholders acting as individuals or as partners,' the employee could not sustain his claims that the parties were concurrently operating as partners.'" Id. at 23, citing Schuster v. Largman, 162 A. 305,

305-06 (Pa. 1932). Thus, GTCR contends that once LeapSource was formed and the written agreements dated September 27, 1999 were executed, any joint venture based on the terms of the SOU would have terminated. Motion (doc. 239) at 22.

Second, GTCR cites two cases, both of which are based on New York law, which hold that incorporation of a business is fundamentally inconsistent with continuing to do business as a joint venture. Motion (doc. 239) at 23, citing WMW Mach. v. Werkzeugmaschinenhandel GmbH IM Aufbau, 960 F.Supp. 734, 746 (S.D.N.Y. 1997) (fiduciary obligations of co-adventurers cease when they agree to conduct business as a corporation); Sanders v. Boelke, 172 A.D.2d 1014, 1015 (N.Y. 1991).

GTCR asserted this same argument in its motion to dismiss. Mot. to Dismiss (doc. 16). At that time, the Court concluded that dismissal on this basis was inappropriate. Order (doc. 72) at 23-24.

> Despite the clear law in New York, cases in California, Florida, Illinois, Maryland, Massachusetts, Michigan, Montana, North Carolina, and Wisconsin hold the opposite. 8 FLETCHER CYCLOPEDIA CORPORATIONS §3997.10, n. 1 (2001 Rev.) at 302. Since Arizona has not squarely addressed this issue, in light of the overwhelming weight of authority which allows a pre-incorporation joint venture to survive incorporation, this court predicts that Arizona will follow this trend. However, the court notes that while these states hold that a joint venture *can* survive incorporation, this does not mean that the venture necessarily *does* survive. In MacDonald v. MacDonald, 192 N.W.2d 903 (Wis. 1972), for example, the court held that survival of the venture was a question of the parties' intent.
>
> Since it is impossible at this stage to determine whether the parties intended the joint venture to continue after the incorporation of LeapSource, the survival issue cannot be determined at this time. The court has noted that survival would present some rather odd results if

> the terms of the joint venture and the LeapSource governing documents were inconsistent; however, that is not an issue appropriate for resolution at this time. The parties may argue the effects of the joint venture agreement on the LeapSource governing documents (and vice versa) at a later time if it can be shown that the venture was intended to survive incorporation.

Id.

As they did in their response to GTCR's prior motion to dismiss, Plaintiffs argue that a joint venture and a corporation can co-exist. Resp. (doc. 253) at 20-23. In addition to the case law they cited in their previous briefs, Plaintiffs also cite Holmes v. Lerner, 74 Cal. App. 4th 442, 445 (1999), to support their argument. "[I]nterpreting the Uniform Partnership Act,... [the court found] the existence of a joint venture where the parties' very first discussions about the business venture contemplated the formation of a corporation[.]" Resp. (doc. 253) at 22, citing Holmes, 74 Cal. App. 4th at 453-57.

As stated above, the Court, in its prior order, concluded that, although Arizona has not yet squarely addressed this issue, it will likely follow the overwhelming weight of authority which allows a pre-incorporation joint venture to survive incorporation. Order (doc. 72) at 23. However, the Court noted that although a joint venture can survive incorporation, that does not mean that it necessarily does survive. Id. Survival depends on the parties' intent. Id. at 24. Plaintiffs now assert that questions of intent are inappropriate for summary judgement, thus, GTCR's motion on this issue should be denied. Resp. (doc. 253) at 23.

