**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Diane Mann, as Trustee for the Estate of LeapSource, Inc., et al.<br><br>            Plaintiffs,<br><br>     vs.<br><br>GTCR Golder Rauner, L.L.C., a Delaware limited liability company., et al.,<br><br>            Defendants. | No. CIV 02-2099-PHX RCB<br><br>O R D E R |

On July 11, 2001, LeapSource Inc. filed a Chapter 7 Petition in the Bankruptcy Court, 01-9020-PHX-JMM, and Diane Mann was appointed as Trustee. Mot. (doc. 312) at 4. In 2002, the Trustee initiated this adversary proceeding against Defendants ICG Group, Inc. ("ICG Group") and Michael Makings ("Makings"). Id. Thereafter, the case was withdrawn to this Court, CIV-02-2325-PHX-RCB, and consolidated into related case, CIV-02-2099-PHX-RCB. Id. On January 20, 2006, Plaintiffs filed their Amended Complaint ("Amend. Complt."), asserting three claims against either Makings

or ICG Group. Amend. Complt. (doc. 310).[1]

On February 2, 2006, the Trustee filed a motion for summary judgment on the preferential transfer claim (Count 3). Mot. (doc. 312). This motion was fully briefed on April 20, 2006, and argued orally on July 31, 2006. Reply (doc. 374); (doc. 415). Having carefully considered the arguments presented by the parties, the court now rules.

**I. Background Facts**

ICG Group provides consulting services to large corporations to help them integrate their financial and accounting systems. PSOF (doc. 313) at ¶ 1; DSOF (doc. 351) at ¶ 1. The ICG business ("ICG") was founded in approximately 1990, and Makings was one of the two co-founders. PSOF (doc. 313) at ¶ 2; DSOF (doc. 351) at ¶ 2. ICG was owned by Image Consulting Group, Inc., which was later changed to ICG Consulting, Inc. Id. At all times prior to the year 2000, Makings was ICG Consulting, Inc.'s 50% shareholder, one of its two directors, and its president. Id.

On January 1, 2000, LeapSource Inc. ("Debtor") purchased the ICG business from ICG Consulting, Inc. for $10 million. PSOF (doc. 313) at ¶ 3; DSOF (doc. 351) at ¶ 3. Debtor paid $5 million in cash (including $2.5 million to Makings and $2.5 million to his partner) and delivered $5 million worth of promissory notes, including a $2.5 million Promissory Note to ICG Consulting, Inc. (the "Note"), which it assigned to Makings. Id.

After that purchase, Debtor hired Makings as an employee.

---

[1] In the Amended Complaint, Plaintiffs also named Marcia Makings as a defendant solely for purposes of binding Makings' marital community. Amend. Complt. (doc. 310) at 2.

-2-

PSOF (doc. 313) at ¶ 4; DSOF (doc. 351) at ¶ 4.  Makings also became a shareholder of Debtor.  Id.  Makings continued to operate the ICG business, integrated the business into a division of Debtor, and did sales and marketing for Debtor on other accounts related to ICG.  Id.  The parties dispute whether, in October 2000, Debtor made Makings its Chief Operating Officer, however, they agree that on or before February 27, 2001, Debtor made Makings its CEO and a director.  Id.

In January 2001, Makings accelerated the entire balance owed on the Note, $2.5 million plus interest, due to Debtor's default.  PSOF (doc. 313) at ¶ 5; DSOF (doc. 351) at ¶ 5.  Thereafter, in early March 2001, Makings began planning a reacquisition of ICG.  PSOF (doc. 313) at ¶ 6.  On March 16, 2001, Makings incorporated a new entity, ICG Group, and has been at all times ICG Group's sole shareholder and sole director.  Id.; DSOF (doc. 351) at ¶ 6.

On March 20, 2001, Makings formally resigned as the CEO and as a director of Debtor.  PSOF (doc. 313) at ¶ 7; DSOF (doc. 351) at ¶ 7.  On March 29, 2001, Debtor's board of directors accepted Making's resignation as a director, which was characterized as effective on March 22, 2001.  Id.  Defendants assert, however, that Makings' resignation was effective on March 20, 2001.  DSOF (doc. 351) at ¶ 7.

