WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Diane Mann, as Trustee for      )
the Estate of LeapSource,       )
Inc., et al.                    )
                                )
              Plaintiffs,       )      No. CIV 02-2099-PHX RCB
                                )
         vs.                    )          O R D E R
                                )
GTCR Golder Rauner, L.L.C.,     )
a Delaware limited liability    )
company, et al.,                )
                                )
              Defendants.       )
_____)

On June 11, 2004, Plaintiffs filed their Fourth Amended Complaint ("FAC") (doc. 121), in which the Trustee and individual Plaintiffs assert claims against Defendant Kirkland & Ellis ("K&E") for tortious interference with contract, tortious interference with prospective economic advantage, breach of fiduciary duties, aiding and abetting breach of fiduciary duty, and professional malpractice.  FAC (doc. 121) ¶¶ 320-23, 332-37, 384-88, 403-09, 414-22, 450-53, 467-73, 481-86.  Many of Plaintiffs' claims against K&E are based at least in part on a theory of vicarious liability

for the actions of Defendant David Eaton, who at the time of the events in question maintained an "of counsel" relationship with K&E.  See id.; Defs.' Statement of Facts for Vicarious Liability ("DSOFVL") (doc. 251) ¶ 6.

Currently pending before the Court are K&E's motions for summary judgment regarding vicarious liability (doc. 250), aiding and abetting and tortious interference claims (doc. 255), and professional malpractice and negligence (doc. 328), as well as AEG Partners, LLC ("AEG") and David Eaton's motion for summary judgment (doc. 247).  All of these motions were argued orally on July 31, 2006. (doc. 415).  Having carefully considered the arguments presented by the parties, the Court now rules.

**I. Background Facts**

    **A. Creation of LeapSource**

This action was originally filed in the Superior Court of Arizona in Maricopa County, alleging numerous state law based claims arising out of the financial demise of LeapSource, Inc. ("LeapSource").  LeapSource was a Phoenix-based "business process outsourcing" ("BPO") company, formed to provide accounting and employee benefit services to mid-sized businesses.  The defendants in this action include a number of individuals and companies who were involved in various transactions related to the start-up and operation of LeapSource.  GTCR Golder Rauner, LLC, is a Chicago-based venture capital firm.  Beginning in September 1999, three partnerships (GTCR Fund VI, L.P., GTCR VI Executive Fund, L.P., GTCR Associates VI) in which GTCR was a general partner made a series of investments by purchasing stock in LeapSource.

Individual Plaintiff Christine Kirk was recruited by GTCR from

1  her prior position as a partner with Arthur Andersen.  She then
2  recruited fellow Andersen employees to work for LeapSource,
3  including fellow partners, some of whom were also given the
4  opportunity to acquire shares of LeapSource.  Between August 30,
5  1999 and September 14, 1999, Kirk negotiated with GTCR over the
6  terms of the parties' Statement of Understanding.  After exchanging
7  numerous drafts and making a number of changes, the parties
8  executed the final version, dated September 14, 1999.  Thereafter,
9  on September 16, 1999, LeapSource was incorporated--then named
10  "Kirkco, Inc."  At this time, LeapSource had no employees, and its
11  only shareholder other than the above-mentioned GTCR entities was
12  Christine Kirk, LeapSource's start-up CEO.  The parties, plus the
13  other individual Plaintiffs in this action, worked to gradually
14  grow the LeapSource business; however, the company eventually
15  failed and filed for chapter 7 bankruptcy liquidation.

16      As an introductory matter, the FAC alleges Plaintiffs' claims
17  against Defendants.  These claims are made by different plaintiffs
18  and groups of plaintiffs against various groups of defendants.  For
19  purposes of this order only, plaintiff-subgroups are referred to as
20  the "Trustee" (the bankruptcy trustee), and the "Plaintiffs" or
21  "individual Plaintiffs" referring to Christine Kirk ("Kirk"),
22  Kimberly Hartmann, Julie B. McCollum, Kelly Powers, Indu Gupta,
23  Bobby D. Scott, and Patrice E. Walker, and Thomas Gilman.
24  Defendant-subgroups are referred to as "GTCR" to indicate GTCR
25  Golder Rauner, LLC, GTCR Fund VI, LP, GTCR VI Executive Fund, LP,
26  GTCR Associates VI, Joseph P. Nolan, Bruce V. Rauner, Daniel Yih,
27  David A. Donnini and Philip A. Canfield, and "K&E" to refer to
28  Kirkland and Ellis.

**B. K&E**

K&E is a law firm organized as a limited liability partnership with its principal office located in Illinois.  K&E has represented GTCR in private equity transactions and investments for well over two decades.  During the time when GTCR began negotiating with Kirk over the possibility of forming a BPO company, K&E provided legal advice and assistance to GTCR.  In August and September 1999, Kirk understood that GTCR was a long-standing client of K&E.

In April 1999 or earlier, Kirk spoke with Jeff Gilbert, a partner at the Sachnoff & Weaver law firm. The parties dispute whether Sachnoff & Weaver represented Kirk at that time, however, they agree that by late August and early September, Gilbert's partner, Jeff Schumacher, was advising her in connection with the negotiations with GTCR.

In connection with GTCR's investment in LeapSource, K&E prepared documents related to the formation of the company.  Kirk's lawyer provided comments to K&E about the draft agreements, including the Purchase Agreement.  K&E prepared revised drafts of these documents based on the comments received from Schumacher. In the course of these negotiations, Schumacher explained the agreements to Kirk and answered all of her questions.  It is undisputed that Kirk's lawyers at Sachnoff & Weaver understood that K&E represented GTCR only, however Kirk claims that she understood that K&E represented GTCR and LeapSource, concurrently.

During negotiations, Kirk's lawyers raised objections to the language drafted in the documents because they wanted a firmer commitment from GTCR.  Specifically, Schumacher contested the use of the words "up to" that described the funding commitment of GTCR

in the Purchase Agreement, and was involved in negotiations with GTCR on whether that language should be deleted or replaced with other language that would remove the conditional aspect associated with the words.  Kirk's lawyers fully explained the Purchase Agreement to her before she signed it.

Kirk does not recall meeting any of the K&E attorneys who were representing GTCR on the LeapSource transaction.  However, during the negotiations, Kirk spoke with Richard Clyne, a K&E associate, who told her that he would be faxing her materials to sign and return, requested that she provide information for registration forms for the company, advised Kirk that K&E would be forming LeapSource, and that K&E would complete the tax filings required for the corporation. Kirk spoke with Steve Ritchie, a K&E partner, sometime in September 1999, but does not recall any conversations with him thereafter.

A legal assistant or paralegal at K&E prepared and filed the necessary paperwork to form Kirkco as a Delaware corporation on September 16, 1999.  However, there is no retainer letter between K&E and LeapSource.  Kirk was responsible for retaining counsel for the company, however, she cannot identify any conversation or writing in which she officially retained K&E to serve as LeapSource's counsel during the period between September 16 and 27, 1999.

In the fall of 1999, LeapSource retained the law firm Osborn Maledon as its principal outside counsel for transactional and corporate work.  In addition to Osborn Maledon, LeapSource hired other law firms to perform legal work, such as the Weinberg Legal Group, for intellectual property matters.

Under Section 7(A) of the Purchase Agreement, Kirkco (later LeapSource) was obligated to pay, among other things, the reasonable fees and expenses incurred by GTCR in connection with the negotiation and execution of the Purchase Agreement and the consummation of the transactions contemplated by the Agreement. See Exbt. 24 (doc. 329) § 7(A).  K&E asserts that, for this reason, it sent certain bills jointly to LeapSource and to GTCR.

Additionally, K&E associate Clyne communicated with LeapSource in regard to his preparation of supplements to the Purchase Agreement, and printed out related board consents and stock certificates.  Clyne confirmed with LeapSource's counsel at Osborn Maledon that K&E would continue to perform this work after Osborn Malendon was hired.  Clyne also communicated with Kirk in early October 1999 about a draft offer letter and employment agreement checklist for LeapSource.  K&E performed additional work for LeapSource relating to the company's Harris Bank line of credit, potential WARN Act violations, and the termination of LeapSource officers and employees.  Based on these and other acts, Plaintiffs assert that K&E held an attorney-client relationship with LeapSource.

