1 **WO**

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                       FOR THE DISTRICT OF ARIZONA

9

10

11

12 Diane Mann, as Trustee for      )
   the Estate of LeapSource, Inc.,)
13 *et al.*,                         )
                                   )
14              Plaintiffs,        )   No. CIV-02-2099-PHX-RCB
                                   )
15      vs.                        )        O R D E R
                                   )
16 GTCR Golder Rauner, L.L.C.,      )
   a Delaware limited liability    )
17 company, *et al.*,                )
                Defendants.        )
18 _____ )

19                          ***Introduction***[1]

20      Defendant Michael Makings had an integral role in LeapSource,

21 Inc., a now defunct business process outsourcing company.  In late

22 2000, he assumed the responsibilities of LeapSource's Chief

23 Operating Officer ("COO").  DSOF (doc. 341), exh. 20 thereto at 83.

24 For a short time, beginning on February 27, 2001, until roughly

25 mid-March, 2001, Mr. Makings was Chief Executive Officer ("CEO")

26 and a director of LeapSource.  Doc. 324 at ¶ 5 (citation omitted).

27 _____

28      [1]   The court assumes familiarity with this protracted litigation,
       including all prior proceedings and decisions herein.

1  In addition to his involvement with LeapSource, as detailed in Mann
2  v. GTCR Golder Rauner, L.L.C., 351 B.R. 708 (D. Ariz. 2006), Mr.
3  Makings has been involved in several capacities with ICG Group,
4  Inc.  Primarily because of LeapSource's sale of its ICG division to
5  Mr. Makings in late March 2001, he was named as a defendant in this
6  action.  Defendant Makings was "at all times ICG Group's sole
7  shareholder and sole director."  Id. at 709 (citations omitted).

8      Before the court are motions directed at nine counts of the
9  Fourth Amended Complaint ("FAC") (doc. 21) against defendant
10  Makings.  Five of those counts are being brought by the plaintiff
11  bankruptcy trustee, Diane Mann.  The other four are being brought
12  by the individual plaintiffs, all former LeapSource shareholders
13  and employees.[2]

14      Currently pending before the court is defendant Makings'
15  motion for summary judgment pursuant to Fed. R. Civ. P. 56 (doc.
16  340).  Having carefully considered that motion, plaintiffs'
17  response (doc. 418), and defendant's reply (doc. 447), and having
18  determined that oral argument is unnecessary, the court rules as
19  follows.

20                          ***Discussion***
21  ***I.  Standard of Review***

22      The court assumes familiarity with what has sometimes been
23  referred to as the Celotex trilogy wherein the Supreme Court, in
24  1986, clarified and refined the standards for deciding Rule 56
25  summary judgment motions.  See Anderson v. Liberty Lobby, Inc., 477
26  U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v.

27  _____

28      [2]    Hereinafter, all references to plaintiffs in the plural form shall be
    read as referring to the individuals, as opposed to the trustee.

1  Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and

2  Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574,

3  106 S.Ct. 348, 89 L.Ed.2d 538 (1986).  There is no need to repeat

4  the entire body of summary judgment case law which has developed

5  since then, but a few principles are worth highlighting.

6      A motion for summary judgment shall be granted "if the

7  pleadings, depositions, answers to interrogatories, and admissions

8  on file, together with the affidavits, if any, show that there is

9  no genuine issue as to any material fact and that the moving party

10 is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

11 56(c).  It is beyond dispute that "[t]he moving party bears the

12 initial burden to demonstrate the absence of any genuine issue of

13 material fact." Horphag Research Ltd. v. Garcia, 475 F.3d 1029,

14 1035 (9th Cir.  2007) (citation omitted).  "Once the moving party

15 meets its initial burden, . . . , the burden shifts to the non-

16 moving party to set forth, by affidavit or as otherwise provided in

17 Rule 56, specific facts showing that there is a genuine issue for

18 trial."  Id. (internal quotation marks and citations omitted).

19 This "[e]vidence  must be concrete and cannot rely on 'mere

20 speculation, conjecture, or fantasy.'" Bates v. Clark County, 2006

21 WL 3308214, at * 2 (D.Nev. Nov. 13, 2006) (quoting O.S.C. Corp. v.

22 Apple Computer, Inc., 792 F.2d 1464, 1467 (9th Cir. 1986)).

23 Similarly, uncorroborated and self-serving testimony or

24 declarations, without more, will not create a genuine issue of

25 material fact precluding summary judgment.  See Dubois v. Ass'n

26 Apart. Owners 2987 Kalakaua, 453 F.3d 1175, 1180 (9th Cir. 2006),

27 cert. denied, 2007 WL 506192, 75 USLW 3436 (Feb. 20, 2007).

28      Nor will "a  mere 'scintilla' of evidence"  be sufficient "to

1  defeat a properly supported motion for summary judgment; instead,

2  the nonmoving party must introduce some 'significant probative

3  evidence tending to support  the complaint.'" <u>Fazio v. City &</u>

4  <u>County of San Francisco</u>, 125 F.3d 1328, 1331 (9th Cir. 1997)

5  (quoting <u>Anderson</u>, 477 U.S. at 249, 252, 106 S.Ct. 2505).   Thus,

6  in opposing a summary judgment motion it is not enough to "simply

7  show that there is some metaphysical doubt as to the material

8  facts." <u>Matsushita</u>, 475 U.S. at 586, 106 S.Ct. 348 (citations

9  omitted).

10       By the same token though, when assessing the record to

11  determine whether there is a "genuine issue for trial," the court

12  must "view the evidence in the light most favorable to the

13  nonmoving party, drawing all reasonable inference in his favor."

14  <u>Horphaq</u>, 475 F.3d at 1035  (citation omitted).  The court may not

15  make credibility determinations; nor may it weigh conflicting

16  evidence.  <u>See</u> <u>Anderson</u>, 475 U.S. at 255, 106 S.Ct. 2505.  With

17  these standards firmly in mind that the court has examined, at

18  length, the present record, and the parties' respective arguments.

19  ***II.   Tortious Interference with Contract Counts***

20       ***A.   Count 1 - Purchase Agreement***

21       The plaintiff trustee designates count one of the FAC,

22  "Tortious [sic] Interference with Contract Against: Makings, Eaton,

23  AEG and K&E[.]"[3] FAC (doc. 121) at 74.  The "contract" which forms

24  the basis for this count is the  Purchase Agreement between the

25  _____

26       [3]     Mr. Makings is the only remaining defendant in this count because Mr.
    Eaton and AEG entered into settlement agreements dismissing all claims as against
27  them with prejudice, and judgment was entered in their favor on September 8, 2006
    (doc. 461).   Furthermore,  the court previously granted a motion for summary
28  judgment in favor of the law firm Kirkland & Ellis ("K&E") on this count and
    others.

1    GTCR VI Entities[4] and LeapSource.   Although the designation
2    explicitly names defendant Makings, his name is conspicuously
3    absent from any substantive allegations in count one.

4         In any event, defendant Makings advances three arguments as to
5    why the court should grant summary judgment in his favor on this
6    count.   First, Makings notes that there "are *no allegations* in the
7    *FAC* that [he] acted in . . . a capacity other than as an officer or
8    director of LeapSource[]" with respect to the Purchase Agreement.
9    Mot. (doc. 340) at 2 (emphasis added).   Second, Makings accurately
10   points out that this court has previously held that there was no
11   breach of the Purchase Agreement when the GTCR Entities decided to
12   stop funding LeapSource.   See Order (D.Ariz. Sept. 30, 2003) (doc.
13   72) at 5-11; and 32.   Thus, Makings reasons, the law of the case
14   doctrine mandates summary judgment because absent a breach, there
15   can be no tortious interference with contract as a matter of law.
16   Third, according to Makings, plaintiffs cannot establish that he
17   had knowledge of the Purchase Agreement – an essential element of a
18   tortious interference with contract cause of action.