Although the Court, in its prior order, stated that the continuation of any joint venture after incorporation of LeapSource

is dependent upon the parties' intentions, the issue of intent need not be reached on this motion. Truly, it is unclear to the Court whether Plaintiffs assert that the Kirk-GTCR Joint Venture survived after the incorporation of LeapSource as a separate entity. Beyond asserting that such a situation *could* occur, Plaintiffs provide the Court with nothing to indicate that such a situation *did* occur here. Other than their claim that GTCR promised to "be [Kirk's] 'partner for life,'" Plaintiffs produce no arguments or evidence indicating that any of the elements of a joint venture existed after the parties effectuated the LeapSource agreements. Resp. (doc. 253) at 12. Moreover, the alleged terms of the Kirk-GTCR Joint Venture that Kirk listed in her interrogatory responses refer only to "the" new venture, not multiple new ventures. PSOF (doc. 271) at Exbt. 2. Thus, without further evidence indicating that the parties contemplated the creation of multiple businesses, it is logical to conclude that "the new venture" was LeapSource. Plaintiffs have submitted no arguments or evidence showing that the elements of a separate joint venture were manifested and satisfied in another capacity. Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Thus, the Court finds that no genuine issue of material fact remains in regard to this issue.

**5. Parole Evidence Rule**

GTCR argues that Plaintiffs' Counts 11, 12, 14 and 15 fail for the additional reason that the alleged Kirk-GTCR Joint Venture

contradicts the terms of the parties' integrated written agreements and thus violates the Parol Evidence Rule. Motion (doc. 239) at 24. In support of their argument, GTCR cites case law from Illinois that explains the Four Corners rule for written contracts. Id. GTCR argues that these cases establish that if the terms of a contract are clear and unambiguous, the court may not refer to any other evidence or allegations outside the contract itself. Id. Moreover, GTCR contends that "Illinois law is clear that 'where parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." Id. at 24, citing Air Safety, Inc. v. Teachers Realty Corp., 706 N.E.2d 882, 885 (Ill. 1999).

In this case, on September 27, 1999, Kirk, GTCR and the corporation they created, Kirkco, entered into a series of agreements, which included integration clauses. Id. at 25. GTCR cites language from the Kirk SMA, asserting that full integration of these agreements was intended to include all aspects of their relationship. Id. at 26.

> Complete Agreement. This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

Id., citing Exbt. 6 (doc. 240) at 17. GTCR argues that the parties' written agreements dated September 27, 1999, explicitly supercede and preempt the September 14, 1999 SOU that contains some of the joint venture terms. Motion (doc. 239) at 26. Thus, they

assert that Plaintiffs' attempt to establish a separate joint venture is foreclosed under the Parol Evidence Rule. Id. at 27.

In contrast, Plaintiffs first argue that only one of the documents executed on September 27, 1999 was signed by all the parties, and the integration clause in that agreement was self-limiting. Resp. (doc. 253) at 24. Plaintiffs assert that only the Stockholders Agreement was signed by all of the individual Plaintiffs and GTCR. Id. Furthermore, Plaintiffs contend that the integration clause within the Stockholders Agreement was self-limiting, making itself only relevant to the subject of "buying LeapSource stock" and nothing else. Id.

> Entire Agreement. Except as otherwise expressly set forth herein, this document embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supercedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter in any way.

PSOF (doc. 271) at Exbt. 15. Thus, Plaintiffs argue that any other representations made by the parties were not integrated into this written agreement. Resp. (doc. 253) at 25.

Second, with respect to the integration clause that GTCR cites in its motion and the clauses contained in the SMAs and Employment Agreements, Plaintiffs argue that such clauses also do not indicate an integration of all of the parties' representations. Id. Plaintiffs initially note that the parties to the Employment Agreements were the individual Plaintiffs and Kirkco or Leap, Inc., not GTCR. Id. In addition, Plaintiffs assert that the integration clauses within these documents were also self-limiting, containing their relevance to only "the terms of [the parties'] employment by

LeapSource." Id. at 26.

Plaintiffs argue that, at most, "GTCR can only attempt to extend the reach of these integration clauses by arguing that they are ambiguous." Id. Arguing that the law of Illinois clearly holds that any ambiguities present in a written contract must be construed against the preparer of the document, Plaintiffs contend that the integration clauses here must be construed against GTCR. Id. However, Plaintiffs assert that if the Court finds the language of the contract to be susceptible to more than one meaning, an ambiguity is present and interpretation of such language is a question of fact. Id. at 27. Moreover, Plaintiffs contend that parole evidence should be admitted to determine the intent of the parties with regard to the subject of the ambiguity. Id.