By Asset Purchase Agreement (the "Agreement") dated March 23, 2001, but allegedly signed on March 30, 2001, Debtor sold its ICG division (the "ICG Asset") to ICG Group.  PSOF (doc. 313) at ¶ 8; DSOF (doc. 351) at ¶ 8.  According to the Agreement, the "purchase price" for the transfer consisted of ICG Group's forgiveness of the Note that Debtor owed to Makings, which he had assigned to ICG

- 3 -

Group.  Id.  Additionally, ICG Group also agreed to assume several third party liabilities owned by LeapSource, including telephone lease payments, building lease payments, copier lease payments, various accounts payable, and past and future payroll expenses. DSOF (doc. 351) at ¶ 8.

Pursuant to the Agreement, the ICG Asset was transferred to ICG Group on March 30, 2001.  PSOF (doc. 313) at ¶ 10; DSOF (doc. 351) at ¶ 11.  The Agreement specifically states that,

> The Closing ("Closing") of the sale and purchase of the Assets and the assignment and assumption of the Assumed Liabilities as well as the consummation of the other transactions contemplated herein shall take place on March 30, 2001.

Exbt. 2 (doc. 313), Asset Purchase Agreement § 2.1.  ICG Group still owns and operates the ICG Asset under the name ICG Consulting.  PSOF (doc. 313) at ¶ 11; DSOF (doc. 351) at ¶ 12.

**II. Standard of Review**

To grant summary judgment, the Court must determine that the record before it contains "no genuine issue as to any material fact" and, thus, "that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In determining whether to grant summary judgment, the Court will view the facts and inferences from these facts in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S.

317, 322 (1986).  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.  In such a case, the moving party is entitled to a judgment as a matter of law.  Id.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A material fact is any factual dispute that might affect the outcome of the case under the governing substantive law.  Id. at 248.  A factual dispute is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the nonmoving party.  Id.

A party opposing a motion for summary judgment cannot rest upon mere allegations or denials in the pleadings or papers, but instead must set forth specific facts demonstrating a genuine issue for trial.  See id. at 250.  Finally, if the nonmoving party's evidence is merely colorable or is not significantly probative, a court may grant summary judgment.  See, e.g., California Architectural Build. Prods., Inc. v. Franciscan Ceramics, 818 F.2d 1466, 1468 (9th Cir. 1987).

**III. Discussion**

Under § 547 (b)(4)(B) of the Bankruptcy Code, a trustee may recover certain transfers made by the debtor within one year before the bankruptcy petition was filed.  A transfer by Debtor constitutes an avoidable preference if six elements are shown: (1)

- 5 -

a transfer of an interest of the debtor in property; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt; (4) made while the debtor was insolvent; (5) made to an insider between 90 days and one year before the date of the filing of the petition; and (6) that enables the creditor to receive more than such creditor would receive in a Chapter 7 liquidation of the estate.  11 U.S.C. § 547(b).  Here, the only elements in dispute are elements five and six, which involve the requirements that the creditor be an "insider" and receive more than such creditor would receive in a Chapter 7 liquidation of the estate.  Resp. (doc. 350) at 9-14.  Defendants also assert that they fall under the new value exception of 11 U.S.C. §§ 547(c)(1) and 547(c)(4), which defeats any preference claim.  Id. at 7-9

**A. Insider Status (Element Five)**

First, Defendants assert that element five of the preferential transfer claim, which requires that the Trustee show that the creditor was an "insider," is a factual issue that is not appropriate for summary judgment.  Resp. (doc. 350) at 11-14.  Specifically, Defendants contest that Makings or ICG Group were "insiders" at LeapSource.  Id. at 12-14.

At the outset, they note that, although not exclusive, the statutory definition of "insider" does not include "former directors or officers."  Id. at 12-13 - (noting that "[t]he statutory definition of 'insider,' where the debtor is a corporation such as LeapSource, includes the debtor's: directors, officers, persons in control, partnerships in which the debtors [sic] is the general partner, general partners, and their relatives"); see also 11 U.S.C. § 101(31)(B).  Defendants assert

-6-

that Congress' enumeration of these positions in the statute should be read to exclude individuals that were formerly in such positions. Id. at 13. They note that it is undisputed that the Agreement was executed after Makings had resigned and no longer had control over LeapSource. Resp. (doc. 350) at 13. Thus, Defendants assert that this alone disqualifies Makings as an "insider." Id. at 13-14, (citing In re Coors of N. Miss. Inc., 66 B.R. 845, 863-64 (Bankr. N.D. Miss. 1986)).