## C. David Eaton and AEG Partners, LLC

David Eaton is a businessman and attorney residing in Illinois.  DSOFVL (doc. 251) ¶ 1; Def.'s Supplemental Statement of Facts for Vicarious Liability ("DSSOFVL") (doc. 369) ¶ 8.  AEG is an Illinois limited liability company formed in January of 2000 by Eaton and two other businessmen to provide "financial advisory and crisis management for financially distressed companies."  See id. ¶¶ 14, 16; DSSOFVL (doc. 369) ¶ 7.

1    In or about February 2001, K&E partner Kevin Evanich referred

2  Eaton, and Eaton's company, AEG, to GTCR.  DSOFVL (doc. 251) ¶ 17;

3  Exbt. 1 (doc. 285) ¶ 17.  At that time, Eaton held an "of counsel"

4  relationship with K&E pursuant to an agreement dated June 11, 1999.

5  DSOFVL (doc. 251) ¶ 6; Exbt. 1 (doc. 285) ¶ 6.  Both parties agree

6  that K&E suggested Eaton to GTCR as a "crisis manager" for

7  LeapSource.  Resp. (doc. 292) at 2; Reply (doc. 303) at 3.   Evanich

8  stated in his deposition that he referred Eaton to GTCR because

9  Eaton "was an expert in the financial restructuring advisory

10  business."  Exbt. 4 (doc. 251) at 21:21-22:4.  Thereafter, Eaton

11  met with GTCR at GTCR's offices in Chicago regarding LeapSource.

12  DSOFVL (doc. 251) ¶ 21; Exbt. 1 (doc. 285) ¶ 21.  On February 27,

13  2001, the LeapSource board of directors voted to retain AEG to

14  offer financial advisory services to LeapSource.  Exbt. 21 (doc.

15  292) at 2.  According to the LeapSource board minutes, the

16  directors voting in favor of retaining AEG were Bruce Rauner, Dan

17  Yih and Joe Nolan, all GTCR principals, and plaintiff Kirk.[1]  Id.

18  LeapSource and AEG formalized their relationship in an agreement

19  dated March 2, 2001 (the "Letter Agreement").  Id. ¶ 35.  In that

20  agreement, LeapSource and AEG agreed that their relationship would

21  be governed by Illinois law.  DSSOFVL (doc. 369) ¶ 1.  Thereafter,

22  Eaton worked on the LeapSource transactions in both Illinois and

23  Arizona.  Id. ¶ 2.

24    Plaintiffs assert that Eaton, being "of counsel" with K&E, was

25

26    [1]At oral argument, Plaintiffs raised the question as to whether
Kirk actually abstained from this vote.  However, the board meeting
27  minutes, included as Exhibit 21 in Plaintiffs' response in opposition
to K&E's motion for summary judgement on the aiding and abetting
28  claims (doc. 292), reflect that Kirk voted in favor of retaining AEG.

1  obligated to avoid taking any position or action that was adverse
2  to K&E's client, GTCR, and, thus, caused the eventual demise of
3  LeapSource by dissipating LeapSource's assets "in order to
4  accomplish GTCR's objectives of shutting down LeapSource[.]"  Resp.
5  (doc. 292) at 13-16.  Additionally, Plaintiffs contend that Eaton
6  "served GTCR's interests with respect to LeapSource, which included
7  (a) limiting GTCR's downside, (b) avoiding embarrassment, and (c)
8  protecting its interest in other investments, including COMSYS,
9  another company funded by GTCR and a customer of LeapSource."  Id.
10  at 15.

11     **D. Pending Motions for Summary Judgment**

12        Plaintiffs' complaint alleges various causes of action,
13  including claims against K&E based on theories of both direct and
14  vicarious liability, as well as against Eaton and AEG.  On
15  December 2, 2002, K&E filed a Rule 12(b)(6) motion to dismiss
16  arguing, inter alia, that it cannot be vicariously liable for
17  Eaton's conduct, as Eaton did not act in his "of counsel" role with
18  K&E during the provision of AEG's services to LeapSource.  Mot.
19  (doc. 10) at 15.  While observing that the relevant cases favored
20  K&E's position, the Court determined that dismissal prior to an
21  adequate opportunity for fact discovery would be premature, and
22  denied the motion on September 30, 2003.  See Order (doc. 69) at
23  12-17.  Discovery was conducted and, on September 8, 2005, K&E
24  filed its Motion for Summary Judgment Regarding Vicarious
25  Liability.  Mot. Vicarious Liability (doc. 250).  In addition,
26  Eaton and AEG filed their own motion for summary judgment.  Mot.
27  Eaton (doc. 247).

28        Between December 26, 2005 and January 6, 2006, the Trustee and

1   Plaintiffs entered into an agreement with Eaton and AEG for the

2   settlement and release of all their claims (the "Settlement

3   Agreement").  See Exbt. 1 (doc. 404).  A choice of law provision in

4   that agreement indicated the parties' intent that the agreement

5   "shall be governed, construed and enforced according to the laws of

6   the State of Arizona without regard to conflicts of laws

7   principles."  Exbt. 3 (doc. 369) ¶ 14.  Of particular relevance to

8   K&E's motion for summary judgment regarding vicarious liability

9   (doc. 250, 368), the parties also included language in the

10  Settlement Agreement by which the Trustee and Plaintiffs purported

11  to reserve their claims against K&E based on the firm's vicarious

12  liability for Eaton's conduct, notwithstanding their release of

13  Eaton.[2]

14  _____

15      [2]  The paragraph of the Settlement Agreement entitled "Release
    of AEG" provides in pertinent part as follows:
16

17          [T]he Trustee . . . and Plaintiffs, hereby
            release, acquit, and forever discharge AEG, . .
18          . and each and every one of their past and
            present . . . shareholders, members, officers,
19          directors, partners, principals, agents, . . .
            and attorneys from any and all claims, causes of
20          action, . . . that the Trustee's bankruptcy
            estate and Plaintiffs may have had or claimed to
21          have had in the past . . . against AEG . . . ;
            provided, however, that the Trustee and
22          Plaintiffs do not release and expressly reserve
            any Claims that she (in her capacity as Trustee)
23          and Plaintiffs might have or claim to have
            against any person or entity other than AEG,
24          including, without limitation, the various
            persons and entities named as defendants or
25          adverse parties in the Litigation or in any
            adversary proceeding in which the Trustee is or
26          has been the plaintiff or other party asserting
            a Claim, that currently is pending in the U.S.
27          District Court or the Bankruptcy Court, and that
            arises from or relates to the Litigation or the
28          Debtor, including without limitation, the Other

                              - 9 -

1    After the settlement, the following events unfolded in the

2  LeapSource bankruptcy proceedings.  On January 13, 2006, the

3  Trustee and Plaintiffs filed a motion in the bankruptcy court

4  requesting the bankruptcy judge to enter an order authorizing and

5  approving their settlement with Eaton and AEG.  <u>In re LeapSource,</u>

6  <u>Inc.</u>, No. B 01-09020 PHX JMM (Bankr. D. Ariz. 2001) (doc. 159).  On

7  February 2, 2006, K&E filed a Notice of Reservation of Rights,

8  agreeing to the terms of the proposed settlement in the bankruptcy

9  proceedings, but "specifically reserv[ing] all of its rights,

10 claims, defenses, and/or other interests regarding the

11 interpretation of th[e] settlement agreement by the District

12 Court."  <u>Id.</u> (doc. 162).  On April 6, 2006, the bankruptcy court

13 entered an order authorizing and approving the settlement on the

14 terms of the Trustee's motion.  <u>Id.</u> (doc. 172).

15    On October 7, 2005, during the briefing of K&E's motion for

16 summary judgment regarding vicarious liability (doc. 250),

17 Plaintiffs filed notice of their settlement with Eaton and AEG.

18 Notice (doc. 259).  Thereafter, on April 17, 2006, K&E filed a

19 supplement to its motion for summary judgment (doc. 250), arguing

20 that Plaintiffs' release of Eaton also operated as a release of K&E

21 from any vicarious liability for Eaton's conduct.  Supplement (doc.

22 368).