19        Plaintiffs' response overlooks the law of the case argument,
20   and instead focuses on the capacity in which defendant Makings is
21   being sued.   In essence plaintiffs counter that Makings is trying
22   to "have his cake and eat it too."   Plaintiffs assert that at other
23   times in this litigation, Makings has taken the position that "he
24   was *not* an officer or director of LeapSource when he purchased the
25   ICG asset from LeapSource[.]" Resp. (doc. 418) at 5.   Now,
26   plaintiffs believe that Makings is claiming he was a LeapSource

27   _____

28        [4]    The GTCR VI Entities are comprised of the three defendant private
     equity funds, GTCR Fund VI, L.P., GTCR VI Executive Fund and GTCR Associates VI.

1    officer or director.  This "contradiction," as plaintiffs describe
2    it, shows that there are disputed facts rendering summary judgment
3    improper.  <u>See</u> <u>id.</u> What is more, plaintiffs maintain that "there
4    are allegations and
5    . . . evidence that Makings was acting purely for his personal
6    benefit and not as an officer or director of LeapSource."  <u>Id.</u>[5]

7         Then, as they did in opposing the GTCR defendants' summary
8    judgment motion, plaintiffs assert that a breach of contract is not
9    a prerequisite to maintaining a cause of action for tortious
10   interference with contract.  "[I]t is enough," in plaintiffs'
11   opinion, "if the Agreement was terminated, even without a
12   breach[.]"  <u>Id.</u> at 6.  Here, plaintiffs contend that that
13   "termin[ation]" took the form of GTCR's decision to cease funding
14   under the Purchase Agreement.

15                *1.  Law of the Case Doctrine*

16        Earlier in this litigation the court granted, *inter alia*, the
17   GTCR defendants' Rule 12 motion to dismiss count two of the First
18   Amended Complaint.[6]  <u>See</u> Doc. 72 at 5-11.  Among other things,
19   count two alleged that the GTCR Entities breached the Purchase
20   Agreement by "failing to fully fund LeapSource" under the terms of
21   that Agreement.  <u>See</u> <u>id.</u> at 5 (internal quotation marks and
22   citation omitted).  The court held that there was no breach of the

---

24        [5]   To support this contention plaintiffs cite only to the FAC and not to
25   any record evidence.  This is a significant oversight given the procedural posture
     of this case.  At this summary judgment stage, plaintiffs cannot rely upon mere
26   conclusory allegations in the complaint.  <u>See</u> <u>Taylor v. List</u>, 880 F.2d 1040, 1045
     (9th Cir. 1989) ("[A] summary judgment motion cannot be defeated by relying solely
27   on conclusory allegations unsupported by factual data.")

28        [6]   Defendant Making's motion to dismiss this count and others was the
     subject of a separate order.  <u>See</u> Doc. 70.

1   Purchase Agreement because the "language [wa]s perfectly clear that
2   it imposed a conditional funding obligation on GTCR." Id. at 11.
3   In fact, the court explicitly found that "[t]he allegation to this
4   effect [*i.e.* an obligation to fully fund LeapSource] [wa]s simply
5   erroneous[.]" Id. at 6-7.

6       That prior order also granted the GTCR defendants' motion to
7   dismiss the related claim for tortious interference with Purchase
8   Agreement.[7] See id. at 31-33; and 69.   In dismissing that count,
9   at the outset this court stressed that "[o]f primary importance to
10  the resolution" of whether plaintiffs stated such a claim was "the
11  fact that the court has already ruled that no breach of the
12  Purchase Agreement occurred[.]" Id. at 32 (citation omitted).  The
13  court continued in a similar vein, noting that as it "ha[d] fully
14  explained in its Order related to [K&E's] Motion to Dismiss, an
15  *actual breach* of the *underlying contract* is a prerequisite to
16  liability for tortious interference." Id. (emphasis added).  Then,
17  after listing the elements of tortious interference with contract,
18  the court reiterated that "a breach of the underlying agreement
19  *must occur* in order to find liability for tortious interference."
20  Id. (emphasis added).  In fact, "[b]ecause the court ha[d] held
21  . . . that this preliminary requirement [breach of the underlying
22  agreement] [wa]s not met," it found no "need to discuss the other"
23  bases for dismissal urged by the GTCR defendants.  Id.
24      In another order issued that same day, the court likewise
25  granted K&E's motion to dismiss the tortious interference with

26
27          [7]     That count is nearly identical to count one of the FAC, which is the
28  subject of this motion, except that in its earlier form plaintiffs named a broader
    range of defendants.

1   Purchase Agreement count.   Employing the same reasoning as it did
2   in the GTCR defendants' dismissal motion, the court held that "a
3   claim for tortious interference with the Purchase Agreement [could]
4   not stand[]" because "the Purchase Agreement was not breached[.]"
5   Doc. 69 at 23.

6       Reasoning that it is now the law of the case that there was no
7   breach of the Purchase Agreement, defendant Makings contends that
8   he is entitled to summary judgment on the claim that he tortiously
9   interfered with that Agreement. "Law-of-the-case rules have
10  developed to maintain consistency and avoid reconsideration of
11  matters once decided during the course of a single continuing
12  lawsuit.'" Sathianathan v. Smith Barney, Inc., 2004 WL 3607403, at
13  *3 (N.D.Cal. May 28, 2004) (quoting, *inter alia*, Wright & Miller,
14  *Federal Practice and Procedure*, § 4478).   "Under the 'law of the
15  case' doctrine, a court is ordinarily precluded from reexamining an
16  issue previously decided by the *same court*, or a higher court, in
17  the *same case*." Hydrick v. Hunter, 466 F.3d 676, 687 (9th Cir.
18  2006) (internal quotation marks and citation omitted) (emphasis
19  added).   "For the law of the case doctrine to apply, the issue in
20  question must have been decided explicitly or by necessary
21  implication in [the] previous disposition." Id. (internal
22  quotation marks and citations omitted).   This doctrine "of practice
23  promotes the finality and efficiency of the judicial process by
24  protecting against the agitation of settled issues." Christianson
25  v. Colt Industries Operating Corp., 486 U.S. 800, 816, 108 S.Ct
26  2166, 100 L.Ed.2d 811 (1988).

27      In the present case, this court has explicitly held that there
28  was no breach of the Purchase Agreement when the GTCR Entities

1  decided to discontinue funding LeapSource.  Moreover, not once but
2  twice before, this court has also explicitly held that without a
3  breach of that underlying Agreement, a claim of tortious
4  interference with that Agreement cannot be sustained.  In light of
5  those prior rulings, the issue of the underlying breach, as well as
6  the issue of requiring a breach as a predicate to liability for
7  tortious interference with contract are not open to relitigation.
8  The court hastens to add that none of the reasons for deviating
9  from the law of the case doctrine apply here.  See Minidoka
10 Irrigation Dist. v. Department of Interior of U.S., 406 F.3d 567,
11 573 (9th Cir. 2005) (internal quotation marks and citation omitted)
12 ("The law of the case doctrine is subject to three exceptions that
13 may arise when (1) the decision is clearly erroneous and its
14 enforcement would mark a manifest injustice, (2) intervening
15 controlling authority makes reconsideration appropriate, or (3)
16 substantially different evidence was adduced at a subsequent
17 trial.")[8]  Consequently, the court finds that the law of the case

18 ─────────────────

19     [8]     Given this court's prior rulings that a breach of contract is necessary
   to prevail on a tortious interference with contract claim, it is possible to read
20 plaintiff's contrary assertion, i.e. "[t]he law does not require a breach[,]" as
   urging a departure from the law of the case.  Plaintiff has not provided a
21 sufficient basis warranting such a departure however; nor has she expressly urged
   such a departure.
        To support her argument, plaintiff relies upon three cases (two outside of
22 this jurisdiction) involving the termination of at-will employees.  See Wallace v.
   Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors, 184 Ariz. 419, 909 P.2d
23 486 (Ariz. Ct. App. 1995); Sterner v. Marathon Oil Co., 767 S.W.2d 686 (Tex. 1989);
   and Cronk v. Intermountain Rural Electric Ass'n, 765 P.2d 619 (Colo. Ct. App.
24 1988).  Plaintiff's reliance upon these employment cases is misplaced from both a
   legal and factual standpoint.  Factually, there is a clear difference between at-
   will employee relationships, with no written contracts, and a written Purchase
25 Agreement such as the one which has been the subject of this litigation.
        There is also a significant legal distinction between each of those at-will
26 employee cases and this action.  In sharp contrast to the present case, in each of
   the cited cases there was a breach of the at-will employee relationship.  As the
27 discussion above makes clear, plaintiff has not, and indeed cannot, show a similar
   breach here.  Hence, to the extent plaintiff is implying that the court should
28 revisit the issue of whether the Purchase Agreement was breached, and thus in turn,
   whether such a breach is necessary to state a claim for tortious interference with

1   doctrine dictates granting defendants Makings' summary judgment

2   motion as to count one of the FAC, alleging tortious interference

3   with the Purchase Agreement.  Because the law of the case doctrine

4   is determinative, there is no need to consider defendant Making's

5   alternative arguments, *i.e.* the capacity in which he was sued and

6   whether he had knowledge of the Purchase Agreement.