In reply, GTCR asserts that each of these arguments is incorrect. First, GTCR contends that common rules of construction demonstrate that the phrase "among the parties" could not refer to Kirk and LeapSource alone, because "among" generally refers to more than two persons. Reply (doc. 265) at 9. Second, GTCR asserts that the phrase "subject matter hereof" in the Kirk SMA is clear and unambiguous in its reference to the subject matter of the "complete agreement." Id. The "complete agreement" includes those matters addressed in the Purchase Agreement, Stockholders Agreement, Registration Agreement and Professional Services Agreement. Id. GTCR argues that if the parties intended to limit the meaning of the integration clause in the Kirk SMA to only include the subject matter of the Kirk SMA, they could have expressly done so. Id. at 10. GTCR contends that the integration

clause contained in the Professional Services Agreement indicates that the parties "knew full well how to write an integration clause with the narrow effect that plaintiffs now assert." Id.

> Entire Agreement; Modification. This Agreement (a) contains the complete and entire understanding and agreement of GTCR and the Company with respect to the subject matter hereof; and (b) supersedes all prior and contemporaneous understandings, conditions and agreements, oral or written, express or implied, respecting the engagement of GTCR in connection with the subject matter hereof.

DSOF (doc. 240) at Exbt. 9.

The integration clauses contained in the Kirk SMA and the other agreements executed on September 27, 1999, extinguished any existing Kirk-GTCR Joint Venture. At the outset, despite Plaintiffs' assertions, it is clear that GTCR was intended as a party to such agreements. In a section of the Kirk SMA entitled "General Provisions," the contract states that "[e]ach of the parties to this Agreement (including the investors) will be entitled to enforce its rights under this Agreement." Exbt. 6 (doc. 240) at §11(h). Neither party disputes that "the investors" were GTCR. More specifically, GTCR signed the documents, above which, in the Kirk SMA, is written "Agreed and Accepted." DSOF (doc. 240) at Exbts. 6-10.

Under Illinois law, the "four corners" rule for written contracts establishes that if the terms of a contract are clear and unambiguous, the court may not refer to any other evidence or allegations outside the contract itself. See Bourke v. Dun & Bradstreet Corp., 159 F.3d 1032, 1036 (7th Cir. 1998); Manor Healthcare Corp. v. Soiltest, Inc., 549 N.E.2d 719, 724 (Ill. App. 1989); AZL Resources, Inc. v. Bromagen, 398 N.E.2d 292 (Ill. App.

1979). In such cases, extrinsic evidence will not be considered. Berutti v. Dierks Foods, Inc., 496 N.E.2d 350, 352 (Ill. App. 1986).

In the instant case, the Court does not find the contract language in the contested agreements to be ambiguous. The parties agreed in the integration clauses included in the Kirk SMA, the Stockholders Agreement, and the Professional Services Agreement that the signed contracts embodied the "complete agreement" and that they "supersede[d] and preempt[ed] any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way." DSOF (doc. 240) at Exbts. 6, 7, 9. The parties do not dispute that, in the eyes of the law, the five agreements executed on September 27, 1999, are seen as one contract. See Labor World, Inc. v. Just Parts, Inc., 735 N.E.2d 149, 152 (Ill. App. Ct. 2000) ("The general rule is that in the absence of evidence of a contrary intention, where two or more instruments are executed by the same contracting parties in the course of the same transaction, the instruments will be considered together and construed with reference to one another because they are, in the eyes of the law, one contract."). Consequently, the integration clauses apply to the entire agreement. Therefore, the Court may not review any other evidence or allegations, outside the contracts, concerning an alleged separate agreement, and Plaintiffs' Counts 11, 12, 14 and 15 fail as a matter of law.