In any event, Defendants argue that the Trustee fails to show that Makings or ICG Group "commanded preferential treatment by the debtor" that would make them "insiders." Id. at 13. Defendants note that the new management of LeapSource, after Makings' resignation, "was under a fiduciary duty of loyalty to LeapSource which prevented them from treating ICG Group and Makings preferentially." Id. In addition, Defendants argue that Makings' long relationship with ICG does not independently qualify him as an "insider." Id. "Just because Makings had knowledge of the ICG business based on his former employment does not render him an insider." Resp. (doc. 350) at 13, citing In re Friedman, 126 B.R. 63, 69-70 (9th Cir. BAP 1991). Lastly, Defendants contend that Makings' influence on LeapSource, despite his title, was minimal, as LeapSource was controlled by GTCR at all times. Id. at 14.

In contrast, the Trustee maintains that, although Makings had resigned at the time of the execution of the Agreement, such facts do not conclusively exempt him from "insider" status. Reply (doc. 374) at 2. She argues that "[s]uch a position turns the policies of § 547(b)(4)(B) on their head, and has been rejected many times." Id. Generally, the Trustee contends that Makings should be

considered an "insider" for purposes of § 547(b)(4)(B), because he put together the transfer while he was still working for LeapSource, hence, at the time the transfer was "arranged," Makings was technically an "insider." Id. at 2-3, citing In re EECO, Inc., 138 B.R. 260 (Bankr. C.D. Cal. 1992); In re F&S Cent. Mfg. Corp., 53 B.R. 842, 849 (Bankr. N.Y. 1985). Moreover, the Trustee argues that Makings had a "sufficiently close relationship" with Debtor, making him an "insider." Id. at 3, citing In re Friedman, 126 B.R. at 69-70.

Courts have split on the exact meaning of the "at the time of such transfer" language found in Section 547(b)(4)(B). See In re EECO, 138 B.R. at 263. One line of cases, which the Trustee urges the Court to follow, holds that a "creditor who is an insider at the time of transfer of the debtor's property is arranged is an insider at the time of the transfer." Id. A second line of cases, to which Defendants encourage the Court to adhere, hold that the language of the statute clearly states that an insider relationship is to be determined on the exact date of the challenged transfer. Id. at 264.

The court in In re EECO described a situation in which it believed the statute requires "insider" status be imposed even if the creditor has resigned from the debtor company. In re EECO, 138 B.R. at 264.

> [I]f an insider put together a transfer for himself, formally resigned, and then a minute later received the monetary benefits from the deal he had made while an insider, it would be clear that the transfer would be avoidable, even without a showing of fraud or intent to delay or hinder required by 11 U.S.C. § 548. The insider's formal resignation did not change the nature of the transfer in any way. Further, to hold that one

- 8 -

        could gain non-insider status in such a manner would thwart § 547's goal of recovering assets from insiders.

Id. The court noted that Congress established the one-year reach-back provision in order to "ameliorate the insider's potential leverage in dealing with the debtor shortly before bankruptcy." Id. at n.2 (citing Hahn v. Economy Car Leasing (In re Henderson), 96 B.R. 820, 825 (Bankr. E.D. Pa. 1989)). "Because of his close relationship with the debtor, an insider typically knows more about the debtor's financial affairs than the debtor's other creditors, and is often in the position to influence or control, at least in part, the debtor's actions." Id. The court in In re EECO held that "an insider is no longer an insider when the transfer is no longer a function of or result of that entity's or person's insider status." 138 B.R. at 265. "One who...uses an insider position to put in motion a step-transaction, such as a golden parachute severance package or stock buyout agreement, cannot become a non-insider for purposes of that transaction by simply saying 'I resign.'" Id. Moreover, although some cases have found that a long term relationship between the creditor and debtor does not conclusively make the creditor an "insider," "a common basis for these rulings was the perception that, so long as the parties transact their business at arm's length, such circumstances do not necessarily give rise to insider status." In re Friedman, 126 B.R. at 70. Here, the Trustee encourages the Court to follow the logic expressed in the above mentioned cases. The Court, however, does not agree that such an analysis is appropriate.