23    Additionally, on October 3, 2005, K&E filed a motion for

24 _____

25         Defendants, <u>regardless of whether AEG on the one</u>
          <u>hand, and any one or more of the Other</u>
26         <u>Defendants, on the other hand, are or may be</u>
          <u>alleged to be principals, agents, or joint</u>
27         <u>tortfeasors as to one or more of the Trustee's</u>
          <u>reserved alleged Claims.</u>
28

Exbt. 1 (doc. 404) (emphasis added).

summary judgment on the aiding and abetting and tortious interference claims (Counts 1, 12, 14, 18, 21, and 23).  Mot. Aid. & Abett.  (doc. 255).  This motion was fully briefed on December 12, 2005.  Reply (doc. 303).  Thereafter, on March 28, 2006, the Court granted summary judgment in favor of K&E on Counts 12 and 14. Order (doc. 356).[3]  Thus, the Court shall only consider K&E's motion for summary judgment on the aiding and abetting and tortious interference claims in regard to Counts 1, 18, 21 and 23.

On February 27, 2006, K&E also filed a motion for summary judgment on the malpractice and professional negligence claim (Count 10).  Mot. Malprac. (doc. 328).   This motion was fully briefed on May 22, 2006.  Reply (doc. 406).

**II. Standard of Review**

To grant summary judgment, the Court must determine that the record before it contains "no genuine issue as to any material fact" and, thus, "that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether to grant summary judgment, the Court will view the facts and inferences from these facts in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

---

[3] The Court notes that the order language of its March 28, 2006 Order mistakenly states that K&E's motion for summary judgment on "Counts 12 and 13" was granted, however, within the body of the order it is clear that the subject motion and the Court's decision were in relation to Counts 12 and 14.  Order (doc. 356) at 2, 40-41.

1  the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S.
2  317, 322 (1986).  "In such a situation, there can be 'no genuine
3  issue as to any material fact,' since a complete failure of proof
4  concerning an essential element of the nonmoving party's case
5  necessarily renders all other facts immaterial." <u>Id.</u> at 323.   In
6  such a case, the moving party is entitled to a judgment as a matter
7  of law.  <u>Id.</u>

8      The mere existence of some alleged factual dispute between the
9  parties will not defeat an otherwise properly supported motion for
10  summary judgment; the requirement is that there be no genuine issue
11  of material fact.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
12  242, 247-48 (1986).  A material fact is any factual dispute that
13  might affect the outcome of the case under the governing
14  substantive law.  <u>Id.</u> at 248.  A factual dispute is genuine if the
15  evidence is such that a reasonable jury could resolve the dispute
16  in favor of the nonmoving party.  <u>Id.</u>

17      A party opposing a motion for summary judgment cannot rest
18  upon mere allegations or denials in the pleadings or papers, but
19  instead must set forth specific facts demonstrating a genuine issue
20  for trial.  <u>See</u> <u>id.</u> at 250.  Finally, if the nonmoving party's
21  evidence is merely colorable or is not significantly probative, a
22  court may grant summary judgment.  <u>See</u>, <u>e.g.</u>, <u>California</u>
23  <u>Architectural Build. Prods., Inc. v. Franciscan Ceramics</u>, 818 F.2d
24  1466, 1468 (9th Cir. 1987).

25  **III. Discussion**

26      K&E has filed motions for summary judgment regarding vicarious
27  liability (doc. 250), aiding and abetting and tortious interference
28  claims (doc. 255), and professional malpractice and negligence

(doc. 328).  AEG and Eaton have also filed a motion for summary

judgment (doc. 247).  The Court addresses each motion in turn.

**A. K&E's Motion for Summary Judgment Regarding Vicarious Liability**

K&E argues that, under Illinois law, Plaintiffs' release of

Eaton also released K&E from any vicarious liability for Eaton's

conduct.  Supplement (doc. 368) at 4-6.  Plaintiffs do not dispute

the result under Illinois law, but maintain that Arizona law should

apply instead due to a choice of law provision in the Settlement

Agreement.  See Resp. (doc. 404).  They contend that Arizona law

allows a plaintiff to release an agent while expressly reserving

its claims against the agent's principal.  See id.  For the reasons

explained more fully below, the Court finds that (1) Illinois law

controls and (2), contrary to Plaintiffs assertions, the result

under Arizona law would be the same as under Illinois law.

**1. Choice of Law**

Two threshold issues before the Court are whether the choice

of law provision in Plaintiffs' Settlement Agreement requires the

Court to apply Arizona law, and, if not, whether Arizona law should

apply under the principles of conflicts of law.  The Court answers

both questions in the negative.

A federal court sitting in diversity must apply the forum

state's choice of law rules.  Klaxon Co. v. Stentor Elec. Mfg. Co.,

313 U.S. 487 (1941); Orr v. Bank of Am., 285 F.3d 764, 772 n.4 (9th

Cir. 2002).  Arizona courts apply the principles of conflict of

laws as expressed in the Restatement, even in the face of

contractual choice of law provisions, as the one employed here,

which purport to preclude the courts from engaging such analysis.

- 13 -

1   <u>Jackson v. Chandler</u>, 61 P.3d 17 (Ariz. 2003); <u>Swanson v. Image</u>

2   <u>Bank, Inc.</u>, 77 P.3d 439, 441 n.2 (Ariz. 2003) (rejecting parties'

3   attempt to preclude court from applying conflict of laws principles

4   as "unsound and contrary to the intent of [the Restatement]").

5        K&E argues that Illinois law should determine whether

6   Plaintiffs' release of Eaton also released K&E from vicarious

7   liability for Eaton's conduct.  Supplement (doc. 368) at 4-6.

8   Plaintiffs, apparently believing that Arizona law dictates a more

9   favorable result, maintain that Arizona law should govern based on

10  a choice of law provision in the Settlement Agreement.  That

11  provision states that the agreement "shall be governed, construed

12  and enforced according to the laws of the State of Arizona <u>without</u>

13  <u>regard to conflicts of laws principles</u>."  Exbt. 3 (doc. 369) ¶ 14

14  (emphasis added).  That provision is unenforceable here for two

15  reasons.  First, it is not binding on K&E, because K&E was not a

16  party to the Settlement Agreement.  Plaintiffs cannot by their

17  agreement with Eaton and AEG bind a nonsignatory like K&E.[4]  <u>See</u> <u>In</u>

18  <u>re Kokomo Times Publ'g & Printing Corp.</u>, 301 F. Supp. 529, 536

19  (Bankr. S.D. Ind. 1968) (finding choice of law provision

20  unenforceable against creditors and purchasers who were not parties

21  to the agreement).  Second, it is not binding on the Court,

22  because, under Arizona's choice of law rules, language purporting

23

─────────────

24       [4]  Plaintiffs state that Eaton executed the Settlement Agreement
     "in his capacity as an individual defendant," yet claim that he did
25   so somehow "knowing" that he would bind his employer, K&E.  Resp.
     (doc. 404) at 5.  The Court accepts Plaintiff's assertion that Eaton
26   signed in his individual capacity, and not as a member of the firm.
     <u>See</u> 805 Ill. Comp. St. 205/18(b) (2005).  Acting in his individual
27   capacity, Eaton could not bind K&E, regardless of his personal
     opinion on his ability to do so.  <u>See</u> <u>id.</u>

28

1   to preclude the courts from applying the principles of conflicts of

2   laws is nugatory and void.  See Swanson, 77 P.3d at 441 n.2; cf.

3   Magellan Real Estate Inv. Trust v. Losch, 109 F. Supp. 2d 1144,

4   1155 (D. Ariz. 2000) (finding choice of law provision inapplicable

5   to tort claims asserted by one contracting party against another).

6   Therefore, the choice of law bearing upon the question of the

7   release's effect upon K&E's vicarious liability as a joint

8   tortfeasor will be determined with regard to conflicts of laws

9   principles.

10          Under the Restatement, "[t]he rights and liabilities of the

11  parties with respect to an issue in tort are determined by the

12  local law of the state which, with respect to that issue, has the

13  most significant relationship to the occurrence and the parties

14  under the principles stated in § 6."  RESTATEMENT (SECOND) OF CONFLICT OF

15  LAWS § 145(1) (1971).  The principles stated in § 6 include the

16  following:

17          (a) the needs of the interstate and
            international systems,
18
            (b) the relevant policies of the forum,
19
            (c) the relevant policies of other
20          interested states and the relative
            interests of those states in the
21          determination of the particular issue,

22          (d) the protection of justified
            expectations,
23
            (e) the basic policies underlying the
24          particular field of law,

25          (f) certainty, predictability and
            uniformity of result, and
26
            (g) ease in the determination and
27          application of the law to be applied.