7       **_B.  Count 21 - Senior Management Agreements and Employment_**
    **_Agreements_**

8

9       The thrust of count 21 is that allegedly defendant Makings,

10  along with other defendants, tortiously interfered with the Senior

11  Management Agreements and the Employment Agreements[9] which the

12  individual plaintiffs had with LeapSource.  Due to that alleged

13  interference, plaintiffs claim that they did not receive the

14  severance payments ("and in some cases other . . . mon[ies]") to

15  which they believe they were entitled under those contracts.  Resp.

16  (doc. 418) at 11.

17      Several times over the course of this litigation, the court

18  has enumerated the elements which are necessary to establish

19  intentional interference with a contract under Arizona law.  Most

20  recently this court indicated:

21              The tort of intentional interference
            with contractual relations requires a
22          plaintiff to prove: (1) existence of a
            valid contractual relationship,(2)
23          knowledge of the relationship on the
            part of the interferor,(3) intentional
24          interference inducing or causing a breach,
            (4) resultant damage to the party whose
25

26  contract, the court declines to do so.

27      [9]      Hereinafter in this section "employment contracts" shall be read as
    referring to these Agreements as well as to the Senior Management Agreements,
28  because there is no need to distinguish between the two for the present motion.

relationship has been disrupted, and (5)that the defendant acted improperly.

Mann, 351 B.R. at 701 (quoting Safeway Insurance Company, Inc. v. Guerrero, 210 Ariz. 5, 106 P.3d 1010, 1025 (2005)) (other citation omitted).

As to the third element, the interference must be "'*both* intentional and improper.'" Safeway, 106 P.3d at 1026 (quoting Restatement (Second) of Torts § 767 cmt. a (1979)). Thus, "[i]f the interferer is to be held liable for committing a wrong, his liability must be based on more than the act of interference alone." Id. (internal quotation marks and citation omitted). As the Arizona Supreme Court explained in Snow v. Western Savings & Loan Association, 152 Ariz. 27, 730 P.2d 204 (1987), "[t]he tort is intentional in the sense that [defendant] must have intended to interfere with the [plaintiffs'] contract or have known that this result was substantially certain to be produced by its conduct." Id. at 33, 730 P.2d at 211 (citations omitted). Consequently, Arizona case law "emphasizes that a plaintiff must show more than the defendant's knowledge that his or her conduct would induce a breach to establish intentional interference with contractual relations." Safeway, 106 P.3d at 1026 (citing cases).

Improper conduct, the fifth element, is analyzed by considering the following seven factors previously recited by this court:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,(c) the interests of the
> other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the
> actor,(e) the social interests in protecting
> the freedom of action of the actor and the
> contractual interests of the other,(f) the
> proximity or remoteness of the actor's conduct

- 11 -

1    to the interference and (g) the relations between
2    the parties.

3  <u>Mann</u>, 351 B.R. 700-701 (quoting Restatement (Second) of Torts § 767
4  (1979)) (other citations omitted).  "If the plaintiff is unable to
5  show the impropriety of the defendant's conduct based on an
6  examination of these factors, the conduct is not tortious." <u>Id.</u> at
7  701 (citation omitted).  Of these seven factors, the two "deserving
8  the most weight are the nature of the actor's conduct and the
9  actor's motive." <u>Wells Fargo Bank v. Arizona Laborers, Teamsters</u>
10 <u>and Cement Masons Local No. 395 Pension Trust</u>, 201 Ariz. 474, 494,
11 38 P.3d 12, 32 (2002) (citation omitted).

12      Initially Makings took the position that because the
13 plaintiffs were "at-will" employees, he could not be held liable
14 for tortiously interfering with their employment contracts when, as
15 LeapSource CEO, he signed their termination letters.  This argument
16 was quickly laid to rest, however, by plaintiffs' opposition
17 emphasizing that they are not asserting any form of "'wrongful
18 termination[.]'" <u>See</u> Resp. (doc. 418) at 11.  Once again,
19 plaintiffs' theory of liability comes back to their fervent belief
20 that the ICG asset sale to defendant Makings was fraudulent and
21 constitutes a breach of fiduciary duties.  This purported breach of
22 fiduciary duties, from plaintiffs' standpoint, supports a claim for
23 tortious interference with contract.  In any event, the alleged
24 tortious interference is not plaintiffs' termination from
25 LeapSource, but rather the ICG asset sale.

26      Viewed through this lens, Makings argues that summary judgment
27 in his favor on count 21 is mandated because the plaintiffs cannot
28 show either that he acted with the requisite intent, or that he

- 12 -

1   "improperly interfere[d] with" their employment contracts.  See

2   Mot. (doc. 340) at 11.  The court agrees.  It does so for the

3   simple reason that, as will be more fully discussed below,

4   plaintiffs have not met their burden of proof with respect to

5   either of these elements.  Nor, for that matter, as will also be

6   more fully discussed below, have plaintiffs met their burden of

7   proof with respect to the knowledge element of this tortious

8   interference claim.

9        Plaintiffs assert that Makings "knew" that they were entitled

10  to severance payments "and in some cases other amounts of money[]"

11  under the terms of their employment contracts.  See Resp. (doc.

12  418) at 11.  According to plaintiffs, Makings gained that knowledge

13  "because he was personally involved in attempts to negotiate

14  reductions in those [contractual] obligations."  Id. The noticeable

15  absence of cites to the record is fatal to plaintiffs' opposition.

16  Plaintiffs cannot defeat this summary judgment motion by relying

17  upon blanket, unsupported assertions declarations in their opposing

18  memorandum of law.  See Smith v. Mack Trucks, 505 F.2d 1248, 1249

19  (9th Cir. 1974) (citation omitted) ("[A] [l]egal memorand[um] . . .

20  , in the summary-judgment context, [is] not evidence, and do[es]

21  not create issues of fact capable of defeating an otherwise valid

22  motion for summary judgment.")  That is so in part because "the

23  arguments and statements of counsel are not evidence and do not

24  create issues of material fact capable of defeating an otherwise

25  valid motion for summary judgment." Barcamerica Intern. v. Tyfield

26  Importers, Inc., 289 F.3d 589, 593 n.4 (9th Cir. 2002) (internal

27  quotation marks and citation omitted).

28       Plaintiffs' opposition is equally unavailing in terms of the

1    intent element.  Plaintiffs accurately state, as noted earlier,
2    that one way in which to establish intent here is to show that a
3    defendant "'*kn[ew] that this result was substantially certain to be*
4    *produced by [his] conduct*." <u>See</u> Resp. (doc. 418) at 10 (quoting
5    <u>Snow</u>, 730 P.2d at 11) (other citation omitted) (emphasis added by
6    plaintiffs).  Applying that rule to the present case would require
7    plaintiffs to show that defendant Makings knew that the ICG asset
8    sale was "substantially certain" to "result" in their not receiving
9    whatever severance and other monies they believe they are owed
10   under the employment contracts.  Plaintiffs baldly assert that "the
11   evidence is overwhelming that [improper] interference with the
12   performance of [the] [employment] contract obligations was certain
13   to be the result of conveying" the ICG asset to Makings.  <u>Id.</u> at
14   10.  To defeat a summary judgment motion, it is not enough to
15   merely state that "the evidence is overwhelming[.]" <u>See</u> <u>id.</u>  Nor is
16   it enough to say, as plaintiffs also do, that "[t]he question of
17   intent ordinarily is for the finder of fact." <u>Id.</u> (quoting <u>Snow</u>,
18   730 P.2d at 212) (other citation omitted).