**B. Counts 11, 12, 14, 15 and 22**

Count 11 of Plaintiffs' FAC alleges a breach of fiduciary duty claim against GTCR. See FAC (doc. 121) at 87. Count 12 alleges

aiding and abetting breaches of fiduciary duty claims against the
GTCR entities, Nolan, Rauner, Makings, Yih, Donnini, Canfield,
Eaton, AEG Partners and K&E.  Id. at 89.  Count 14 contains a claim
for tortious interference with prospective economic advantage
against the GTCR entities, Nolan, Rauner, Makings, Yih, Eaton, AEG
Partners, and K&E.  Id. an 90.  Count 15 alleges a breach of the
joint venture agreement against GTCR.  Id. at 92.  Finally, in
Count 22, individual Plaintiffs claim that GTCR breached the
Purchase Agreement and duty of good faith and fair dealing arising
from the Purchase Agreement.  Id. at 102.  On this claim,
Plaintiffs assert that, through the joint venture, they were made
third party beneficiaries to the Purchase Agreement.  FAC (doc.
121) at ¶ 476.  Thus, Count 22 exclusively relies on the existence
of a joint venture between the parties.

In its motion for summary judgment, GTCR argues that each of
these claims arise out of the alleged joint venture and, thus, must
fail as no joint venture existed.  Motion (doc. 239).  The Court
has determined that Plaintiffs failed to sufficiently establish
that each of the individual Plaintiffs, except possibly Kirk, had
an equal right of control over the alleged joint venture.  In
addition, the Court concluded that Plaintiffs have failed to
produce any evidence that indicates that any joint venture
continued after the incorporation of LeapSource.  Finally, due to
the parole evidence rule, the Court concluded that the integration
clauses contained within the Kirk SMA and other LeapSource
documents extinguished any previously existing Kirk-GTCR Joint
Venture agreement.  Accordingly, the Court shall grant summary
judgment in favor of GTCR on Counts 11, 12, 14, 15 and 22.

**C. Promissory Estoppel: Count 16**

Count 16 alleges a promissory estoppel claim against GTCR. FAC (doc. 121) at 94. The FAC claims that GTCR, Nolan and Rauner made certain promises to individual Plaintiffs Kirk, Hartmann and McCollum between July and September 1999, which these parties relied upon to their detriment. Id. at ¶¶ 431-440.

In order to establish a claim for promissory estoppel, Plaintiffs must show that GTCR made a promise and should have reasonably foreseen that Plaintiffs would rely on that promise, and that Plaintiffs actually relied to their detriment. See Higginbottom v. State, 203 Ariz. 139, 144 (App. 2002). A plaintiff must additionally show that he or she had a "justifiable right to rely" on the promise. Id. However, as the Supreme Court of Arizona has clarified, "[t]here can be no implied contract where there is an express contract between the parties in reference to the same subject matter." Chanay v. Chittenden, 115 Ariz. 32, 35 (1977); see also Sutter Home Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d 401, 408-09 (9th Cir. 1992).

GTCR first challenged the viability of this claim in its motion to dismiss. Mot. to Dismiss (doc. 16). In its Order of September 30, 2003, the Court declined to dismiss this claim until discovery illuminated the status of the alleged joint venture. Order (doc. 72) at 29. GTCR now offers the same challenges again, asserting that discovery on the matter is closed and the evidence indicates that the promissory estoppel claim must fail. Motion (doc. 239) at 27.

First, GTCR argues that Plaintiffs' promissory estoppel claim fails because the same subject matter is addressed by an express

contract between the parties. GTCR defines the express contracts as "the fully integrated agreements executed on September 27, 1999, plus the various employment agreements executed thereafter." Motion (doc. 239) at 28. In their motion, GTCR notes that "every promise underlying the promissory estoppel claim is addressed in one or more of the parties' subsequent written agreements." Id. (listing "Funding," "Management," and "Employment" as the three topics involved in Plaintiffs' promissory estoppel claim and citing sections of the parties' written contracts that address such agreements).

Second, GTCR asserts that the Parole Evidence Rule and the integration clause bar Plaintiffs' promissory estoppel claim. Id. at 29. Again, GTCR argues that due to the integration clauses included in the September 27, 1999 agreements, the agreements were fully integrated and expressly provided that they superseded all prior promises or representations "which may have related to the subject matter hereof in any way." Motion (doc. 239) at 29, citing DSOF (doc. 240) at Exbt. 6. GTCR asserts that "[t]he alleged promises (which pertain to funding, management and employment) all 'relate' to the subject matter of the parties' written agreements," and, consequently, foreclose Plaintiffs from making claims based on such alleged promises. Id.