    In the case at bar, it is undisputed that, prior to his resignation, Makings began planning a reacquisition of the ICG

-9-

 1  Asset and began negotiating with Debtor for such reacquisition.  In
 2  relation to this planning, Makings incorporated a new entity, ICG
 3  Group, for the purpose of reacquiring and operating the ICG
 4  business.  Furthermore, it is undisputed that Makings formally
 5  resigned as the CEO and as a director of Debtor on March 20, 2001.
 6  The Agreement, which was drafted by Debtor's attorneys, was entered
 7  into between three and ten days later, on either March 23, 2001
 8  (the date on the Agreement) or March 30, 2001 (the alleged date
 9  that the Agreement was signed), and the ICG Asset was transferred
10  to Makings on March 30, 2001.  Exbt. 2 (doc. 313), Asset Purchase
11  Agreement § 2.1.

12       Defendants do not assert that Makings was not involved in
13  negotiating the Agreement prior to his resignation.  They instead
14  argue that Makings received non-insider status on the date of his
15  resignation.  Defendants cite In re Coors in support of this
16  contention, however such case is distinguishable from the case at
17  bar.  66 B.R. 845.  In In re Coors, the contested transfers that
18  the debtor sought to avoid occurred around six months after the
19  creditor sold his stock in the company, extinguishing his status as
20  a shareholder, director or officer at the company.  66 B.R. at 851,
21  863-64.  The factual circumstances in the case at bar, where
22  Makings received the transfer of the ICG Asset three to ten days
23  after his resignation from LeapSource, are not completely on par
24  with those in In re Coors.  Thus, the Court finds the authority
25  cited by both parties to be fairly uninstructive on this matter.
26  Regardless, the Court notes that it is not bound by the conclusions
27  reached by the courts in such cases.
28       The Bankruptcy Code does not provide a static definition of

"insider."  Specifically, it provides that if a debtor is a corporation, the term "insider" includes directors, officers, persons in control of the debtor, partnerships in which the debtor is the general partner, general partners of the debtor, and their relatives.  11 U.S.C. § 101(31)(B); S. REP. NO. 95-989, at 25 (1978) ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.").  In any event, to avoid a transfer, Section 547(b)(4)(B) requires that the creditor be an "insider" at "the time of [the] transfer."  11 U.S.C. 547(b)(4)(B).

> The term "transfer" means–
>
>   (A) the creation of a lien;
>   (B) the retention of title as a security interest;
>   (C) the foreclosure of a debtor's equity of redemption; or
>   (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with–
>     (i) property; or
>     (ii) an interest in property.

11 U.S.C. § 101(54).  The Code further explains that a transfer is made,

>   (A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 30 days after, such time, except as provided in subsection (c)(3)(B);
>   (B) at the time such transfer is perfected, if such transfer is perfected after such 30 days; or
>   (C) immediately before the date of the filing of the petition, if such transfer is not perfected at the later of--
>     (i) the commencement of the case; or

- 11 -

>(ii) 30 days after such transfer takes effect between the transferor and the transferee.

11 U.S.C. § 547(e)(2).  Hence, the Court concludes that, to avoid the transfer of the ICG Asset under section 547, the Trustee must show that Makings was an insider "at the time [the] transfer [took] effect between [LeapSource] and [ICG Group];" thus, at the time the Agreement was effectuated on March 30, 2001.  Id.; see also Exbt. 2 (doc. 313), Asset Purchase Agreement § 2.1.  The Trustee has failed to show this.

The parties do not dispute that Makings had resigned from his position as CEO and as a director of LeapSource at the time the Agreement was effectuated.  The Trustee raises no further arguments or evidence that indicates that Makings was a person "in control of LeapSource," as defined by the statute, at the time of the transfer.  Consequently, Makings was not an "insider" at the time of the transfer.  In light of this fact, the Court finds that the analysis regarding the preferential transfer ends here.

Although there does not appear to be a disputed genuine issue of material fact on this matter, the Trustee is not entitled to judgment as a matter of law.  In light of the Court's conclusion that the Trustee has not established that Makings was an insider "at the time of [the] transfer," the Court need not analyze the remaining elements of the preferential transfer claim or the other issues raised by the parties on this matter.  The Trustee's motion for summary judgment on the preferential transfer claim (Count 3) shall be denied.

Therefore,

1  IT IS ORDERED that the Trustee's motion for summary judgment
2 on the preferential transfer claim (Count 3) (doc. 312) is DENIED.
3  DATED this 28th day of August, 2006.

_____
Robert C. Broomfield
Senior United States District Judge

10 Copies to counsel of record.