28  Id. § 6(2).  In applying these principles, courts must also

consider "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." _Id._ § 145(2).  "These contacts are to be evaluated according to their relative importance with respect to the particular issue."  _Id._  With regard to issues of release and vicarious liability, the situs of conduct and injury alone are not determinative.  _Id._ § 170, cmt. c.

In this case, the conduct allegedly causing Plaintiffs' injuries occurred in both Illinois and Arizona, as Eaton worked on the LeapSource transaction out of offices in both states.  _See_ DSSOFVL (doc. 369) ¶ 2.  Thus, this factor neither favors nor disfavors application of either state's law.

Although Plaintiffs' injuries allegedly occurred in Arizona, this factor alone is not decisive.  _See_ RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 170, cmt. c (1971).

While Plaintiffs are Arizona residents, Eaton, AEG, and K&E are all domiciliaries of, or are organized in, Illinois.  _See_ DSSOFVL (doc. 369) ¶¶ 7-10.  Because the issue here concerns the rights and liabilities of joint tortfeasors-specifically, whether one may unilaterally obtain a release from a plaintiff who purports to reserve claims against the other--the Court finds that the relative importance of Defendants' contacts with Illinois far outweighs the significance of Plaintiffs' contacts with Arizona. Therefore, this factor favors Illinois law.

As to the place where the parties' relationships are centered, K&E points out that in their original Letter Agreement LeapSource

and AEG agreed that their relationship would be governed by
Illinois law.  DSSOFVL (doc. 369) ¶ 1.  Plaintiffs respond that
their decision in the more recent Settlement Agreement to have
their relationship governed by Arizona law should take precedence.
Resp. (doc. 404) at 2.  The Court disagrees.  When an injury is
caused by an act done in the course of a relationship between the
parties, the focus of the Restatement is on the place of that
relationship at the time of the act.  See RESTATEMENT (SECOND) OF
CONFLICT OF LAWS § 145, cmt. e (1971).  The fact that a party may
later find it expedient to recharacterize the place of that
relationship does not alter the analysis.  In this case,
LeapSource's relationship with Eaton and AEG was centered in
Illinois at the time of the alleged tortious conduct.  Therefore,
on balance, the relevant contacts favor Illinois law.  With that in
mind, the Court will apply the principles of conflicts of laws set
forth in section 6(2).  See id. § 145(2).

Given the prevalence of the Illinois contacts, the Court finds
that the "further[ance] of harmonious relations between states" and
the "facilitat[ion] [of] commercial intercourse between them"
counsels for the application of Illinois law.  See id. § 6, cmt. d
(regarding needs of the interstate system).  It may have been a
countervailing, although not determinative, consideration if the
relevant policies of Arizona, as the forum state, differed
significantly from Illinois law on the issues of release and
vicarious liability of joint tort.  See id. § 6(2)(b) (relevant
policies of the forum).  However, as explained later in this
opinion, Arizona law is actually consistent with Illinois law on
the questions at issue here, contrary to Plaintiffs' assertions

otherwise.  Since there are no other interested states, the Court concludes that the policies of the forum and interested states favor the application of Illinois law.  See Id. § 6(a), (b), and (c).

Ultimately, Plaintiffs have not offered any arguments directed toward the principles of conflicts of laws, presumably due to their confidence in the Settlement Agreement's choice of law provision.  However, the mere fact that Plaintiffs, Eaton, and AEG have expressed a preference for Arizona law does not bestow upon them any "justified expectations" or interest in "uniformity of result" with regard to the rights and liabilities of K&E, a non-party to their agreement, in issues of tort.  See RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6, cmt. g; Id. § 145, cmt. b.

For all of the foregoing reasons, the Court finds that Illinois is the state with the most significant relationship to the occurrence and the parties with respect to the issues of release and vicarious liability.  Accordingly, the Court will apply Illinois law in determining whether Plaintiffs may reserve their claims against K&E based on its vicarious liability for Eaton's conduct, notwithstanding their release of Eaton.

### 2. The Result Under Arizona Law Is the Same as Under Illinois Law

Under Illinois law, a settlement with the agent extinguishes the principal's liability.  Gilbert v. Sycamore Mun. Hosp., 156 Ill. 2d 511, 622 N.E.2d 788, 796-97 (1993); accord Doe v. City of Chicago, 360 F.3d 667, 673 (7th Cir. 2004) (Posner, J.).  The rule is grounded in the unassailable logic that the agent would gain nothing from a settlement that would allow the plaintiff to proceed

against the principal, as the principal would simply "turn around and seek indemnity from the agent." City of Chicago, 360 F.3d at 673. Thus, K&E argues that Plaintiffs' settlement with, and release of, Eaton also released K&E from any vicarious liability for Eaton's conduct. Supplement (doc. 368) at 4-6. Rather than challenge this result under Illinois law, Plaintiffs devote much of their brief to arguments urging the application of Arizona law.[5] See Resp. (doc. 404). As discussed above, those entreaties proved unconvincing. There being no disputed issues of fact, the Court finds that K&E is entitled to summary judgment on the issue of vicarious liability, because Plaintiffs' release of Eaton also operated to release K&E as a matter of law.

The Court hastens to note that the result would not be any different under Arizona law. Plaintiffs seem to believe that in Arizona an injured party may release an agent from liability while reserving claims against the principal based on its vicarious

---

[5] Plaintiffs also claim that K&E did not object to the proposed language of the Settlement Agreement when it had the opportunity to do so in the bankruptcy court, and characterize K&E's motion for summary judgment (doc. 250, 368) in this Court as an impermissible collateral attack on the bankruptcy judge's order. Resp. (doc. 404) at 5-8. Both positions are untenable. Although K&E did not object to the Settlement Agreement's effect in the bankruptcy case, it did voice its objections to the extent its rights would be affected in this case, and correctly expressed its view that this Court, and not the bankruptcy court, would exercise jurisdiction over those matters and issues. See Exbt. 2 (doc. 404) ¶¶ 2-4. While the bankruptcy judge's order properly reaches those claims over which the bankruptcy court is vested with jurisdiction, it does not affect any of the claims before this Court. See Exbt. 3 (doc. 404). Moreover, the Court has not been asked to disturb the bankruptcy court's decision with regard to the claims in the bankruptcy case, but only to determine the effect of the Settlement Agreement on the claims in this case. As such, Plaintiffs reliance on the collateral attack doctrine is misplaced.

1   liability for the agent's conduct.  In support of their position,

2   Plaintiffs claim that "[t]here is no case in Arizona that holds the

3   release of an agent, which expressly reserves rights against the

4   principal, relieves the principal of responsibility for the same

5   act(s)."  Resp. (doc. 404).  There are, of course, certain legal

6   doctrines that are so widely accepted, and thus so scarcely

7   litigated, that an extensive body of case law rarely develops.  In

8   this instance, however, Arizona does have a case directly on point,

9   and it is cited in Plaintiffs' response.

10      The Supreme Court of Arizona has declared that "[i]t is, of

11  course, an elementary rule of law that the liability of joint

12  tortfeasors is joint and several and that the release of one

13  releases all."  <u>Faberberg v. Phoenix Flour Mills Co.</u>, 71 P.2d 1022,

14  1025 (Ariz. 1937).  In <u>Faberberg</u>, the injured party entered into a

15  written agreement with one joint tortfeasor covenanting not to sue

16  that party, while attempting to reserve the right to sue the other

17  joint tortfeasor.  <u>Id.</u> at 1025.  After reiterating the "elementary

18  rule" that the "release of one releases all," the court was very

19  deliberate in explaining that a reservation of rights is only valid

20  in a covenant not to sue, and not in a release.

21          As we have said, from early times a release of
            one joint tort-feasor released all the others.

22          . . . .  Finally some ingenious counsel
            advanced the theory that, <u>while the injured</u>

23          <u>party could not release one of the tortfeasors</u>
            <u>from liability without releasing the others</u>, he

24          might for a sufficient consideration enter into
            an agreement with one not to sue him for the

25          tort, and that such an agreement would not bar
            his right of action against the others.  This

26          ingenious method of "whipping the devil around
            a stump" was seized upon by the courts as a

27          happy solution of the problem, and it was
            quickly and practically unanimously held that,

28          if as a matter of law, an agreement with one of

several joint tortfeasors was only one not to sue <u>and not a legal release of the liability for the tort</u>, the other wrongdoers might be sued by the injured party . . . . There have been many cases before the courts involving this question, and they all agree as to the general rule of law stated above, <u>the vital question in each particular case being whether or not the agreement involved therein was a covenant not to sue or a release and settlement</u>. We must therefore consider the document in question and determine which it was. The phraseology shows clearly that it was most carefully worded by someone who knew the <u>different legal effects of a release and settlement and of a covenant not to sue</u>, and that it was the latter which was intended by the parties. <u>Nowhere therein is there any use of the words "release" or "settlement" or others of similar import</u> . . . .