19        Plaintiffs must demonstrate how that evidence is
20   "overwhelming."  At the very least, as the party opposing summary
21   judgment, plaintiffs must "designate *specific facts* showing that
22   there is a genuine issue for trial." <u>See</u> <u>Celotex</u>, 477 U.S. at 324,
23   106 S.Ct. 2548 (internal quotation marks omitted) (emphasis added)
24   Further, they must point to the evidence from which a jury could
25   find, or reasonably infer, the requisite intent.  Plaintiffs have
26   not done that however.

27        Plaintiffs did quote from the deposition of one of the
28   plaintiffs, Patrice Walker, wherein she testified about a breakfast

1  meeting she had with defendant Makings in early January, 2001.

2  When directly asked whether "Mr. Makings ever specifically sa[id]

3  anything about the company [LeapSource], quote, unquote, going

4  under[,]" plaintiff Walker responded: "He said there were

5  significant changes going on at LeapSource because of the increased

6  pressure from GTCR."  Resp. (doc. 418) at 12-13 (quoting Walker

7  Deposition).[10]  Following up on that answer, Ms. Walker was then

8  asked whether Makings said "anything else on that issue[.]" Id. at

9  13 (citation omitted).  She replied, "All he [Makings] wanted to do

10 was walk away with ICG."  Id. (citation omitted).  Pointedly asked

11 whether Makings "specifically sa[id] that[,]" Walker readily

12 agreed, "He specifically said that."  Id. (citation omitted).

13      Plaintiffs' reliance upon the foregoing is problematic.

14 Plaintiffs have not explained (and it is not readily apparent) how

15 this testimony bears on the issue of whether Makings knew that if

16 he bought ICG, the plaintiffs would not receive severance payments

17 pursuant to their employment contracts.  Therefore, as with the

18 knowledge component of tortious interference with contract,

19 plaintiffs have not shown a genuine issue of material fact so as to

20 preclude summary judgment on this count.

21      Turning to the fifth element, improper conduct, plaintiffs

22 accurately state the law, listing the seven Restatement factors

23 which must be examined in resolving that issue.  Resolution of this

24 issue, plaintiffs maintain, "requires a factual determination that

25 cannot be made in the context of this motion for summary

26 judgment[.]" Resp. (doc. 418) at 9.  Denial of this aspect of

27

28      [10]    Plaintiffs did not cite to where, if at all, this excerpt can be found
in the record.  Thus, the court is unable to provide a complete citation.

1   Makings' motion is mandated, plaintiffs suggest, because "there is
2   more than enough evidence to support a jury verdict that, . . . ,
3   the sale of the ICG assets was harmful to the interests of the
4   creditors of LeapSource, and prevented LeapSource from performing
5   its contract obligations to creditors, including to . . .
6   Plaintiffs who were owed substantial severance payments by
7   LeapSource."   Id.

8       Again, the deficiency in plaintiffs' response is their failure
9   to cite to relevant record evidence.  As the Ninth Circuit permits,
10  this court has "limit[ed] its review to the documents submitted for
11  purposes of summary judgment and *those parts of the record*
12  *specifically referenced therein*."   Carmen v. San Francisco Unified
13  Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001) (emphasis added).
14  Here, plaintiffs "specifically referenced" a few selected quotes,
15  some of which are set forth above, from the deposition of plaintiff
16  Walker.  However, the fact that defendant Makings purportedly
17  "wanted to walk away with ICG[]" does not create a genuine issue of
18  material fact as to "improper conduct."   See Doc. 418 at 13
19  (citation omitted).

20      The remainder of Walker's deposition testimony from which
21  plaintiffs quote does not advance their argument that Makings
22  engaged in improper conduct of the type which is necessary to
23  support tortious interference with contract.  To illustrate, Ms.
24  Walker testified that Makings asked her if she had "ever considered
25  ICG[.]" Id. at 12 (citation omitted).  As Walker recalls it,
26  Makings then asked her what she would "do personally if these
27  changes occurred at LeapSource[.]" Id. (citation omitted).  And
28  Makings wondered if she "could . . . take his cell phone [number]

1  if [she] wanted to discuss this in the future." <u>Id.</u> (citation

2  omitted).  The court is at a loss to see how this testimony creates

3  a factual issue as to Makings' supposed improper conduct.  If

4  plaintiffs had analyzed, with cites to relevant record evidence,

5  "the nature of [Making's] conduct and [his] motive" (the two

6  factors "deserving the most weight[]" in deciding whether conduct

7  is improper), <u>Wells Fargo</u>, 38 P.3d at 32 (citation omitted),

8  perhaps the court could have overlooked their lack of discussion as

9  to the other six Restatement factors which are germane to improper

10  conduct inquiry, but the court cannot.  Plaintiffs do "not have

11  enough evidence of" not just one but three "essential elements" of

12  this tortious interference with contract claim "to carry [their]

13  ultimate burden of persuasion[.]" <u>See</u> <u>Nissan Fire & Marine Ins. Co.</u>

14  <u>v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

15  Therefore, summary judgment in favor of defendant Makings as to

16  count 21 is proper.

17  ***C.  Count 23 - Stockholders Agreement and Purchase Agreement***

18  In count 23 of the FAC, the plaintiffs alleged that defendant

19  Makings and other defendants "intentionally caused the GTCR VI

20  Entities to breach the Stockholders Agreement and the Purchase

21  Agreement[.]" FAC (doc. 121) at 103, ¶ 485.  To the extent

22  plaintiffs are alleging that defendant Makings tortiously

23  interfered with the Purchase Agreement, for the reasons set forth

24  in section II(A) above, the court grants defendant's motion for

25  summary judgment.

26  In moving for summary judgment on count 23, defendant Makings

27  focused solely on the Purchase Agreement.  As the moving party,

28  Makings had the burden of "either produc[ing] evidence negating an

1  essential element of" this claim as it pertains to the Stockholders

2  Agreement, or "show[ing] that the nonmoving party does not have

3  enough evidence of an essential element to carry its ultimate

4  burden of persuasion at trial."   See Nissan Fire & Marine, 210 F.3d

5  at 1102.  Defendant Makings did neither.  Accordingly, the court

6  denies defendant Making's summary judgment as to count 23 to the

7  extent the Stockholders Agreement is a basis for that count.

8  ***III.  Breach of Fiduciary Duty Counts***

9       Defendant Makings also is moving for summary judgment on the

10 breach of fiduciary duty counts, both those brought by the trustee

11 and those brought by the individual plaintiffs.  Primarily because

12 there is a significant standing issue with respect to the

13 individual plaintiffs, the court will separately analyze these

14 breach of fiduciary duty counts.

15      ***A.  Count 5 - "Breach of Fiduciary Duties by Directors and
16      Officers"***

17      In count 5 the trustee alleges that defendant Makings, along

18 with other defendants, breached a wide range of fiduciary duties.

19 From the extensive discovery, defendant Makings surmises that he

20 allegedly breached those duties in three different ways.[11]  In

21 opposing this aspect of defendant Making's motion, however, the

22 trustee focuses upon the ICG assets sale to the exclusion of other

23 possible bases for a breach of fiduciary.  The court will similarly

24 limit its analysis.

25

26      [11]   The first way is through  "discussions [Makings] was allegedly having
27 with the GTCR Defendants[.]" Mot. (doc. 340) at 18.  Second, Makings allegedly
   breached his fiduciary duties by "developing cost projections and reduction in work
28 force[.]" Id.  The third alleged breach arises out of the ICG asset sale to ICG
   Group.

1    A prior ruling in the consolidated adversary proceeding

2  further limits the scope of count five *vis-a-vis* the present

3  motion.   When the trustee filed her opposition to the present

4  motion, her summary judgment motion as to count III, alleging a

5  preferential transfer in violation of 11 U.S.C. § 547, was still

6  pending in the adversary proceeding.   However, in an August 28,

7  2006, decision, the court found that defendant Makings was not an

8  "insider" within the meaning of that statute.   See Mann, 351 B.R.