Third, GTCR contends that Plaintiffs could not have justifiably relied on any of the aforementioned promises since they later entered into various written agreements which directly contradicted such promises. Motion (doc. 239) at 29-30. For example, GTCR argues that any unqualified oral promise to fund the company was directly contradicted by the LeapSource Purchase

Agreement. Id. Any promise as to the manner in which GTCR would be involved in the company's management is contradicted by the Kirk SMA and the Stockholders Agreement. Id. In addition, GTCR contends that any promises as to Andersen-related compensation and severance payments were expressly contradicted in Plaintiffs' SMAs. Id. Finally, GTCR asserts that the claimed promises regarding funding, management and employment are also inconsistent with the SOU of September 14, 1999. Id. at 30. As a result, having entered into these agreements, GTCR contends that Plaintiffs could not justifiably rely on the oral promises.

Fourth, GTCR asserts that Plaintiffs' claim must fail because the alleged promises involved in Plaintiffs' promissory estoppel claim were merely negotiations. "[T]he promissory estoppel doctrine is inapplicable where the alleged promises were bargained for during negotiation of a written agreement and the acts taken in reliance on those promises were part of the consideration supporting the written agreement." Motion (doc. 239) at 30. In support of this argument, GTCR cites Walker v. KFC Corp., 728 F.2d 1215 (9th Cir. 1984), claiming that it is on all fours with the case at bar.

In Walker, the plaintiff was a KFC franchisee who claimed to have leased space and otherwise prepared to operate franchised restaurants in reliance on promises made prior to the parties entering into their written franchise agreement. 728 F.2d at 1219. The court found that the parties obligations were established in their negotiated written contracts and not the "promises made outside the written agreements." Id. at 1220.

> In sum, either [the franchisor] was in breach of

> the contract or it was not. ...Promissory estoppel is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove a breach of contract.

Id.

Here, GTCR argues that Plaintiffs' promissory estoppel claim relies on alleged promises similar to those discussed in Walker. Although the Ninth Circuit applied California promissory estoppel principles in Walker, GTCR contends that such principles are the same under Arizona law and should be analyzed in the same manner. Motion (doc. 239) at 31. Thus, GTCR asserts that Plaintiffs' alleged reliance on such promises was simply "the deal" and that they cannot now use promissory estoppel to take a "second bite at the apple" when their breach of contract claim fails. Id. at 31-32, citing Walker, 728 F.2d at 1220.

Plaintiffs respond directly with three arguments. First, they contend that the LeapSource agreements were entered into by Plaintiffs after they agreed to form the joint venture and after they left their existing positions at Andersen. Resp. (doc. 253) at 28. As a result, they claim that the later inconsistent agreements were entered after the parties had already relied to their detriment. Id. "Whether it was reasonable for the plaintiffs to rely on the promises and representations made by GTCR in agreeing to leave Andersen must be determined as of the time that the plaintiffs acted in reliance on those promises and representations." Id.

Second, Plaintiffs assert that, overall, the written agreements signed by the parties do not contradict the promises upon which Plaintiffs base their promissory estoppel claim. Id. at

28-29. Plaintiffs argue that there is no "fully integrated agreement" that purports to extinguish all previous understandings between the parties. Id. Regarding the promise that GTCR would take a "hands-off" approach with respect to the management of the company, Plaintiffs assert that this understanding was not contradicted by the Stockholders Agreement, which granted GTCR the majority of seats on the LeapSource Board of Directors. Resp. (doc. 253) at 29. "[T]hat provision does not protect GTCR from liability for interference with management of the company as alleged in the Fourth Amended Complaint[.]" Id. Moreover, in regard to the alleged promises to make plaintiffs whole with respect to anticipated Andersen-related compensation and severance payments, Plaintiffs assert that such promises are not inconsistent with the promises made in the SMAs. Id.