<u>See</u> <u>id.</u> at 1026. In other words, the rule is the same in Arizona as it is in Illinois-- a plaintiff cannot release the agent without simultaneously releasing the principal. <u>See</u> <u>id.</u> The cases upon which Plaintiffs rely, distinguishing a covenant not to sue from a settlement and release, reflect Arizona's exception to that rule. <u>See</u> <u>id.</u> (covenant not to sue); <u>Blocher v. Thompson</u>, 818 P.2d 167, 170 (Ariz. 1991) (same); <u>see also</u> <u>Rager v. Superior Coach Sales & Serv.</u>, 516 P.2d 324, 327 (Ariz. 1973) ("A covenant not to execute is certainly not a satisfaction, nor is it the same as a release. Its legal effect is similar to a covenant not to sue, in that it does not extinguish the plaintiff's cause of action and does not operate to release other joint tortfeasors.") (citations omitted). Thus, the decisive inquiry is whether the document in question "was a covenant not to sue or a release and settlement." <u>Faberberg</u>, 71 P.2d at 1026. If the latter, the general rule remains that a release of one is a release of all. <u>See</u> <u>id.</u>

In the present case, Plaintiffs' agreement with Eaton and AEG

1   was a release and settlement, not a covenant not to sue.   See Exbt.
2   1 (doc. 404).   Therefore, even if Arizona law did apply, K&E would
3   still be entitled to summary judgment on the issue of vicarious
4   liability.   In light of these conclusions, summary judgment on the
5   contested vicarious liability claims is appropriate as a matter of
6   law.   The Court will grant K&E's motion for summary judgment
7   regarding vicarious liability (doc. # 250).

8        **B. K&E's Motion for Summary Judgment Regarding Aiding and**
         **Abetting and Tortious Interference Claims**
9
10            **1. Aiding and Abetting**

11            In the Fourth Amended Complaint, Plaintiffs claim that K&E
12  aided and abetted GTCR in committing breaches of its fiduciary duty
13  in its role as majority shareholder of LeapSource.   FAC (doc. 121)
14  at 97 (Count 18).   Under Arizona law, a claim for aiding and
15  abetting tortious conduct requires proof of three elements: (1) the
16  primary tortfeasor must commit a tort that causes injury to the
17  plaintiff; (2) the defendant must know that the primary
18  tortfeasor's conduct constitutes a breach of duty; and (3) the
19  defendant must substantially assist or encourage the primary
20  tortfeasor in the achievement of the breach.   See Wells Fargo Bank
21  v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension
22  Trust Fund, 38 P.3d 12, 23 (Ariz. 2002).   "Substantial assistance"
23  means more than "a little aid," and "requires a showing that the
24  defendant's assistance was a substantial factor in causing the
25  plaintiff's harm."   In re Am. Cont'l Corp./Lincoln S. & L. Sec.
26  Litig., 794 F.Supp. 1424, 1434-35 (D. Ariz. 1992); see also Wells
27  Fargo, 38 P.2d at 26.
28            In its motion for summary judgment, K&E asserts that

1  Plaintiffs have not met their burden on this claim, because they

2  have failed to show evidence that K&E rendered "substantial

3  assistance" to achieve a breach of fiduciary duty.  Mot. Aid. &

4  Abett. (doc. 255) at 8.   K&E notes that the only act that

5  Plaintiffs allege is the basis of this claim is K&E's communication

6  with GTCR.  Id.   This, however, it argues is not enough to

7  establish "substantial assistance."  Id. (citing Witzman v.

8  Lehrman, Lehrman & Flom, 601 N.W.2d 179, 188-89 (Minn. 1999), and

9  Spinner v. Nutt, 631 N.E.2d 542, 556 (Mass. 1994)).  "Plaintiffs

10  have not identified a single witness who could testify from

11  personal knowledge that K&E substantially assisted or encouraged

12  anyone to commit a tort, nor is there any document or other

13  evidence that would support such a finding."  Id. at 9.

14      In response, Plaintiffs argue that they have satisfied the

15  element of "substantial assistance" in two ways.  Resp. (doc. 292)

16  at 4-7.  First, Plaintiffs assert that the evidence of K&E's act of

17  recommending David Eaton for his role at LeapSource, establishes

18  that K&E provided "substantial assistance" to the breaches of

19  fiduciary duty.  Id. at 4.

20          Here, the circumstances surrounding K&E's
           recommendation that one of its own attorneys be
21          retained to act as "crisis manager" for a company
           that it knew to be involved in a conflict with
22          another K&E client that paid the firm millions of
           dollars in fees every year are so egregious that a
23          jury could reasonably conclude that Mr. Eaton was
           recommended precisely because his relationship
24          with K&E would prevent him from taking any
           position on behalf of LeapSource that would be
25          adverse to the interests of GTCR[.]

26  Id. at 5-6.  Second, the Plaintiffs argue that this element is

27  established through the acts of Eaton, who Plaintiffs assert was

28  "directly and actively involved in every one of the breaches of the

1   fiduciary duty complained of after he was retained as "crisis

2   manager" for LeapSource[.]"  Id. at 7.

3        The Court finds that Plaintiffs have failed to establish that

4   K&E substantially assisted or encouraged GTCR in committing a

5   breach.  At the outset, the Court notes that it has granted K&E's

6   motion for summary judgment on the vicarious liability claims

7   involving Eaton and AEG.  Supra, section III(A).  Thus, Eaton's

8   conduct is irrelevant to the issues discussed here, and the Court

9   shall only analyze Plaintiffs' claims as they relate to the conduct

10  of K&E.  Consequently, the only viable act that Plaintiffs maintain

11  establishes the contested "substantial assistance" element is K&E's

12  recommendation of Eaton and AEG to GTCR.  However, this act alone

13  does not constitute aiding and abetting the alleged breach of

14  fiduciary duty that GTCR owed in its role as majority shareholder

15  of LeapSource.  Plaintiffs do not identify, nor can the Court find,

16  any evidence showing that K&E's recommendation to GTCR was a

17  "substantial factor" or equated to more than "a little aid" in any

18  alleged subsequent breach of fiduciary duty by GTCR.

19       A party opposing a motion for summary judgment cannot rest

20  upon mere allegations or denials in the pleadings or papers, but

21  instead must set forth specific facts demonstrating a genuine issue

22  for trial.  Anderson, 477 U.S. at 250.  Summary judgment is

23  appropriate "against a party who fails to make a showing sufficient

24  to establish the existence of an element essential to that party's

25  case, and on which that party will bear the burden of proof at

26  trial."  Celotex Corp., 477 U.S. at 322.  Here, Plaintiffs'

27  conclusory assumption that "Mr. Eaton was recommended precisely

28  because his relationship with K&E would prevent him from taking any

position on behalf of LeapSource that would be adverse to the

interests of GTCR" is not enough to survive summary judgment.  <u>See</u>

Resp. (doc. 292) at 5-6.  Due to Plaintiffs' lack of evidence

showing that K&E substantially assisted or encouraged GTCR to

commit the alleged breach of fiduciary duty, the Court finds that

they have failed to make a showing sufficient to establish the

existence of this element that is essential to their claim of

aiding and abetting.  Summary judgement is appropriate as a matter

of law.

### 2. Tortious Interference

Additionally, Plaintiffs claim that K&E tortiously interfered

in the performance of the Purchase Agreement between GTCR and

LeapSource (Count 1), the Senior Management Agreements and

Employment Agreements of the individual Plaintiffs (Count 21), and

the Stockholders Agreement and Purchase Agreement (Count 23).  FAC

(doc. 121) at 74-75, 100-01, 103.  In <u>Safeway Insurance Co. v.</u>

<u>Guerrero</u>, 106 P.3d 1020, 1025 (Ariz. 2005), the Arizona Supreme

Court set forth the elements of this tort, stating:

> The tort of intentional interference with contractual
> relations requires a plaintiff to prove: (1) existence of
> a valid contractual relationship, (2) knowledge of the
> relationship on the part of the interferor, (3)
> intentional interference inducing or causing a breach,
> (4) resultant damage to the party whose relationship has
> been disrupted, and (5) that the defendant acted
> improperly.