9  at 714.   Accordingly, the court denied the trustee's motion for

10  summary judgment as to count III.[12]

11    That prior ruling directly impacts the present motion because

12  the trustee asserts that "[a]s a matter of law, the *same conduct*

13  that [was] described in [her] Motion for Summary Judgment Re Count

14  III (fraudulent transfer and preferential transfer of the assets of

15  an insolvent company[13]) constitutes a breach of fiduciary duty to

16  LeapSource[.]"[14] Resp. (doc. 418) at 14 (footnote and emphasis

17  added).   The conduct which the trustee identified in that motion,

18  and which she incorporated by reference herein, is her belief that

19  Makings had "inside information that [LeapSource] was failing and

20  on its way to bankruptcy[.]" Mot. (doc. 374) at 2.   As further

21

22    [12]    As a result, all three counts are still pending in the adversary
proceeding: (1) fraudulent transfer pursuant to 11 U.S.C. § 548 against defendants
23  ICG Group, Inc. and Makings; (2) aiding and abetting a fraudulent transfer against
defendant Makings; and (3) preferential transfer against ICG Group, Inc. and
Makings.

24

25    [13]    The trustee is mistaken.   That motion did *not* pertain to the fraudulent
conveyance count.   The trustee moved for summary judgment *only* as to count III,
alleging a  preferential transfer.   See Mann, 351 B.R. at 709 (citing doc. 312).

26    [14]    Given the court's holding in the GTCR defendants' related summary
27  judgment motion that the individual plaintiffs lack standing to pursue their
separate breach of fiduciary duty claims against defendant Makings, there is no
need to address the issue of whether, as they contend, Makings owed a separate
28  fiduciary duty to the individual plaintiffs as LeapSource creditors.

1   support for her view that Makings was an "insider," the trustee

2   pointed out that he "negotiated for payment of his own debt[,]"

3   that is the $2.5 million note; he then resigned as the CEO and a

4   director of LeapSource. <u>See</u> <u>id.</u>  From the trustee's perspective,

5   adding to Makings' purported status as an "insider" is that days

6   after his resignation, the ICG asset was transferred to him. <u>See</u>

7   <u>id.</u>

8        To the extent the trustee contends that Makings breached his

9   fiduciary duties because he engaged in a preferential transfer in

10  violation of section 547, the law of the case doctrine, discussed

11  herein, forecloses this argument.  The trustee therefore is left

12  with her argument that defendant Makings engaged in a fraudulent

13  transfer in violation of 548 of the Bankruptcy Code, which in turn

14  results in a breach of fiduciary duty.

15       With this clarification, the court next considers defendant's

16  argument that summary judgment is proper as to count 5 because he

17  did not owe any fiduciary duties to LeapSource on the date of the

18  ICG assets sale.  Makings asserts that he did not owe any fiduciary

19  duties to LeapSource at that time because he had resigned as

20  LeapSource's CEO and as one of its directors before the sale date.

21  Defendant Makings correctly acknowledges that Delaware law applies

22  to this fiduciary duty claim. <u>See</u> Mot. (doc. 340) at 18.  Despite

23  that, he then incongruously relies upon Arizona law to argue that

24  he did not owe any fiduciary duties when the ICG assets sale

25  occurred. <u>See</u> <u>id.</u> at 19 (citing <u>Master Records, Inc. v. Backman</u>,

26  133 Ariz. 494, 652 P.2d 1017 (1982)). <u>Master Records</u> applies

27  Arizona law, and thus is *not* controlling on the issue of whether

28  under Delaware law defendant Makings owed a fiduciary duty to

1    LeapSource at the time of the ICG asset sale.  This is a

2    significant omission.  It was incumbent upon defendant Makings to

3    support his argument with the applicable law, *i.e.* Delaware.  That

4    he did not do.  Therefore, the court denies Makings' summary

5    judgment motion insofar as he grounds it on the theory that as a

6    matter of law he did not owe a duty to LeapSource when the ICG

7    asset sale occurred.

8         Shifting to the time frame prior to the ICG assets sale,

9    Makings readily concedes that he was a LeapSource employee and

10   director while at least some of the negotiations for that sale took

11   place.  Nonetheless, Makings contends that, as a matter of law, he

12   cannot be held liable for breach of fiduciary duties during that

13   time  because he was entitled to engage in what he terms "mere

14   preparations" to compete with LeapSource.  <u>See</u> Mot. (doc. 340-2) at

15   22.  Makings believes that he was entitled to engage in those

16   "preparations" (which he does not identify or explain) even though

17   he was still an employee and director of LeapSource.

18        Defendant Makings provides no legal argument to support his

19   position.  Instead, he cites to a string of five cases from

20   jurisdictions as varied as the Tennessee Court of Appeals to the

21   Kansas Supreme Court.  In fact, even though it is undisputed that

22   Delaware law governs this breach of fiduciary duty count, only one

23   of the five cases to which Makings cites even mentions Delaware

24   law, and then just in passing.  <u>See</u> <u>Bancroft-Whitney Co. v. Glen</u>,

25   64 Cal.2d 327, 345, 411 P.2d 921 (Cal. 1966) (quoting from a 1939

26   Delaware case as to the "general rules applicable to the duties of

27   a corporate officer[]").  What is more, <u>Bancroft-Whitney</u>, like the

28   other cases to which Makings cites, is readily distinguishable on

1   its facts.  There, the defendant, while still employed by the

2   plaintiff company, provided company information to a competitor,

3   thus enabling that competitor to enter into employment contracts

4   with plaintiff's co-workers.  Clearly there are no such allegations

5   in the present case.

6       Finally, defendant Makings' reliance upon Bancroft-Whitney is

7   all the more curious because in that case the court expressly held

8   that "as a matter of law" the defendant' did not breach his

9   fiduciary duties given that his conduct fell "demonstrably short of

10  the most scrupulous observance of an officer's duty to his

11  corporation."  Bancroft-Whitney, 411 P.2d at 936 and 937.  In sum,

12  because none of the cases to which defendant Makings cites are

13  binding on this court, once again, Makings has not met his burden

14  in terms of showing that as a matter of law, he did not breach any

15  fiduciary duties when he engaged in "preparations" for the ICG

16  assets sale prior to resigning from LeapSource.

17      Even in the face of these weaknesses, defendant Makings

18  persists in arguing that summary judgment is warranted as to this

19  breach of fiduciary duty count.  That is so, Makings asserts,

20  because the testimony of Ms. Matiski, whom he portrays as "an

21  expert in the area of officer fiduciary duties (and the attorney

22  that LeapSource relied on for these issues)[,] . . . effectively

23  ends Plaintiffs' claims that [he] breached his fiduciary duties."

24  Mot. (doc. 340-2) at 23.  In this regard, defendant Makings offers

25  the following excerpt from Ms. Matiski's deposition:

26              Q.  Are you familiar with the fiduciary responsibilities
                that officers owe to companies such as LeapSource?
27
                A.  Yes.
28

1

2
>           Q.   And that is a field you have been practicing in for
>           approximately 25 years?

3
>           A.   25 years, thank you.

4
>           Q.   After observing Mr. Makings' conduct during the time
>           he was COO and CEO, did you observe any breaches of
>           fiduciary duties?

5

6
>           A.   No.

Id. (quoting SOF 96).

7
       This snippet of deposition testimony is not dispositive of the

8
fiduciary duty issues which this motion raises though.  The trustee

9
has countered with additional testimony by Ms. Matiski showing that

10
this opinion is not as unequivocal as it might appear at first

11
glance.  As to possible breaches of fiduciary duties, later in her

12
deposition Ms. Matiski testified:

13
>           Q.   Did you provide any advice to Chris Kirk

14
>           as to whether Mike Makings had breached his
>           fiduciary duties to LeapSource?

15
>           A.   I don't remember.  The context was GTCR is

16
>           a member --. . . of the board of directors . . .
>           of this company through its representatives.