Third, Plaintiffs argue that Walker is not at all instructive in this case. Id. at 29-30. As previously stated, the court in Walker applied California law. In addition, Plaintiffs assert that the Walker court also applied a particular provision of California law that limits the promissory estoppel doctrine "to cases where no benefit flows to the promisor." Id. at 29, citing Walker, 728 F.2d at 1220. Citing a case from the District of Delaware, Plaintiffs argue that Walker has been distinguished as recently as this year precisely for the reason that it was no guide to the applicability of promissory estoppel under Arizona law. Id., citing J-Squared Technologies, Inc. v. Motorola, Inc., 364 F. Supp.2d 449, 453 (D. Del. 2005).

> ...*Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir.1984), cited by defendant in support of its argument, applies California contract law to a

> claim of promissory estoppel; therefore, it is hardly instructive on Arizona contract law.

J-Squared Technologies, Inc., 364 F. Supp.2d at 453. In its reply, GTCR challenges this argument on the fact that the J-Squared Technologies, Inc. decision is a Rule 12(b)(6) dismissal case. Reply (doc. 265) at 22.

In their Fourth Amended Complaint, Plaintiffs claim that GTCR made the following promises to them:

> 432. GTCR, Nolan, and Rauner promised that GTCR would fully fund the new outsourcing company during its startup period with $65 million.
>
> 433. GTCR, Nolan, and Rauner promised that GTCR would fund the new outsourcing company during the startup period when the Company was expected to incur cash losses between $10 million to $20 million and operate with negative EBITDA.
>
> 434. GTCR, Nolan, and Rauner promised that GTCR would fund the new outsourcing company and allow it to generate a profit or positive EBITDA.
>
> 435. GTCR, Nolan, and Rauner promised that GTCR would take a "hands-off" role in management by permitting Kirk, as CEO, to operate the Company.
>
> 436. GTCR, Nolan, and Rauner promised that GTCR would make each of them whole on any bonus or capital distribution withheld by Andersen or cash payments due to the spin-off of Andersen Consulting.
>
> 437. GTCR, Nolan, and Rauner promised that GTCR would pay each of them one-year's severance if terminated without cause.

FAC (doc. 121) at 94. Plaintiffs assert that they detrimentally relied on these promises when they "[withdrew] from positions as partners, senior managers, and managers from Andersen,...[founded] and [joined] LeapSource as officers, directors, or employees, and [purchased] common stock in the Company." Id. at ¶ 439. However, the Court finds that Plaintiffs cannot show that their reliance on

the alleged oral promises was justifiable since the contracts they effectuated on September 27, 1999, and the employment agreements executed thereafter, included integration clauses and contemplated the same subject matters as those discussed in the promises. For example, the LeapSource Purchase Agreement outlines GTCR's funding responsibility to LeapSource. DSOF (doc. 240) at Exbt. 10; see also Order (doc. 72) at 5-11. In addition, the Kirk SMA and the Stockholders Agreement contemplate how LeapSource would be controlled and operated. DSOF (doc. 240) at Exbts. 6, 7. Finally, the Kirk, Hartmann and McCollum SMAs contemplate their compensation and any severance payments. Id. at Exbts. 6, 11, 12. "There can be no implied contract where there is an express contract between the parties in reference to the same subject matter." Chanay, 115 Ariz. at 35; see also Sutter Home Winery, Inc., 971 F.2d at 408-09.

Moreover, many of the alleged promises were also directly considered in the SOU. The matter of GTCR's funding responsibility, the basis of Plaintiffs' first three alleged promises, was clearly contemplated in the SOU. Exbt. 4 (doc. 240) at §II(A).

> GTCR will commit to invest up to $65.0 million of equity capital in NewCo. $15 million of the equity capital will be intended to support the company's initial capital requirements related to starting the business, and up to $50 million of capital will be used to fund Company acquisitions and contract acquisition costs, both as approved by the Board.

Id. In addition, the matters of Kirk running the company and her compensation, the bases of the Plaintiffs' fourth and fifth alleged promises, as it relates to Kirk, were clearly contemplated in the SOU. Exbt. 4 (doc. 240) at §IV(A).