<u>Id.</u>; <u>see also</u> <u>Wells Fargo</u>, 38 P.3d at 31.  Element (5) specifically

requires that the claimant prove that the defendant acted

improperly.  On this issue, the Restatement (Second) of Torts

advises,

> ...[i]n determining whether an actor's conduct in

> intentionally interfering with a contract or a
> prospective contractual relation of another is
> improper or not, consideration is given to the
> following factors:
> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the
> actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom
> of action of the actor and the contractual
> interests of the other,
> (f) the proximity or remoteness of the actor's
> conduct to the interference and
> (g) the relations between the parties.

RESTATEMENT (SECOND) OF TORTS § 767 (1979); see also Wagenseller v.

Scottsdale Mem'l Hosp., 710 P.2d 1025, 1042-43 (Ariz. 1985),

superseded in part by A.R.S. § 23-1501.  If the plaintiff is unable

to show the impropriety of the defendant's conduct based on an

examination of these factors, the conduct is not tortious.

Wagenseller, 710 P.2d at 1043.

In its motion for summary judgment, K&E argues that Plaintiffs

have shown no genuine issue of material fact relating to their

claims for tortious interference with contractual relations, and,

therefore, assert that they are entitled to judgment as a matter of

law.  Mot. Aid. & Abett. (doc. 255) at 5-8.  Specifically, K&E

asserts that Plaintiffs have produced no evidence that K&E acted

improperly to interfere with any of the written agreements, or that

K&E intentionally interfered at all.  Id.  K&E maintains that the

evidence in the record only establishes that it communicated with

its client, GTCR.  Id. at 6.  K&E argues that the mere act of

giving legal advice to a client cannot constitute tortious

interference.  Id. (citing Safeway Ins. Co., 106 P.3d at 1025 n.7).

In response, Plaintiffs have, for the most part, focused their

arguments on the acts of David Eaton.  Resp. (doc. 292) at 7-16.

As the Court previously noted, it has granted K&E's motion for
summary judgment on the vicarious liability claims involving Eaton
and AEG.  Supra, section III(A).  Thus, Eaton's conduct is
irrelevant to the issues discussed here, and the Court shall
analyze Plaintiffs' claims of tortious interference with a contract
as they relate to the conduct of K&E alone.  Consequently, the only
act that Plaintiffs maintain establishes that K&E intentionally
interfered and acted improperly is K&E's recommendation of Eaton
and AEG to GTCR.  Resp. (doc. 292) at 2.

Basically, Plaintiffs argue that the act of recommending Eaton
and AEG to GTCR, while facing the alleged conflict of interest K&E
held by advising GTCR, establishes the improper conduct required of
their claim.  Id. at 13.  "K&E's authorities regarding the non-
liability of a lawyer for doing no more than providing legal advice
to his own client have no application to a situation in which the
lawyer has a conflict of interest."  Id. at 10.  However,
Plaintiffs cite no authority that supports their argument that, if
a conflict did exist, the act of recommending an individual, with
whom the recommender holds an "of counsel" relationship, to a
client for the purpose of acting as a "crisis manager" equates to
an improper activity.  Plaintiffs seem to assert that K&E's act was
improper because the law firm intended to encourage GTCR to
encourage LeapSource to hire Eaton in some capacity that would
eventually destroy the company.  Id. at 8.  They do not, however,
point to any evidence that supports this allegation.

Additionally, Plaintiffs offer no arguments, nor point to any
evidence, that indicates that K&E intentionally interfered with
either the Purchase Agreement between GTCR and LeapSource, the

1   Senior Management Agreements, the Employment agreements of the

2   individual Plaintiffs, or the Stockholders Agreement and Purchase

3   Agreement, inducing or causing a breach of such contracts.

4   Plaintiffs cite a specific Arizona case where the court held that a

5   claim of tortious interference does not require proof that the

6   defendant actually desired to interfere with the plaintiff's

7   contract.  Resp. (doc. 292) at 9 (citing Snow v. Western Sav. &

8   Loan Ass'n, 730 P.2d 204 (Ariz. 1986).  Specifically, Plaintiffs

9   note that in Snow, the court stated that the tort is intentional if

10  the defendant must "*have known that this result was substantially*

11  *certain to be produced by its conduct*."  Resp. (doc. 292) at 9

12  (citing Snow, 730 P.2d at 211).  In any event, Plaintiffs maintain

13  that summary judgment is inappropriate because questions of intent

14  are ordinarily for the finder of fact to decide.  Resp. (doc. 292)

15  at 10 (citing Snow, 730 P.2d at 211-12).  The Court, however, does

16  not find that K&E's intent remains a genuine issue of material

17  fact.

18      Plaintiffs fail to make any argument or show any evidence that

19  indicates that K&E "must have known" that its recommendation of

20  Eaton to GTCR would cause the alleged breach of any of the parties'

21  contracts.  Evanich testified at his deposition that he recommended

22  Eaton to GTCR because he "was an expert in the financial

23  restructuring advisory business."  Exbt. 4 (doc. 251) at 21:21-

24  22:4.  The parties do not dispute that Evanich only recommended

25  Eaton to GTCR and made no similar recommendation to LeapSource.

26  Plaintiffs fail to show any evidence that indicates that Evanich

27  directly intended to interfere with Plaintiffs' contracts, or that

28  he must have known that his recommendation would result in GTCR's

alleged breaches of the contested contracts.  Without further evidence, any connection between these events is tenuous and requires numerous leaps in logic on the part of this Court.

A party opposing a motion for summary judgment cannot rest upon mere allegations or denials in the pleadings or papers, but instead must set forth specific facts demonstrating a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 250.  Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp.</u>, 477 U.S. at 322.  Due to Plaintiffs' lack of evidence that K&E intentionally interfered with either the Purchase Agreement between GTCR and LeapSource, the Senior Management Agreements, the Employment agreements of the individual Plaintiffs, or the Stockholders Agreement and Purchase Agreement, or that any of its acts were improper, the Court finds that they have failed to make a showing sufficient to establish the existence of these elements that are essential to their claim of tortious interference with a contract.  Summary judgement on the aiding and abetting and tortious interference claims is appropriate as a matter of law.

**C. K&E's Motion for Summary Judgment Regarding Malpractice and Professional Negligence**

In the case at bar, the Trustee asserts a malpractice claim against K&E alleging that (1) K&E represented GTCR in early 2001 concerning GTCR's relationship with LeapSource, and (2) K&E had a conflict because it simultaneously represented LeapSource in early 2001, or alternatively, because it had represented LeapSource

during the September 1999 formation negotiations during which it
learned that Kirk wanted a firmer funding commitment from GTCR.   In
order to be successful on a legal malpractice claim, a party must
establish: (1) the existence of an attorney-client relationship
that imposes a duty on the attorney to exercise that degree of
skill, care, and knowledge commonly exercised by members of the
profession; (2) a breach of that duty; (3) that such negligence was
a proximate cause of resulting injury; and (4) the fact and extent
of the injury.  See Phillips v. Clancy, 733 P.2d 300, 303 (Ariz.
Ct. App. 1986).  Here, the parties dispute elements one and three,
requiring that the parties have an attorney-client relationship and
that the alleged negligence proximately cause the claimed injury.

### 1. Proximate Cause (Element Three)

An essential element of the Trustee's claim of professional
negligence is that there must be some reasonable connection between
the act or omission of K&E and the damage which LeapSource
suffered.  See Purcell v. Zimbelman, 500 P.2d 335, 342 (Ariz. Ct.
App. 1972).  On the issue of causation, the plaintiff has the
burden of proof.  Id.  Thus, the plaintiff must introduce evidence
which affords a reasonable basis for the conclusion that it is more
likely than not that the conduct of the defendant was a substantial
factor in bringing about the result.  Id.  Although a mere
possibility of such causation is not enough, the plaintiff is not
required to prove his case beyond a reasonable doubt and he need
not negate entirely the possibility that defendant's conduct was
not a cause.  Id.  All that is required in negligence cases is for
the plaintiff to present probable facts from which negligence and
causal relations may be reasonably inferred.  Id.