17
>           They have fiduciary obligations.  They are
>           refusing to fund.  That is a breach of their

18
>           fiduciary obligations.  That is the kind of research
>           we were doing.  That is not a breach of fiduciary

19
>           obligations.  I don't . . . believe -- I don't think
>           -- no, we were not -- I was not thinking about Mike

20
>           Makings in that context, *and we didn't do an*
>           *independent review of his actions.*

21
PSOF (doc. 419) at 50 (emphasis added by plaintiffs).  It is

22
possible to read the foregoing as meaning that Ms. Matiski's law

23
firm, Osborn Maledon,  did not do "an independent review" of

24
Makings actions in connection with the funding decision.  On the

25
other hand, an equally reasonable inference can be drawn that the

26
Osborn firm did not "do an independent review of [Makings']

27
actions[]" as to whether he breached any fiduciary duties

28

1   generally.   Given these competing inferences, taken together with
2   the flaws in defendant's argument outlined above, summary judgment
3   is not appropriate with respect to count five.   Thus, the court
4   denies defendant Makings' summary judgment motion as to count five
5   of the FAC.

6   **B.   Count 7 -"Aiding and Abetting Breach of Fiduciary Duties**
    **By Professional Advisers and Consultants"**
7

8        Count three of the FAC alleges a "Breach of Fiduciary Duties
9   By Professional Advisers and Consultants: Against Eaton, AEG, and
10  K&E[.]" FAC (doc. 121) at 76.   Among other things, in an August 28,
11  2006, order this court granted K&E's motion for summary judgment as
12  to that count.   See Mann v. GTCR Golder Rauner, L.L.C., 351 B.R.
13  685, 707 (D.Ariz. 2006) Furthermore, Eaton and AEG entered into a
14  stipulation of dismissal with prejudice as to all claims against
15  them, including count three.   See id.

16       Count seven relates to count three in that the former alleges
17  "Aiding and Abetting Breach of Fiduciary Duties by Professional
18  Advisers and Consultants[.]" FAC (doc. 121) at 81.   "A claim for
19  aiding and abetting a breach of fiduciary duty requires . . . (1)
20  the existence of a fiduciary relationship; (2) a *breach* of that
21  *duty*; (3) knowing participation by the non-fiduciary; and (4)
22  damages." In re American Business Financial Services, Inc., 2007
23  WL 510094, at *6 (Bankr. D.Del. Feb. 13, 2007) (citation omitted)
24  (emphasis added).   Given that the underlying breach of fiduciary
25  duty claim has not survived, defendant Makings is entitled to
26  summary judgment as to count seven because a critical element of
27  this aiding and abetting claim is missing – the breach of a
28  fiduciary duty by Eaton, AEG, or K&E.   See McGowan v. Ferro, 859

- 24 -

1  A.2d 1012, 1041 (Del. Ch. 2004) (granting summary judgment as to

2  aiding and abetting breach of fiduciary duty count after granting

3  summary judgment as to the underlying  breach of duty of loyalty

4  count), aff'd without pub'd opinion, 873 A.2d 1099 (Del. 2005).

5  Accordingly, the court grants summary judgment in defendant

6  Makings' favor as to count seven of the FAC.

7         **C.   *Count 18 – "Aiding and Abetting Breach of Fiduciary Duty"
         and Count 19 - "Breach of Fiduciary Duty"***

8

9         The plaintiffs are bringing counts 18 and 19 against defendant

10  Makings, along with several other defendants.    Count 18 alleges

11  aiding and abetting the breach of fiduciary duty against defendant

12  Makings as well as others.   Count 19 alleges that defendant Makings

13  breached a host of fiduciary duties.

14         Defendant Makings is taking the position that because these

15  fiduciary duty based claims are derivative in nature, they may only

16  be pursued by the plaintiff trustee, and not by these individual

17  plaintiffs.   Plaintiffs did not respond to this argument.

18  Regardless, whether the individual plaintiffs have standing to

19  pursue these breach of fiduciary duty counts is thoroughly

20  discussed in the order being issued contemporaneously herewith

21  granting the GTCR defendants' summary judgment motion.   For those

22  same reasons, the court finds that the individual plaintiffs lack

23  standing to pursue counts 18 and 19 against defendants Makings.

24  Thus, the court grants defendant Makings summary judgment motion

25  with respect to counts 18 and 19.

26  **IV.   *Other Remaining Counts***

27         The remaining causes of action, counts eight and nine, are

28  being brought solely by the trustee.   The court will address these

1  counts seriatim.

2  **_A. Count 8 - "Aiding and Abetting Fraudulent Transfers"_**

3  Count eight of the FAC alleges that defendant Makings, among

4  others, aided and abetted a fraudulent transfer, that is  the ICG

5  assets sale to Makings.  Defendant Makings seeks summary judgment

6  as to this count on three separate grounds.  First he argues that

7  the trustee lacks standing.  Second, as did the GTCR defendants in

8  moving for summary judgment motion, Makings argues that Arizona

9  does not recognize a cause of action for  aiding and abetting a

10 fraudulent transfer.  Third, even if Arizona did recognize such a

11 cause of action, Makings contends that the trustee has not come

12 forth with evidence to establish each of the elements necessary to

13 sustain that cause of action.

14 Emphasizing that she is not bringing this claim on behalf of

15 any specific creditor, relying upon 11 U.S.C. § 541(a)(1),[15] the

16 trustee retorts that she does have standing "to bring pre-petition

17 claims" on behalf of LeapSource, the bankrupt estate.  Resp. (doc.

18 418) at 19.   As to the viability of an aiding and abetting a

19 fraudulent transfer claim, the trustee makes the identical argument

20 which she did in opposing the GTCR defendants' summary judgment

21 motion.  More specifically, the trustee reiterates her view that

22 "if there is liability for _conspiring_ to assist a fraudulent

23 transfer," as the New Jersey Supreme Court held in <u>Banco Popular</u>

24 <u>North American v. Gandi</u>, 184 N.J. 161, 876 A.2d 253 (2005), "_a_

25 _fortiori_ . . . there may also be liability for _aiding and abetting_

26

27        [15]    That statute provides, _inter alia_ that a bankruptcy "estate is
28 comprised of . . . all legal or equitable interests of the debtor[.]" 11 U.S.C. §
   541(a)(1) (West 2004).

1  a fraudulent transfer." Resp. (doc. 418) at 20.  Insofar as the

2  elements of this cause of action are concerned, plaintiff asserts

3  that as to the underlying transfer itself  "at best" there are

4  disputed factual issues as to whether it  was "for reasonable

5  value."   Id. at 22.  Thus, in plaintiff's opinion, the court must

6  deny summary judgment as to count eight.

7       Given the jurisdictional nature of standing, the court will

8  address this defense argument first.  See Allen v. Wright, 468 U.S.

9  737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (Standing "is

10  perhaps the most important of [the jurisdictional] doctrines.") If

11  defendant Makings' standing argument is sound in that the trustee

12  lacks standing, then the court would not have jurisdiction to

13  consider this particular claim.

14       **_1.  Standing_**

15       The central premise of defendant Making's standing argument is

16  that "[t]he trustee cannot hold [him] liable for aiding and

17  abetting a fraudulent transfer since _no such claim exists_[.]" Mot.

18  (doc. 340-2) at 25 (emphasis added).  The existence of a claim is

19  not the focus of a standing inquiry, however.  "The standing

20  doctrine determines 'whether the litigant is entitled to have the

21  court decide the merits of the dispute or of particular issues.'"

22  U.S. v. Lazarenko, 476 F.3d 642, 649  (9th Cir. 2007) (quoting

23  Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343

24  (1975)).  Thus, while the merits and standing often are closely

25  related, "[s]tanding ensures that, _no matter the academic merits_ of

26  the claim, the suit has been brought by a proper party." Arakaki

27  v. Lingle, 477 F.3d 1048, 1059 (9th Cir.  2007) (emphasis added).

28  Given this distinction between standing and the merits, for the

1  moment, the court will disregard whether a cause of action exists

2  for aiding and abetting a fraudulent transfer.  Instead, the court

3  will focus on the narrower issue of whether, assuming the existence

4  of such a cause of action, the trustee is the proper party to

5  pursue it.