> Kirk will be the Chief Executive Officer of NewCo. The CEO's initial compensation will consist of a base salary of $400,000 per year...The CEO will be eligible for an annual bonus of up to 50% of base salary, based on the attainment of financial and operating objectives to be approved by the Board...As CEO, Kirk will be responsible for all aspects of the daily operation of the business, the completion and integration of acquisitions, and the pricing and structuring of outsourcing contracts.

Id.

Finally, the parties agreed in the integration clauses included in the Kirk SMA, the Hartmann SMA, the McCollum SMA, the Stockholders Agreement, and the Professional Services Agreement that the signed contracts embodied the "complete" or the "entire" agreement and that they "supersede[d] and preempt[ed] any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way." DSOF (doc. 240) at Exbts. 6, 7, 9, 11, 12. Thus, the Court may not review any other evidence or allegations, outside the contracts, concerning any alleged promises.

The Court finds it difficult to believe that over a course of negotiation lasting over five months, and in light of Plaintiffs' own lawyers directing that the LeapSource Agreements not be prepared until after the individual Plaintiffs' withdrew from Andersen, the parties had not reached an agreement on the date of such withdrawal that eventually led to the LeapSource Agreements that included the integration clauses. Regardless, the Court concludes that Plaintiffs cannot establish that they justifiably relied on the alleged promises due to the express contracts between the parties referencing the same subject matters and the

integration clauses contained therein. Consequently, the Court shall grant summary judgment on Count 16.

**IV. K&E's Motion for Entry of Judgment on Counts 12 and 14**

On August 23, 2005, K&E filed and served a motion for summary judgment regarding Plaintiffs' joint venture-related claims and a joinder in GTCR's motion for summary judgement. K&E Joinder and Motion (doc. 242). Plaintiffs failed to file a response to K&E's motion. Thus, on October 18, 2005, K&E filed a Notice of Plaintiffs' Failure to Respond and Motion for Entry of Judgment Re Joint Venture-Related Claims. Mot. Entry of Judg. (doc. 269) at 1. Pursuant to Federal Rule of Civil Procedure 56(e) and Rule 7.2(i) of the Rules of Practice of the United States District Court for the District of Arizona (hereinafter "Local Rules"), K&E moves for entry of judgment on Counts 12 and 14 of the FAC. Id.

On August 23, 2005, K&E joined GTCR's motion for summary judgment, asserting that there is no evidence to establish that a joint venture existed between Plaintiffs and GTCR. K&E Joinder and Motion (doc. 242) at 2. In addition, in its own motion for summary judgment, K&E argued that it was separately entitled to summary judgment on the joint venture-related claims because there is no evidence that K&E knew about the existence of the purported joint venture. Id. Plaintiffs did not respond to K&E's motion.

Under Rule 56(e) of the Federal Rules of Civil Procedure, a non-moving party must respond to a properly supported motion for summary judgment by setting forth "specific facts showing that there is a genuine issue for trial." "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Id. Furthermore, Local Rule 7.2(i)

provides that, "if the opposing party does not serve and file the required answering memoranda . . . such non-compliance may be deemed a consent to the denial or granting of the motion and the Court may dispose of the motion summarily." The Ninth Circuit requires that such motions be facially meritorious. See Henry v. Gill Indus., 983 F.2d 943, 950 (9th Cir. 1993).

In light of the fact that over five months have passed since K&E filed its motion, and K&E's motion is facially meritorious, the Court shall grant K&E's motion for summary judgment.

Therefore,

IT IS ORDERED that GTCR's motion for summary judgment on the joint venture-related claims (Counts 11, 12, 14, 15, 16, and 22) (doc. 239) is GRANTED.

IT IS FURTHER ORDERED that K&E's motion for summary judgment on Counts 12 and 13 (doc. 242) is GRANTED.

IT IS FINALLY ORDERED that K&E's motion for entry of judgment (doc. 269) is GRANTED.

DATED this 28th day of March, 2006.

Robert C. Broomfield
Senior United States District Judge

Copies to counsel of record.