1    Proximate causation generally presents a question of fact for
2  the jury.  See Hydroculture, Inc. v. Coopers & Lybrand, 848 P.2d
3  856, 862 (Ariz. Ct. App. 1992).  Only when the facts are undisputed
4  and reasonable jurors could not differ as to the conclusion the
5  facts support can the court determine the issue as a matter of law.
6  Id.  In a legal malpractice claim, a claimant cannot satisfy her
7  burden on causation by merely pointing to an alleged conflict of
8  interest, but, instead, must present specific facts showing that a
9  breach of duty by the defendant was the proximate cause of the
10 damage suffered by the claimant.  See Brosie v. Stockton, 468 P.2d
11 933, 936 (Ariz. 1970).

12     Expert testimony is generally required to establish the
13 standard of care in a professional malpractice action.  See Asphalt
14 Engineers, Inc. v. Galusha, 770 P.2d 1180, 1181-82 (Ariz. Ct. App.
15 1989).  Moreover, the parties do not dispute that, in the absence
16 of specific evidence establishing causation, a claimant must
17 present expert testimony to substantiate the link between the
18 claimed breach and the alleged injury.  Mot. Malprac. (doc. 328) at
19 16 (citing Carbone v. Tierney, 864 A.2d 308, 314-15 (N.H. 2004);
20 Gregg v. Nat'l Med. Health Care Servs., Inc., 699 P.2d 925, 928
21 (Ariz. Ct. App. 1985)).  In the case at bar, the Trustee retained
22 Professor Geoffrey Hazard to offer expert opinions and testimony
23 regarding the conduct of K&E in relation to the malpractice and
24 professional negligence claim.

25     In its motion, K&E argues that the Trustee has failed to
26 produce any evidence of causation to support her claim of
27 professional negligence and malpractice.  Mot. Malprac. (doc. 328)
28 at 14-17.  K&E asserts that, even assuming an attorney-client

relationship existed between it and LeapSource, which it adamantly

asserts did not, the Trustee has failed to produce specific facts

showing that a breach of K&E's duty was the proximate cause of

damage suffered by LeapSource. Id. at 15. K&E notes that Hazard,

the Trustee's expert, identified a conflict in late 2000 and early

2001 when K&E represented GTCR regarding its LeapSource investment.

Id. Such conflict allegedly arose from K&E's knowledge that Kirk

wanted a firm funding commitment from GTCR. Id. K&E notes that

the nature of GTCR's funding commitment was a heavily negotiated

point during September 1999, and GTCR was aware of Kirk's desire

for a firmer commitment. Id. at 16. Regardless, K&E argues that

there is no causal connection between Kirk's desire for a firmer

commitment from GTCR and any harm suffered by LeapSource in 2001.

Mot. Malprac. (doc. 328) at 15-16. K&E notes that in his report,

Hazard offers no expert opinion on causation, and, in contrast,

concedes that if LeapSource received any independent legal advice

in late 2000 and early 2001, it would raise a question about any

proximate cause. Id. at 16-17. K&E argues that LeapSource had

such outside representation at that time. Id. at 17.

      In response, the Trustee asserts that Hazard did express an

opinion on the subject of proximate cause in his report. Resp.

(doc. 375) at 9-15. The Trustee states that "Hazard opined that

assuming LeapSource would have survived as a functioning company

and avoid [sic] bankruptcy if it had been properly advised and

assisted 'it was reasonably foreseeable to Kirkland and Eaton that

their course of conduct in the period from late 2000 through May

2001 would have material adverse affect on LeapSource and Ms. Kirk

and her associates.'" Id. at 9. Hazard explained that, in making

- 32 -

his assumption regarding LeapSource's viability if it had been

properly advised, he relied principally upon the analysis done by

Tom Gilman in his memorandum to the LeapSource board dated February

24, 2001 ("Gilman Memorandum").  Id.  The Trustee argues that

"[t]he Gilman Memorandum and Professor Hazard's report together

establish the existence of conflicts of interest between LeapSource

and GTCR, and a more than sufficient basis to support a jury

verdict that K&E's (and Eaton's) harmful and improper conduct in

the face of those conflicts of interest was a proximate cause of

the very foreseeable damage to LeapSource."  Id. at 9-10.  However,

the Trustee does not specifically point out what evidence or facts

from these documents establish the necessary proximate cause.

Later in her response, the Trustee restates that there is

"overwhelming evidence" establishing that K&E's acts proximately

caused damage to LeapSource.  Id. at 13.

> Notwithstanding K&E's memorandum, which simply
> ignores the relevant evidence of K&E's and Eaton's
> conduct, the Plaintiff's evidence of causation is
> not limited to the existence of a conflict of
> interest.  It is based upon the overwhelming
> evidence of K&E's and Eaton's direct assistance to
> GTCR in conduct that resulted in the destruction
> of LeapSource - including the sale of the ICG
> assets to an insider without consideration, and
> the breaches of duty described in the Gilman
> Memorandum even before Chris Kirk was removed as
> CEO of LeapSource.

Id.  However, again, the Trustee does not point to any evidence

that establishes that K&E was involved in the "sale of the ICG

assets," any of the alleged "breaches of duty" described in the

Gilman Memorandum, or that it acted in any other way that

proximately caused damage to LeapSource.  The Trustee makes this

conclusory statement without providing any citation to exhibits or

1   other evidence that would provide it support.

2       Lastly, the Trustee seems to assert that K&E's recommendation

3   of David Eaton for "a position of trust" at LeapSource was the

4   breach of K&E's alleged duty to LeapSource that proximately caused

5   damage to the company.  Resp. (doc. 375) at 13-14.  "With knowledge

6   of the conflicts between GTCR and LeapSource (made unmistakably

7   clear by the Gilman Memorandum), K&E recommended Eaton for a

8   position of trust and responsibility at LeapSource, and caused him

9   to be engaged at LeapSource, knowing that he could not take any

10  position on behalf of LeapSource that would be adverse to GTCR."

11  Id. at 13.  The Trustee cites the "Of Counsel" Agreement K&E held

12  with David Eaton, which stated that Eaton could not "undertake any

13  employment, representation, or consultancy that is adverse to any

14  Kirkland & Ellis client."  Id. at 14; see also Exbt. 14 (doc. 292)

15  at 2.  Again, the Trustee cites no evidence that indicates that K&E

16  recommended or encouraged LeapSource to hire Eaton as their Chief

17  Restructuring Officer.

18      In the case at bar, the parties do not dispute that, in the

19  absence of specific evidence establishing causation, a claimant

20  must present expert testimony to substantiate the link between the

21  claimed breach and the alleged injury.  Mot. Malprac. (doc. 328) at

22  16 (citing Carbone v. Tierney, 864 A.2d 308, 314-15 (N.H. 2004);

23  Gregg v. Nat'l Med. Health Care Servs., Inc., 699 P.2d 925, 928

24  (Ariz. Ct. App. 1985)).  Here, the Court concludes that Hazard did

25  not express a specific opinion regarding causation in this matter.

26  First, the Court notes that Hazard, in his report, states that he

27  believes K&E had a conflict of interest in concurrently

28  representing LeapSource and GTCR.  Exbt. 28 (doc. 329) at 5.

Moreover, Hazard opines that K&E's "proceeding with assistance to GTCR . . . fell below the standards of recognized professional practice and constitutes a failure to conform to the standard of care reasonably expected of a professional in such circumstances." Id. Finally, the parties note that, after accepting certain assumptions, Hazard opines that K&E's acts were a substantial cause of injury to LeapSource. See Resp. (doc. 375) at 9; Reply (doc. 406) at 4-5.[6]

> I understand that there will be other evidence that, if LeapSource had been properly advised and assisted, it would have survived as a functioning company rather than going into bankruptcy. Assuming there is such evidence, in my opinion it was reasonably foreseeable to Kirkland and Eaton that their course of conduct in the period from late 2000 through March 2001 would have material adverse effect on LeapSource and Ms. Kirk and her associates. On that basis, the inhibitions imposed by their conflicts of interest in my opinion were a substantial cause of injury to LeapSource and Ms. Kirk and her associates.