6      In Hamilton Taft & Company v. Howard, Weil, Labouisse,

7  Friedrichs Inc., 176 B.R. 895 (Bankr. N.D.Cal.), aff'd on other

8  grounds, 196 B.R. 532 (N.D.Cal. 1995), aff'd, 114 F.3d 991 (9th

9  Cir. 1997), the bankruptcy court indicated that "[t]he Ninth

10  Circuit has *squarely held* that a trustee's power to avoid

11  fraudulent transfers does not enable a trustee to recover damages

12  for aiding and abetting a fraudulent transfer."  Id. at 902

13  (emphasis added).  Relying strictly upon that language, with no

14  other analysis, defendant Makings contends that "[t]he [plaintiff]

15  trustee simply does not have standing[.]" See Mot. (doc. 340-2) at

16  25 (citation omitted).

17      The court agrees that the trustee does not have standing here,

18  but for  reasons  more nuanced than defendant Makings suggests.  A

19  careful reading of Elliott v. Glushon, 390 F.2d 514 (9th Cir.

20  1967), the case which the Hamilton court relied to support its lack

21  of standing argument, reveals that the Ninth Circuit in Elliott did

22  not "squarely" hold that a trustee does not have standing to bring

23  a claim for aiding and abetting a fraudulent transfer.

24  Nonetheless, as will be seen, Elliott is somewhat instructive on

25  the standing issue presently before the court.

26      In Elliott an attorney served as the  escrow holder and

27  attorney for those transferring property from the bankrupt.    The

28  Court held that the trustee was not entitled to recover from that

1   attorney for an allegedly fraudulent voidable transfer because the

2   attorney never received an interest in the property.  <u>Id.</u> at 517.

3   The <u>Elliott</u> Court provided the following justification for its

4   holding:

5               The [Bankruptcy] Act carefully speaks of
                conveyances of property as being 'null and
6               void,' and authorizes suit by the trustee
                to 'reclaim and recover such property or
7               collect its value.'  The actions legislated
                against are not 'prohibited'; those persons
8               whose actions are rendered 'null and void'
                are not made 'liable'; and terms such as
9               'damages' are not used.  The *legislative
                theory* is *cancellation, not* the *creation of
10              liability* for the consequences of the wrongful
                act.

11

12  <u>Id.</u> (footnote omitted) (emphasis added).[16]   As the foregoing

13  demonstrates, standing was *not* an issue in <u>Elliott</u>.

14       Despite the fact that <u>Elliott</u> did not involve standing, the

15  court in <u>Hamilton</u> adopted the <u>Elliott</u> Court's reasoning and applied

16  it in the standing context.  Based in part upon the <u>Elliott</u> Court's

17  rationale, quoted above, the <u>Hamilton</u> court explicitly found that

18  the trustee did not have standing to assert a claim for aiding and

19  abetting a fraudulent transfer.  <u>Elliott</u> was not the sole basis for

20  the court's holding in <u>Hamilton</u> though.  At the outset, the

21  <u>Hamilton</u> court observed that in California a creditor may "recover

22  civil damages from those who conspire to transfer property of a

23  debtor to hinder, delay, or defraud creditors."  <u>Hamilton</u>, 176 B.R.

24

25       [16]     The court is keenly aware that since <u>Elliott</u> the Bankruptcy Code has
    been recodified. Regardless of which version of the Code the court looks to,
26  however, the common denominator is that the allegedly fraudulent transfer is
    voidable.  In other words, whether in its prior form or in its recodified form,
27  when dealing with potentially fraudulent transfers, the Code does not "creat[e]
    liability for the consequences of the wrongful act."  <u>See</u> <u>Elliott</u>, 390 F.2d at 516.

28

at 902 (citations omitted).   Regardless, the <u>Hamilton</u> court
hastened to add that the bankruptcy trustee "is not authorized to
pursue every action that creditors of the debtor might pursue."
<u>Id.</u> (citations omitted).   Implicit in the foregoing is the
recognition that a creditor, in contrast to a bankruptcy trustee,
may have standing to pursue such a state law based cause of action.

The bankruptcy court in <u>Hamilton</u> went on to explain that "[a]
trustee's only authority to assert creditor's state-law causes of
action related to fraudulent conveyances is found in section 544(b)
of the Bankruptcy Code[,]" which "only permits the trustee to *avoid*
a fraudulent transfer."   <u>Id.</u> (footnote omitted).   That section
"does not authorize [a] Trustee to assert a claim for aiding and
abetting a fraudulent transfer."   <u>Id.</u> at 902.   The foregoing
reasons, in combination with <u>Elliott</u>, left the <u>Hamilton</u> court to
conclude that the trustee "lack[ed] standing to sue Defendant for
aiding and abetting a fraudulent conveyance."   <u>Id.</u>

For the reasons just discussed, the court is persuaded that
after <u>Hamilton</u> the trustee is hard-pressed to argue that she has
standing to assert a cause of action for aiding and abetting
fraudulent transfers.   Moreover, it is no answer to Makings'
standing argument to assert, as the trustee does, that she has
standing to assert claims against him for breaches of fiduciary
duties.   <u>See</u> Resp. (doc. 418) at 19.   That is not the issue at
this juncture.   Thus, the court finds that the plaintiff trustee
does not have standing to assert a claim for aiding and abetting a
fraudulent transfer as against defendant Makings.   Consequently,
the court grants defendant Makings' summary judgment motion as to
count eight of the FAC.

1     **_2.  Existence of a Cause of Action for Aiding and_**
2     **_Abetting Fraudulent Transfers?_**

3     Even if the court were to find that the trustee has standing
4     to pursue a claim for aiding and abetting fraudulent transfers,
5     defendant Makings still would be entitled to summary judgment on
6     count eight.  Defendant Makings is  entitled to that relief
7     because, as discussed in this court's order issued
8     contemporaneously herewith, granting summary judgment in favor of
9     the GTCR defendants, "the court is convinced that Arizona's Supreme
10    Court would adopt the majority view; there is no independent cause
11    of action for aiding and abetting a fraudulent transfer under the
12    UFTA [Uniform Fraudulent Transfer Act]."  <u>Mann v. GTCR Golder</u>
13    <u>Rauner, L.L.C.,</u> No. CIV 02-2099-PHX RCB (D.Ariz. March 30, 2007).

14    Because the court has found that the trustee lacks standing,
15    and because it is convinced that in any event, Arizona would not
16    recognize a cause of action for aiding and abetting a fraudulent
17    transfer, there is no need to address defendant Making's argument
18    that the trustee cannot meet her burden of establishing each of the
19    elements necessary to support such a cause of action.

20    **_B.  Count 9 - "Trust Fund Doctrine"_**

21    In count nine of the FAC plaintiffs invoke the trust fund
22    doctrine, which "was judicially created to ensure that all
23    creditors' claims are first equitably satisfied before stockholders
24    may claim their rights upon the assets of an insolvent
25    corporation."  <u>A.R. Teeters & Associates, Inc. v. Eastman Kodak</u>
26    <u>Company</u>, 172 Ariz. 324, 331, 836 P.2d 1034, 1041 (Ariz. Ct. App.
27    1992)(citations omitted).  The trust fund doctrine provides that
28    "[i]ndependently of statute, if corporate officers divide the

1   assets among stockholders when the corporation is insolvent or
2   where the corporation is thereby rendered insolvent, such officers
3   are personally liable for corporate debts, or at least to the
4   extent of the amount of assets received by them." Realty Exchange
5   Corporation v. Cadillac Land and Development Company, 13 Ariz. App.
6   232, 234, 475 P.2d 522, 524 (Ariz. Ct. App. 1970) (internal
7   quotation marks and citation omitted); see also Southern Arizona
8   Bank and Trust Co. v. U.S., 386 F.2d 1002, 1005 (U.S. Ct. Cl. 1967)
9   (citation omitted) ("Arizona follows the . . . rule that where
10  stockholders of a corporation receive its assets on liquidation and
11  leave it without sufficient property to pay its creditors, then
12  those stockholders are required to respond to creditors up to the
13  full vale of the assets received.") The theory underlying  the
14  trust fund doctrine "is that all of the assets of a corporation,
15  immediately on its becoming insolvent, exist for the benefit of all
16  of its creditors and that thereafter no liens nor rights can be
17  created either voluntarily by operation of law whereby one creditor
18  is given an  advantage over others." Teeters, 836 P.2d at 1041
19  (internal quotation marks and citations omitted).  After setting
20  forth the elements necessary for a plaintiff to successfully invoke
21  the trust fund doctrine,[17] the Teeters court unequivocally stated,
22  "[l]iablity, if established, is limited to the value of the assets
23  received by the director, officer or stockholder." Id. citations
24  omitted).