Reply (doc. 406) at 4-5; see also Exbt. 28 (doc. 329) at 5. Basically, Hazard opines that K&E had a conflict of interest and breached its duty to LeapSource by providing assistance to GTCR and not LeapSource during the period from late 2000 through March 2001. Hazard does not, however, go further to opine that if K&E had properly advised and assisted LeapSource, thus not breaching its alleged duty, the company would have survived instead of going into bankruptcy.  In his report, Hazard only assumes that there will be

_____

[6] The Court notes that, originally, it was not provided a complete copy of Hazard's report, but instead only had the first five pages of that report for its review.  However, on July 19, 2006, counsel for K&E submitted the missing page of the report to the court.  In any event, the first sentence of the quoted section, which is critical to this analysis, was made available to the Court.

1   evidence to establish this causation.  <u>See</u> Exbt. 28 (doc. 329) at 5

2   ("I understand that there will be other evidence that, if

3   LeapSource had been properly advised and assisted, it would have

4   survived as a functioning company rather than going into

5   bankruptcy.").

6       Although the Trustee ensures the Court that such assumptions

7   are normal in the creation of expert reports, this assumption is

8   critical to the Trustee's claim, as it involves a specific element

9   required of the Trustee's cause of action.  On a motion for summary

10  judgement, the Court is unable to make such assumptions.  Specific

11  facts and evidence must be brought forward to indicate the

12  existence of all the elements required in the claim.  Without

13  evidence or facts that support Hazard's assumption that but for

14  K&E's alleged breach of providing assistance to GTCR and not

15  LeapSource, LeapSource would have survived as a company, the

16  element of causation remains unestablished.  Thus, the Court cannot

17  rely on Hazard's statement that K&E's acts or omissions were "a

18  substantial cause of injury to LeapSource."  This would be an act

19  of putting the cart before the proverbial horse.

20      Additionally, the Gilman Memorandum, which the Trustee

21  maintains provides evidence of causation and lists K&E's "breaches

22  of duty," fails to even mention K&E.  <u>See</u> Exbt. 6 (doc. 292).  The

23  Court concludes that neither the Hazard Report nor the Gilman

24  Memorandum sufficiently establishes the element of causation in

25  Plaintiff's malpractice and professional negligence claim.

26      Furthermore, the Court disagrees with the Trustee's allegation

27  that K&E's recommendation of Eaton for "a position of trust" at

28  LeapSource was the breach of duty that proximately caused damage to

1  LeapSource.  As previously indicated, the Trustee has cited no

2  evidence showing that K&E "recommended" Eaton for "a position of

3  trust" at LeapSource.  The Court itself cannot find any evidence in

4  the record that indicates that K&E recommended Eaton to LeapSource

5  or encouraged LeapSource to hire Eaton in any capacity.

6  Plaintiff's own statement of facts indicates that Eaton was

7  referred by Kevin Evanich, a K&E partner, to GTCR only.  PSOFM

8  (doc. 375) at ¶ 173.

9         Eaton was recommended to become involved in a
   matter in which K&E was already involved on behalf

10         of GTCR. David Eaton was referred to GTCR by Mr.
   Evanich at K&E.

11

12  Id.  Although the Trustee, in her statement of facts, cites

13  Evanich's deposition testimony where he allegedly stated that he

14  "referred David Eaton to GTCR, to represent G -- to talk to GTCR

15  about working for LeapSource," the Trustee has produced no evidence

16  or argument regarding how this act proximately caused damage to

17  LeapSource.  Id.[7]  Plaintiff's Statement of Facts further indicate

18  that Eaton was originally consulted to advise GTCR about what

19  course of action was in GTCR's best interests.  Id. at ¶ 178.

20  Moreover, according to the LeapSource board minutes, the directors

21  voting in favor of retaining AEG were Bruce Rauner, Dan Yih and Joe

22  Nolan, all GTCR principals, and plaintiff Kirk.  Id. at ¶ 183;

23  Exbt. 21 (doc. 292) at 2.[8]  The Trustee provides no argument or

24

25      [7] The Court notes that it was not provided a full transcript of
   the Evanich deposition or the specific pages on which this testimony

26  allegedly lies.  Thus, the Court is unable to independently verify
   the quoted testimony.

27

28      [8] At oral argument, Plaintiff raised the question as to whether
   Kirk actually abstained from this vote.  However, the board meeting

1   analysis to explain how causation could be or is established under

2   these circumstances.   The Court does not see how K&E's

3   recommendation of Eaton to GTCR could have proximately caused any

4   damage to LeapSource.

5        A party opposing a motion for summary judgment cannot rest

6   upon mere allegations or denials in the pleadings or papers, but

7   instead must set forth specific facts demonstrating a genuine issue

8   for trial.  Anderson, 477 U.S. at 250.  Here, the Court finds that

9   the Trustee has failed to set forth specific facts demonstrating a

10  genuine issue for trial regarding causation in this claim.

11  Moreover, to the extent that the Trustee is asserting that

12  causation is established vicariously due to the individual actions

13  of Eaton, this claim is now moot as summary judgment has been

14  granted in favor of K&E on all of Plaintiffs' vicarious liability

15  claims involving Eaton and AEG.  Supra, section III(A).  Summary

16  judgment is appropriate "against a party who fails to make a

17  showing sufficient to establish the existence of an element

18  essential to that party's case, and on which that party will bear

19  the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S.

20  317, 322 (1986).  The Court concludes that the Trustee has failed

21  to make a showing sufficient to establish the existence of the

22  causation element essential to her claim.  The relevant facts are

23  undisputed and reasonable jurors could not differ as to the

24  conclusion the facts support.  In light of this determination, the

25

26  ───────────────

27  minutes, included as Exhibit 21 in Plaintiff's response in opposition
    to K&E's motion for summary judgement on the aiding and abetting
    claims (doc. 292), reflect that Kirk voted in favor of retaining AEG.

28

- 38 -

1  Court need not analyze the remaining elements of the malpractice

2  and professional negligence claim.  Summary judgment on the

3  malpractice and professional negligence claim is appropriate as a

4  matter of law.

5  **D. AEG and Eaton's Motion for Summary Judgment**

6  Prior to their settlement with Plaintiffs, AEG and Eaton filed

7  a motion for summary judgment (doc. 247).  Pursuant to the terms

8  and conditions of their Settlement Agreement[9], the parties have

9  stipulated and requested that all of Plaintiffs' claims against AEG

10  and Eaton be dismissed with prejudice.  Stipulation (doc. 371).

11  Accordingly, the court determines that there is no just reason for

12  delay and will direct the Clerk of the Court to enter judgment in

13  favor of Defendants AEG and Eaton pursuant to Federal Rule of Civil

14  Procedure 54(b), and Defendants' motion for summary judgment (doc.

15  247) will be denied and dismissed as moot.

16  Therefore,

17  IT IS ORDERED that Defendant Kirkland & Ellis's supplemented

18  Motion for Summary Judgment Regarding Vicarious Liability (doc.

19  250, 368) is GRANTED.

20  IT IS FURTHER ORDERED that K&E's motion for summary judgment

21  on the aiding and abetting and tortious interference claims (Counts

22  1, 18, 21, and 23) (doc. 255) is GRANTED.

23  IT IS FURTHER ORDERED that K&E's motion for summary judgment

24  on the malpractice and professional negligence claim (Count 10)

25  (doc. 328) is GRANTED.

26

27  [9]  Those terms and conditions purporting to affect the rights and

28  liabilities of K&E, a non-party to the Settlement Agreement, will be construed in a manner consistent with this opinion.

- 39 -

1    IT IS FURTHER ORDERED that the second order in the Court's

2 order dated March 28, 2006 (doc. 356) is corrected to read:

3    IT IS FURTHER ORDERED that K&E's motion for summary

4 judgment on Counts 12 and 14 (doc. 242) is GRANTED.

5    IT IS FURTHER ORDERED, having determined that there is no just

6 reason for delay, directing the Clerk of the Court to enter

7 judgment in favor of Defendants AEG Partners, LLC and David Eaton

8 pursuant to Federal Rule of Civil Procedure 54(b).

9    IT IS FINALLY ORDERED that Defendant AEG Partners, LLC and

10 David Eaton's Motion for Summary Judgment (doc. 247) is DENIED and

11 dismissed as moot.

12    DATED this 28th day of August, 2006.

13

14

15    _____

16    Robert C. Broomfield
      Senior United States District Judge

17

18

19

20 Copies to counsel of record.

21

22

23

24

25

26

27

28

- 40 -