25

26      [17]      "To prevail on its trust fund doctrine claim, Kodak first must prove
27  that (1) corporate assets were transferred to Teeters, (2) the transfer of
    corporate assets occurred while the corporation was insolvent, and (3) the transfer
    preferred Teeters to the disadvantage of other creditors of the same priority."
28  Teeters, 172 Ariz. at 331.

1    Defendant Makings posits that the trust fund doctrine claim

2   fails as a matter of law because he was not a LeapSource

3   stockholder or an officer at the time of the ICG asset sale.[18]  As

4   an aside, Makings notes that "[t]he transfer of the ICG assets was

5   to ICG Group, Inc.[,]" and not to him "individually."  Mot. (doc.

6   340-2) at 29, n. 4 (citation omitted).  Of course, as this court

7   has previously held, from the date of its inception forward,

8   Makings has been the ICG Group's "sole shareholder and sole

9   director."  See Mann, 355 B.R. at 709 (citations omitted).

10  According to Makings, "even if the ICG Group is deemed to be [him],

11  the trustee cannot show that the ICG asset sale "'disadvantage[d]'

12  any other creditors of the same priority." Mot. (doc. 340-2) at 29.

13    The trustee completely disregards defendant Makings' argument

14  that the trust fund doctrine is not a viable theory of liability

15  because he was not a LeapSource director, officer or shareholder at

16  the time of the ICG asset sale.  Yet, as with the GTCR defendants,

17  the court finds this argument determinative.  Thus, it grants

18  summary judgment in defendant Making's favor as to count nine as

19  well.

20  ***IV.  Release***

21    As part of the March, 2001, Purchase Agreement between

22  LeapSource and ICG Group, Inc., those two entities, and defendant

23  Makings, in his individual capacity, as well as in his capacity as

24  president of ICG Group,  entered into a "Mutual Release" dated

---

26   [18]    In moving on count nine, defendant presumed that plaintiff was seeking
to invoke the trust fund doctrine as to three separate transactions: (1) "[t]he
27  transfer of the customer asset purchases[;]" (2) "[t]he compromising of debts to
LeapSource"[;] and (3) "[t]he transfer of the ICG assets[.]" See Mot. (doc. 340-2)
28  at 29. In opposing this aspect of Makings' motion, however, the trustee focused
exclusively upon the ICG asset sale; and so, too, will this court.

1   March 30, 2001.  <u>See</u> DSOF (doc. 341), exh. 19 thereto at 2.  In

2   part, that Release states:

3           [I]n consideration of the covenants
            contained in the Purchase Agreement and
4           other good and valuable consideration, the
            receipt and sufficiency of which is hereby
5           acknowledged by each of the Parties to this
            Mutual Release, the Parties agree as follows:
6
            The Parties, . . . covenant not to sue or to
7           cause others to sue one another . . . , on or
            from any and all claims, actions, causes of
8           action, suits, debts, sums of money, accounts,
            covenants, contracts, agreements, representations,
9           warranties, damages, injuries, liabilities and
            demands whatsoever, in law, equity, arbitration,
10          administrative proceeding or otherwise[.]

11  <u>Id.</u> at 1-2.  Based upon that language, which from Makings'

12  standpoint is "straightforward and unambiguous[][,]" he broadly

13  asserts that this Release "ends any and all liability questions on

14  [his] behalf . . . and ICG Group[.]" Mot. (doc. 340-2) at 30 and

15  29.  According to defendant Makings this Release, which he claims

16  was "voluntarily entered into" by the parties, bars the present

17  action.  <u>See</u> <u>id.</u> at 29.  Further, Makings contends that this

18  Release operates as an "express[] waive[r]" by plaintiffs "of their

19  known rights."  <u>Id.</u> at 31.  Therefore, not only should the court

20  enforce this Mutual Release, but Makings urges the court to

21  sanction the plaintiffs "for filing this suit that is antithetical

22  to the very representations they made to Makings and ICG Group."

23  <u>Id.</u>

24      Plaintiffs counter that "[a] mutual release given in a

25  transaction that constitutes a fraudulent transfer or preference

26  . . . does not protect a 'released party' from liability for

27  engaging in the fraudulent transfer or preference  because the

28  release is voidable along with the rest of the transaction."  Resp.

1   (doc. 418) at 26.  Put somewhat differently, because supposedly the
2   ICG asset sale was fraudulent, plaintiffs reason that the Mutual
3   Release, a part of that allegedly fraudulent transfer, is likewise
4   voidable.

5       Plaintiffs continue, "[t]he 'release' argument fails for the
6   same reason that the Trustee is entitled to summary judgment
7   previously moved for under Count III."  Id. at 27.  Of course, as
8   mentioned earlier, the court denied this motion.  One consequence
9   of that denial is that it is now the law of the case that the ICG
10  assets sale is not a preferential transfer within the meaning of
11  section 548.  The law of the case doctrine thus precludes the
12  trustee's argument that the Mutual Release is invalid or voidable
13  because it was part of a preferential transfer.

14      To rebut plaintiffs' argument, Makings states that
15  "[p]laintiffs cannot prove any transfers were fraudulent, so their
16  argument that the fraudulent transfer 'invalidates' the release is
17  unsupported."  Reply (doc. 447) at 18.

18      Despite the relatively forceful language which he employs,
19  this is defendant Making's last summary judgment argument, not his
20  first.  This suggests that Makings is likely aware of the inherent
21  weakness in this argument, at least at this point in the
22  litigation.  As Makings impliedly concedes in his rebuttal, the
23  validity of the release is intertwined with the fraudulent transfer
24  issue under section 548 of the Bankruptcy Code.  Thus, because in
25  all likelihood the resolution of the validity of the release turns
26  upon whether the ICG asset sale was a fraudulent transfer, the
27  court leaves that issue for another day.

28      For all of the reasons set forth above,

- 35 -

IT IS ORDERED that defendant Michael Making's motion for summary judgment pursuant to Fed. R. Civ. P. 56 (doc. 340) is GRANTED IN PART and DENIED IN PART, as hereinafter ordered.

IT IS FURTHER ORDERED that defendant Makings' motion for summary judgment as to count 1, "Tortious Interference with Contract," is GRANTED.

IT IS FURTHER ORDERED that defendant Makings' motion for summary judgment as to count 21, Tortious Interference with Senior Management Agreements and Employment Agreements, is GRANTED.

IT IS FURTHER ORDERED that defendant Makings' motion for summary judgment as to count 23, Tortious Interference with Stockholders Agreement and Purchase Agreement, is DENIED as to the Stockholders Agreement, but GRANTED as to the Purchase Agreement.

IT IS FURTHER ORDERED that defendant Makings' motion for summary judgment as to count 5, "Breach of Fiduciary Duty By Directors and Officers[,]" is DENIED.

IT IS FURTHER ORDERED that defendant Makings' motion for summary judgment as to count 7, "Aiding and Abetting Breach of Fiduciary Duties by Professional Advisers and Consultants," is GRANTED.

IT IS FURTHER ORDERED that defendant Makings' motion for summary judgment as to count 18, "Aiding and Abetting Breach of Fiduciary Duty," is GRANTED.

IT IS FURTHER ORDERED that defendant Making's motion for summary judgment as to count 19, "Breach of Fiduciary Duty," is GRANTED.

IT IS FURTHER ORDERED that defendant Makings' motion for summary judgment as to count 8, "Aiding and Abetting Fraudulent

1  Transfers," is GRANTED.

2         IT IS FINALLY ORDERED that defendants Makings' motion for

3  summary judgment as to count 9, "Trust Fund Doctrine," is GRANTED.

4         DATED this 30th day of March, 2007.

5                                      _____

6                                      Robert C. Broomfield
                                       Senior United States District Judge

7

8

9

10

11

12

13  Copies to counsel of record

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28