1  WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9

10

11  Diane Mann, as Trustee for        )
    the Estate of LeapSource, Inc.,)
12  *et al.*,                          )
                                      )
13                  Plaintiffs,       )   No. CIV-02-2099-PHX-RCB
                                      )
14          vs.                       )        O R D E R
                                      )
15  GTCR Golder Rauner, L.L.C.,       )
    a Delaware limited liability      )
16  company, *et al.*,                 )
                    Defendants.       )
17  _____   )

18

19                          ***Introduction***

20      LeapSource, Inc. existed as a "business process outsourcing"

21  company for less than two years.[1]   LeapSource's demise engendered

22  this litigation which has been ongoing for nearly five years (more

23  than twice as long as the Company existed).[2] Before the court is a

24  motion directed at 15 counts of the Fourth Amended Complaint

25  _____

26      [1]      On September 16, 1999, LeapSource's predecessor corporation was formed.
    DSOF (doc. 348) at 2, ¶ 1; see also PSOAF (doc. 417, pt. 2) at 2, ¶ 1. On July 11,
    2001, LeapSource filed its petition for bankruptcy.  In re LeapSource, Inc., No.
27  B 01-9020 PHX JMM (Bankr. D. Ariz. 2001) (doc. 1).

28      [2]      The court has issued no less than nine substantive decisions,
    familiarity with which is assumed.

1   ("FAC") (doc. 121), brought by defendants GTCR Golder Rauner,

2   L.L.C., GTCR Fund VI, L.P., GTCR VI Executive Fund, L.P., GTCR

3   Associates VI,[3] Joseph P. Nolan, Bruce V.  Rauner, Daniel Yih,

4   David A. Donnini and Philip A. Canfield[4] for summary judgment

5   pursuant to Fed. R. Civ. P. 56 (doc. 347).  Finding oral argument

6   unnecessary, the court rules as follows.

7                          ***Discussion***

8   ***I.  Standard of Review***

9      The court assumes familiarity with what has sometimes been

10  referred to as the <u>Celotex</u> trilogy wherein the Supreme Court, in

11  1986, clarified and refined the standards for deciding Rule 56

12  summary judgment motions.  See <u>Anderson v. Liberty Lobby, Inc.</u>, 477

13  U.S. 242, 106 S.Ct. 2505, 91 L.E.2d 202 (1986); <u>Celotex Corp. v.</u>

14  <u>Catrett</u>, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and

15  <u>Matsushita Elec. Industr. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,

16  106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  There is no need to repeat

17  the entire body of summary judgment case law which has developed

18  since then, but a few principles are worth highlighting.

19      A motion for summary judgment shall be granted "if the

20  pleadings, depositions, answers to interrogatories, and admissions

21  on file, together with the affidavits, if any, show that there is

22  no genuine issue as to any material fact and that the moving party

---

23

24      [3]    When necessary to distinguish among these defendants, the GTCR VI Entities shall be read as referring to the three defendant private equity funds, GTCR Fund VI, L.P., GTCR VI Executive Fund and GTCR Associates VI.  GTCR shall be

25  read as referring to GTCR Golder Rauner, LLC, the general partner of GTCR Partners VI, L.P., which, in turn, is the general partner of the GTCR VI Entities.

26      [4]    Unless necessary to distinguish among them, hereinafter "the GTCR

27  defendants" and "GTCR" shall be read as referring to GTCR, the GTCR VI entities, as well as any or all of the individual GTCR principals, Rauner, Nolan, Yih,

28  Donnini, and Canfield.

1  is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

2  56(c).  It is beyond dispute that "[t]he moving party bears the

3  initial burden to demonstrate the absence of any genuine issue of

4  material fact." Horphag Research Ltd. v. Garcia, 475 F.3d 1029,

5  1035 (9th Cir.  2007) (citation omitted).  "Once the moving party

6  meets its initial burden, . . . , the burden shifts to the non-

7  moving party to set forth, by affidavit or as otherwise provided in

8  Rule 56, specific facts showing that there is a genuine issue for

9  trial."  Id. (internal quotation marks and citations omitted).

10  This "[e]vidence  must be concrete and cannot rely on 'mere

11  speculation, conjecture, or fantasy.'" Bates v. Clark County,2006

12  WL 3308214, at * 2 (D.Nev. Nov. 13, 2006) (quoting O.S.C. Corp. v.

13  Apple Computer, Inc., 792 F.2d 1464, 1467 (9th Cir. 1986)).

14  Similarly, uncorroborated and self-serving testimony or

15  declarations, without more, will not create a genuine issue of

16  material fact precluding summary judgment.  See Dubois v. Ass'n

17  Apart. Owners 2987 Kalakaua, 453 F.3d 1175, 1180 (9th Cir. 2006),

18  cert. denied, 2007 WL 506192, 75 USLW 3436 (Feb. 20, 2007).

19      Nor will "a  mere 'scintilla' of evidence"  be sufficient "to

20  defeat a properly supported motion for summary judgment; instead,

21  the nonmoving party must introduce some 'significant probative

22  evidence tending to support  the complaint.'" Fazio v. City &

23  County of San Francisco, 125 F.3d 1328, 1331 (9th Cir. 1997)

24  (quoting Anderson, 477 U.S. at 249, 252, 106 S.Ct. 2505).  Thus,

25  in opposing a summary judgment motion it is not enough to "simply

26  show that there is some  metaphysical doubt as to the material

27  facts." Matsushita, 475 U.S. at 586, 106 S.Ct. 1348 (citations

28  omitted).

1    By the same token though, when assessing the record to
2 determine whether there is a "genuine issue for trial," the court
3 must "view the evidence in the light most favorable to the
4 nonmoving party, drawing all reasonable inference in his favor. "
5 Horphag, 475 F.3d at 1035 (citation omitted).  The court may not
6 make credibility determinations; nor may it weigh conflicting
7 evidence.  See Anderson, 475 U.S. at 255.  It is with these
8 standards firmly in mind that the court has examined, at length,
9 the record as presently constituted.

10    Before addressing the merits, the court has a few preliminary
11 observations.  Most importantly, plaintiffs' response memorandum is
12 substantially lacking in terms of citations to the record.   Their
13 40 page response includes cites to only 11 paragraphs of
14 plaintiffs' 106 page, 261 paragraph PSOAF.  Further, plaintiffs
15 twice designated deposition testimony by page and line, but elected
16 not to correlate that testimony to any specific exhibit in the
17 record.  And although plaintiffs incorporate by reference memoranda
18 filed in earlier motions, they did not indicate which pages are
19 relevant to the issues *now* before the court.  These omissions would
20 be problematic in any case, but they are especially so here where
21 the record consists of over 140 exhibits, totaling approximately
22 2500 pages.[5]  Perhaps these omissions simply indicate that much of
23 the record does not support plaintiffs' position, and they have
24 done the best possible with the facts and law available.

25    As the Ninth Circuit has acknowledged on more than one
26

27 ───────────────
    [5]    To put the length of this record in perspective, Leo Tolstoy's *War and*
28 *Peace* is "typically over 1400 pages as a paperback."
    http://en.wikipedia.org/wiki/List_of_longest_novels (last visited March 7, 2007).

occasion though, a court does not have an obligation to "examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." See Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); see also Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.) (internal quotations and citations omitted) ("[It] is not our task to scour the record in search of a genuine issue of triable fact.; Forsberg v. Pacific N.W. Bell Tel. co., 840 F.2d 1409, 1418 (9th Cir. 1988) (A district court is not "required to comb the record to find some reason to deny a motion for summary judgment[.]").  That is so because courts "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." Keenan, 91 F.3d at 1279 (internal quotation marks and citations omitted).  Or, as the Ninth Circuit so succinctly put it in Carmen:

> A lawyer drafting an opposition to a summary judgment motion may easily show a judge, in the opposition, the evidence that the lawyer wants the judge to read. It is absurdly difficult for a judge to perform a search unassisted by counsel, through the entire record, to look for such evidence.

Carmen, 237 F.3d at 1030; see also Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992) ("[The nonmoving party's] burden to respond is really an opportunity to assist the court in understanding the facts.  But if the nonmoving party fails to discharge that burden - for example, by remaining silent- its opportunity is waived and its case wagered.") In short, nothing in Rule 56 or the case law construing it, requires the court to

1  consider matters not specifically brought to its attention.
2  Accordingly, as is its prerogative, here the court has "'limit[ed]
3  its review to the documents submitted for purposes of summary
4  judgment and *those parts of the record specifically referenced*
5  *therein*.'" <u>Hubbard v. 7-Eleven, Inc.</u>, 433 F.Supp.2d 1134, 1140
6  (S.D.Cal. 2006) (quoting <u>Carmen</u>, 237 F.3d at 1030) (emphasis
7  added).

8      This insufficient identification of those facts which
9  plaintiffs believe defeat defendants' summary judgment motion is
10  compounded by the fact that frequently in their response plaintiffs
11  relied more upon rhetoric than reason.  Indeed, in discussing some
12  issues, for example, aiding and abetting of fiduciary breaches,
13  plaintiffs did not cite to any case law at all.  When it was
14  difficult to discern the exact nature of plaintiffs' opposition
15  argument, the court did not speculate because to do so would mean
16  that it would be impermissibly taking on the role of  advocate,
17  rather than impartial decision-maker.  Again, however, the court
18  assumes that plaintiffs provided the court with such citations to
19  the record as were available to them.

20  ***II.  Fiduciary Duties***

21      For discussion purposes, the remaining counts in the FAC can
22  be divided into two broad categories – those alleging breach of
23  fiduciary duties (and the aiding and abetting of those breaches),
24  as well as six remaining miscellaneous counts.  The fiduciary duty
25  claims can be further divided into those brought by plaintiff
26  Dianne Mann, as bankruptcy trustee (counts 2, 4, 5, 6 and 7), and
27  those brought by the eight individual plaintiffs, former LeapSource
28  employees (counts 17-20).

**A. _Scope_**

As it did in its September 30, 2003, dismissal order, the court will once again look to Delaware law, the state of LeapSource's incorporation, to assess the viability of plaintiffs' fiduciary duty claims. See <u>Mann I</u> (doc. 72) at 42 (citing <u>First National City Bank v. Banco Para Elcommercio Exterior de Cuba</u>, 462 U.S. 611, 621 (1983)).  Delaware law recognizes that not only do directors and officers "stand in a fiduciary relationship to their corporation and stockholders[,]" but "a majority shareholder, or a group of shareholders who combine to form a majority, has a fiduciary duty to the corporation and to its minority shareholders if the majority shareholder dominates the board of directors and controls the corporation." <u>Matter of Reading Co.</u>, 711 F.2d 509, 517 (3rd Cir. 1983) (citations omitted); <u>see also</u> <u>In re MAXXAM, Inc.</u>, 659 A.2d 760, 771 (Del.Ch. 1995) ("A shareholder that owns a majority interest in a corporation, or exercises actual control over its business affairs, occupies the status of a fiduciary to the corporation and its minority shareholders.") Consistent with that view, plaintiffs allege separate breaches of fiduciary duties by the GTCR Entities as "majority shareholders of LeapSource," doc. 121 at 75, ¶325 (count 2); and at 95, ¶ 444 (count 17); and separately by defendants Nolan, Rauner, Donnini, and Yih[6] as "directors and officers of LeapSource." <u>Id.</u> at 78, ¶ 345 (count

---

[6]     Michael Makings, a former LeapSource employees also is named as a defendant in this cause of action, as well as a number of other counts in the FAC. Defendant Makings has separately moved for summary judgment (doc. 340).  His motion is the subject of a separate order which is being issued contemporaneously herewith.
    David Eaton was also a defendant in this count, as well as in other counts, but the parties entered into a stipulation of dismissal with respect to all counts against him.

1   5); and at 98, ¶ 455 (count 19).  Further, plaintiffs generally

2   allege that these defendants owed them a host of fiduciary duties:

3   "good faith, fair dealing, candor, loyalty, due care, and full and

4   fair disclosure."  See, e.g., id. at 79, ¶ 346; and 95 at ¶ 444.

5   These claimed breaches of fiduciary duties occurred in a variety of

6   ways, ranging from "engaging in the fraudulent transfer of valuable

7   assets[]" to "placing . . . [LeapSource] in bankruptcy

8   liquidation."  See id. at ¶ 446.

9        Despite the broad scope of the breach of these fiduciary duty

10  counts, defendants frame their summary judgment motion strictly in

11  terms of the duties of loyalty and due care.  This is in accordance

12  with Delaware law which identifies loyalty and due care as the two

13  "traditional" fiduciary duties.  See In re Gaylord Container Corp.

14  S'holders Litig., 753 A.2d 462, 475 (Del. Ch. 2000); see also Cede

15  & Co. v. Technicolor, Inc., 634 A.2d 345, 367 (Del. 1993)(citation

16  omitted)("Duty of care and duty of loyalty are the traditional

17  hallmarks of a fiduciary who endeavors to act in the service of a

18  corporation and its stockholders.") "Each of these duties is of

19  equal and independent significance."  Cede, 634 A.2d at 367.   The

20  other fiduciary "duties" which plaintiffs claim were owed them are

21  subsumed in the duties of loyalty and due care.   For example, in

22  Stone v. Ritter, 911 A.2d 362 (Del. 2006), the Delaware Supreme

23  Court clarified that "although good faith may be described

24  colloquially as part of a 'triad' of fiduciary duties that includes

25  the duties of care and loyalty, the obligation to act in good faith

26  does not establish an independent fiduciary duty that stands on the

27  same footing as the duties of care and loyalty."  Id. at 370

28  (footnote omitted) (emphasis added).  For that reason, "[o]nly the

1    latter two duties, where violated, may directly result in
2    liability, whereas a failure to act in good faith may do so, but
3    indirectly."  <u>Id.</u>

4         Likewise, "the . . . fiduciary duty of disclosure, . . . , is
5    not an independent dut[y] but the application in a specific context
6    of the . . . fiduciary duties of care, good faith, and loyalty."
7    <u>Malpiede v. Townson</u>, 780 A.2d 1075, 1086,  (Del. 2001) (footnote
8    omitted); <u>Stroud v. Grace</u>, 606 A.2d 75, 84 (Del. Supr. 1992) ("[I]t
9    is more appropriate . . . to speak of a duty of disclosure [which
10   is subsumed in the traditional duties] . . . rather than the
11   unhelpful terminology that has crept into Delaware court decisions
12   as a 'duty of candor.'")  Therefore, it is logical to assume that
13   to the extent there may be a duty of "fair dealing," as plaintiffs
14   allege, it too is subsumed in the primary duties of loyalty and due
15   care.

16        The import of the foregoing is that if defendants prevail on
17   their motion for summary judgment with respect to the alleged
18   breaches of the fiduciary duties of due care and loyalty, then they
19   would be entitled to summary judgment with respect to all counts
20   alleging breaches of fiduciary duty, regardless of how those duties
21   are defined.  This is especially so given that plaintiffs devote
22   their opposition almost exclusively to arguing that defendants did
23   not act in good faith as a means of rebutting the business judgment
24   rule, as opposed to showing a separate  and independent breach of
25   such a duty.

26        ***B.  Standing***
27        The GTCR defendants advance several arguments as to why they
28   are entitled to summary judgment with respect to the fiduciary duty

1    claims (counts 17-20).  The first argument is lack of standing and

2    is directed solely at the individual plaintiffs, as opposed to the

3    plaintiff trustee.[7]  If, as defendants assert, the individuals lack

4    standing, then the court would not have jurisdiction to consider

5    their fiduciary duty claims.  See KB2S, Inc. v. City of San Diego,

6    California, 2007 WL 173858, at *1 (S.D.Cal. Jan. 17, 2007)

7    ("Article III standing is necessary for federal court

8    jurisdiction.") Given the jurisdictional nature of standing, as did

9    the defendants, the court will address this argument first.

10        "Article III standing must be determined as a threshold matter

11   in every federal case."[8]  United States v. 5208 Los Franciscos Way,

12   LA, CAL., 385 F.3d 1187, 1191 (9th Cir. 2004) (citation omitted).

13   "The Constitution's case-or-controversy limitation on federal

14   judicial authority is the lynch pin for standing . . .

15   jurisprudence."  United States v. Lazarenko, 476 F.3d 642, 649 (9th

16   Cir. 2007) (citing Friends of the Earth, Inc. v. Laidlaw Envtl.

17   Servs., Inc., 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610

18   (2000)).  At its core, "[t]he standing doctrine determines 'whether

19   the litigant is entitled to have the court decide the merits of the

20   dispute or of particular issues.'"  Id. (quoting Warth v. Seldin,

21   422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).  There

22   are two components to standing – one "rooted in the Constitution's

23   case-or-controversy requirement," and the other "a prudential

24

25        [7]    Hereinafter in this section "plaintiffs" shall be read as referring

26   to the individual plaintiffs -- not to the plaintiff trustee.

27        [8]    Even though the FAC includes only state law based claims, because this
     action is "related to" the LeapSource bankruptcy proceeding, this court has
     "original but not exclusive jurisdiction" pursuant to 28 U.S.C. § 1334(b), making

28   this a "federal case."

1  component, which embraces judicially self-imposed restraints on

2  federal jurisdiction."  Id. (citing, inter alia, Elk Grove Unified

3  Sch. Dist. v. Newdow, 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d

4  98 (2004)).  "A litigant must satisfy both [components] to seek

5  redress in federal court." Id. (citation omitted).

6       "Article III's standing requirements are familiar[.]" Nuclear

7  Inf. & Res. v. Nuclear Reg. Com'n., 457 F.3d 941 (9th Cir. 2006).  A

8  plaintiff must show:

9               (1) it has suffered an 'injury in fact
                that is (a) concrete and particularized and
10              (b) actual or imminent, not conjectural or
                hypothetical; (2) the injury is fairly traceable
11              to the challenged action of the defendant;
                and (3) it is likely, as opposed to merely
12              speculative, that the injury will be redressed
                by a favorable decision.
13

14  Id. at 949 (internal quotation marks and citations omitted).  In

15  addition to meeting those criteria, a plaintiff "must also meet

16  non-constitutional or prudential requirements to invoke federal

17  jurisdiction." Lazarenko, 476 F.3d at 649.  "Prudential standing

18  encompasses 'the general prohibition on a litigant's raising

19  another person's legal rights, the rule barring adjudication of

20  generalized grievances more appropriately addressed in

21  representative branches, and the requirement that a plaintiff's

22  complaint fall within the zone of interests protected by the law

23  invoked.'" Id. (quoting Allen v. Wright, 468 U.S. 737, 751, 104

24  S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

25       In Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct.

26  2130, 119 L.Ed.2d 351 (1992), the Supreme Court reiterated that

27  "[t]he party invoking federal jurisdiction bears the burden of

28  establishing [the standing] elements." Id. at 561, 112 S.Ct. 2130

1  (citing, *inter alia*, <u>Warth</u>, 422 U.S. at 508,  95 S.Ct. 2197).  As
2  the <u>Lujan</u> Court made clear, because the elements of standing "are
3  not mere pleading requirements but rather an indispensable part of
4  the plaintiff's case, each element must be supported in the same
5  way as any other matter on which the plaintiff bears the burden of
6  proof, i.e. with the manner and degree of evidence required at the
7  successive stages of the litigation."  <u>Id.</u> (citations omitted).
8  Thus, while "[a]t the pleading stage, general factual allegations
9  of injury resulting from the defendant's conduct may suffice, . . .
10 [i]n response to a summary judgment motion, . . . , the plaintiff
11 can no longer rest on such 'mere allegations,' but must 'set forth'
12 by affidavit or other evidence 'specific facts,' which for purposes
13 of the summary judgment motion will be taken to be true."  <u>Id.</u>
14 (quoting Fed. R. Civ. P. 56(c)); <u>see also</u> <u>Bras v. California Public</u>
15 <u>Utilities Commission</u>, 59 F.3d 869, 874 (9th Cir. 1995) ("In deciding
16 whether [plaintiff] has . . . standing, we must consider the
17 allegations of fact contained in [plaintiff's] declaration and
18 other affidavits in support of his assertion of standing.")

19      The fact of removal does not change plaintiffs' burden as to
20 standing at this point in the litigation.  Thus, even if plaintiffs
21 had doubts as to their standing upon removal from state to district
22 court, "as the party asserting federal jurisdiction when it is
23 challenged," plaintiffs must "make the showings required for
24 standing."  <u>See</u> <u>DaimlerChrysler Corp. v. Cuno</u>, 126 S.Ct. 1854, 1861
25 n.3, 164 L.Ed.2d 589 (2006).

26      Initially the GTCR defendants took the position that because
27 the fiduciary duty claims are being brought by plaintiffs "as
28 minority shareholders," FAC (doc. 121) at 95, ¶ 443; and at 98, ¶

456, and because these claims "are premised upon direct harm to the corporation" in the form of decreased stock value, these are derivative claims which can only be brought by the plaintiff trustee.  See Mot. (doc. 347) at 9.

The foregoing argument conforms to the plain language of the FAC, wherein plaintiffs allege that they are bringing these fiduciary duty claims as "minority shareholders[.]" FAC (doc. 121) at 95, ¶ 443; and at 98, ¶ 456.  In responding to GTCR's standing argument, plaintiffs shifted gears however.  Now plaintiffs maintain that they are pursuing these claims as "creditors of LeapSource[,]" and as such they, as well as the trustee, have standing.  See Resp. (doc. 417) at 7.  Citing to Production Resources Group, L.L.C. v. NCT Group Inc., 863 A.2d 772 (Del. Ch. 2004), plaintiffs contend that they "have standing to complain of the breaches of fiduciary duties owed to the creditors of LeapSource when it was insolvent or in the zone of insolvency."[9] Id. According to plaintiffs, their standing derives from their status as "creditors" who have "suffered . . . individualized damages, apart from the losses sustained as shareholders including claims for unpaid bonuses[10] and severance payments."  Id. (footnote added).

Regardless of whether plaintiffs are bringing these fiduciary duty claims "as shareholders or 'creditors,'" in their reply,

---

[9]     "Standing is measured at the time the complaint is filed."  Hubbard, 433 F.Supp.2d at 1141 (citation omitted).  Here, the FAC was filed on June 11, 2004.  The first amended complaint, which was the basis for removal to this district court on October 21, 2002, was filed on July 31, 2002.  Thus, regardless of which filing date the court uses, because LeapSource filed its bankruptcy petition on July 11, 2001, clearly it was insolvent "at the time the complaint [wa]s filed[,]" see id.; and the parties are not disputing that.  See Resp. (doc. 417) at 6.

[10]     There are no allegations in counts 17-20 that plaintiffs were injured because they were not paid bonuses.

defendants stress that these claims are derivative.  See Reply
(doc. 449) at 9.  Given the derivative nature of the fiduciary duty
claims, GTCR adheres to its position that "only . . . the
trustee[]" has standing to assert them.  Id.  As further support
for its argument that the fiduciary duty counts are derivative, in
its reply GTCR relied upon Big Lots Stores, Inc. v. Bain Capital
Fund VII, LLC, 2006 WL 846121 (Del. Ch. Mar. 28, 2006), an
unpublished opinion.  The court in Big Lots, found that "[s]horn of
excess verbiage, Big Lots's fundamental complaint . . . is that the
defendants caused HCC to become insolvent through what amounted to
breaches of fiduciary duty."  Id. at *7.  Quoting from the
Production Resources, the Big Lots court found that "claims of
th[at] type [we]re classically derivative[,]" and thus could not
"be maintained by Big Lots in this proceeding."  Id. at *7
(quotation marks, citation and footnote omitted); and at *8
(footnote omitted).  The court did note, however, that if "Big Lots
[had] pleaded facts which establish a direct claim, such as those
in Production Resources, both the bankruptcy estate and Big Lots
could have brought claims arising out of the same facts[,]" but it
did not.  See id. at *8 n. 54.

     As an unpublished decision, in accordance with Rule 171(h) of
the Court of Chancery of the State of Delaware, a copy of Big Lots
should have been attached to GTCR's reply, but it was not. For that
reason, and to allow plaintiffs to address the potential
applicability of Big Lots to the present action, the court ordered
plaintiffs to file a sur-reply (doc. 468), which they did (doc.
469).  Defendants were given an opportunity to respond, which they
also did (doc. 470).

1    "[I]t is settled under Delaware law," as plaintiffs suggest,
2    that "[w]hen a firm has reached the point of insolvency, . . . the
3    firm's directors . . . owe fiduciary duties to the company's
4    creditors." Production Resources, 863 A.2d at 790-91 (footnote
5    omitted); see also Geyer v. Ingersoll Publications Co., 621 A.2d
6    784, 787 (Del. Ch. Ct. 1992) (directors of insolvent corporation
7    have a fiduciary duty to act for the benefit of corporate
8    creditors).  In fact, as the court in Production Resources
9    observed, "[t]his is an uncontroversial proposition and does not
10   completely turn on its head the equitable obligations of the
11   directors to the firm itself."  Id. at 791 (footnote omitted).
12   What is less clear however is whether those creditors' claims are
13   direct or derivative.  This is an important distinction here
14   because GTCR and the plaintiffs have opposing views.  GTCR
15   maintains that the plaintiffs' claims are derivative, and hence
16   they lack standing, whereas, plaintiffs argue that the direct
17   nature of their fiduciary duty claims gives them standing.
18      "Whether an action is derivative or direct is usually a
19   question of state law." Abrahamson v. Western Savings and Loan
20   Association, 1994 WL 374294, at *3 (D.Ariz. Jan. 24, 1994) (citing,
21   inter alia, In re Sunrise Sec. Litig., 916 F.2d 874, 881 (3rd Cir.
22   1990)).  And, as mentioned at the outset, Delaware law governs the
23   breach of fiduciary duty claims herein.  See Mann I (doc. 72) at
24   42(citation omitted).  "Aiming at clarification in light of
25   confusing jurisprudence on the direct/derivative dichotomy," In re
26   Enron Corp. Securities, Derivative and "ERISA" Litigation, 2005 WL
27   2230169, at *1 (S.D. Tex. Sept. 12, 2005) (internal quotation marks
28   omitted), the Delaware Supreme Court in Tooley v. Donaldson,

1  Lufkin, & Jenrette, Inc., 845 A.2d 1031 (Del. 2004), "discarded the

2  old 'special injury' test, i.e. whether the plaintiff has suffered

3  an injury different from that suffered by shareholders in general,

4  for determining whether a claim is direct or derivative."

5  Dieterich v. Harrer, 857 A.2d 1017, 1027 (Del. Ch. 2004) (footnote

6  omitted); see also Albert v. Alex. Brown Management Services, Inc.,

7  2005 WL 2130607, at *12  (Del. Ch. Aug. 26, 2005) (In Tooley, the

8  Supreme Court of Delaware "revised the standard for determining

9  whether a claim is direct or derivative.")  After Tooley, "the

10 proper analysis" for distinguishing between direct and derivative

11 claims requires a court to examine "the nature of the wrong and to

12 whom the relief should go."  Tooley, 845 A.2d at 1039.  More

13 specifically, the Tooley Court held that the issue of "whether the

14 complaint alleges a direct or derivative claim . . . must turn

15 solely on the following questions: (1) who suffered the alleged

16 harm (the corporation or the suing stockholders individually); and

17 (2) who would receive the benefit of any recovery or other remedy

18 (the corporation or the stockholders, individually)?"  Id. at 1033.

19      In analyzing the first prong, the Delaware Supreme Court found

20 "helpful" the Chancellor's approach, which was to "[l]ook[] at the

21 body of the complaint and consider[] the nature of the wrong

22 alleged and the relief requested[.]"  Id. at 1036 (internal

23 quotation marks omitted).  From there, the question becomes whether

24 "the plaintiff [has] demonstrated that he or she can prevail

25 without showing any injury to the corporation[.]"  Id. (internal

26 quotation marks and footnote omitted).  "The second prong of the

27 analysis should logically follow[,]" opined the Tooley Court.

28 Stated somewhat differently, the Delaware Supreme Court in Tooley

stressed that "[t]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation." Id. at 1039. "The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." Id.

Applying the two prong Tooley test, GTCR asserts that plaintiffs' claims fail under the first prong in that they cannot prevail on the fiduciary duty counts "without showing an injury to the corporation[.]" Resp. (doc. 470) at 2 (internal quotation marks omitted). Indeed, GTCR is quick to point out that as plaintiffs' themselves describe their theory, "GTCR reacted angrily and destructively [to their criticism], and in less than a month LeapSource was destroyed." Id. (internal quotation marks and citation omitted). As GTCR views it "[t]hese are classically derivative claims, belonging solely to the Trustee." Id. Consequently, the individual plaintiffs lack standing.

Overlooking Tooley, in their sur-reply plaintiffs argue that they have standing because their damages "fall within the class of cases, contemplated by the court in Production Resources and acknowledged by the court in Big Lots, where the claims of particular creditor plaintiffs are based at least in part upon conduct **aimed specifically at those plaintiffs**, and motivated by animus that is **not** common to all creditors (or to all shareholders)." Sur-Reply (doc. 469) at 5 (emphasis in original). Originally, plaintiffs did not indicate whether they were seeking to bring direct or derivative fiduciary duty claims. Their sur-reply clarifies that they are attempting to assert direct breach of fiduciary duty claims.

1    Plaintiffs' heavy reliance upon Production Resources, combined

2    with the fact that that court "stressed multiple times the unusual

3    and particularized facts that gave rise to its holding[,]" Fleet

4    National Bank v. Boyle, 2005 WL 2455673, at *14 (E.D.Pa. Sept. 12,

5    2005), warrants a close examination of those facts.  In concluding

6    that the creditor's direct breach of fiduciary duty claim survived

7    a motion to dismiss, the Production Resources court was persuaded

8    by several factors.  First, and perhaps foremost, the plaintiff in

9    Production Resources had obtained a $2 million judgment against the

10   defendant, a judgment which plaintiff had been seeking to collect

11   for approximately five years with little success.  Second, the

12   defendant's actions in Production Resources all took place after it

13   became insolvent.  Third, the challenged conduct there included

14   allegations that the defendant breached "specific promises  made to

15   [the judgment creditor] and [it] . . . t[ook] steps to accept new

16   capital in a manner that was intentionally designed to hinder [the

17   judgment creditor's] effort to obtain payment."  Id. at 800

18   (emphasis added).  In other words, the board took "particular steps

19   to disadvantage PRG as a creditor and to frustrate its efforts at

20   collection."  Id.  Finally, as the court in Big Lots so aptly put

21   it, "[i]n the face of such extraordinary machinations, the

22   [Production Resources] court was unwilling to dismiss the

23   creditor's claims of specific injury as derivative because it

24   seemed possible that the creditor in question was the only one that

25   had been injured, and was thus the only one to which recovery was

26   due."  Big Lots, 2006 WL 846121, at *7.

27    Production Resources stands in sharp contrast to the present

28   case.  Even viewing the evidence in a light most favorable to

1   plaintiffs, and drawing all reasonable inferences in their favor,
2   as the court must, it cannot find that plaintiffs' fiduciary duty
3   claims fall within the narrow category of direct claims recognized
4   in Production Resources.  This is not a situation, such as
5   Production Resources, where plaintiffs are judgment creditors who
6   have been seeking to collect a debt owed to them for a number of
7   years.  Rather, the plaintiffs herein are "creditors holding
8   unsecured priority claims[,]" in the related bankruptcy proceeding.
9   See PSOAF (doc. 417-18), exh. 29 thereto.  This is a significant
10  distinction because as the court in Big Lots astutely observed,
11  "[t]he immediacy of the Production Resource defendant's debt was a
12  necessary underpinning of th[at] court's find that the debtor's
13  recalcitrance might have been motivated by targeted animus towards
14  the plaintiff."  Id. (footnote omitted).  In fact, in Big Lots the
15  court distinguished Production Resources because, among other
16  things, the plaintiff in Big Lots "had no right to repayment of its
17  debt at the time of the challenged transaction."  Big Lots, 2006 WL
18  846121, at *7.  The same is true of the individual plaintiffs
19  herein.

20      Furthermore, also in sharp contrast to Production Resources,
21  it is plaintiffs' theory that the GTCR defendants' breaches of
22  fiduciary duties caused LeapSource's insolvency, not that
23  LeapSource was insolvent at the time of the alleged breaches.  In
24  addition, unlike Production Resources, there is not "a marked
25  degree of animus [here] towards a particular creditor with a proven
26  entitlement to payment[.]" Production Resources, 863 A.2d at 798
27  (footnote omitted).  "In March 2001, [LeapSource] attempted to
28  negotiate reductions in severance obligations for terminated

1  employees."  DSOF (doc. 348) at 15, ¶ 100 (citations omitted);

2  PSOAF (doc. 417, pt. 2) at 55, ¶ 100.  Other terminated employees,

3  but not plaintiffs, "agreed to execute . . . releases in return for

4  partial severance payments."  <u>Id.</u> at 15, ¶ 102 (citations omitted);

5  <u>id.</u> at 56, ¶ 102.  Plaintiffs decided to pursue another avenue.

6  They filed claims in the LeapSource bankruptcy proceeding.  PSOAF

7  (doc. 417, pt. 2) at 106, ¶ 261 (citing exh. 29); Def. Resp. PSOAF

8  (doc. 450) at 70, ¶ 216.  Thus, despite how plaintiffs attempt to

9  depict it, they were not treated differently than others.  They

10 simply chose a different option than did the employees who elected

11 to sign a release.  This similar treatment further weakens

12 plaintiffs' argument of animus directed "**specifically**" at them.

13 <u>See</u> Sur-Reply (doc.  469) at 5 (emphasis in original).

14      Not only that, in <u>Production Resources</u> there were allegations

15 that the defendants were intentionally hindering the judgment

16 creditor's collection efforts, and "engaging in preferential

17 treatment of the company's primary creditor[.]"  <u>See</u> <u>Production</u>

18 <u>Resources</u>, 863 A.2d at 800 (footnote omitted).  There are no such

19 allegations or proof of similar conduct by the GTCR defendants.

20 Given the significant factual distinctions between <u>Production</u>

21 <u>Resources</u> and the present case, the latter does not mandate the

22 conclusion that plaintiffs' fiduciary duty claims are direct, and

23 thus they have standing.

24      There are several other compelling reasons to find that these

25 fiduciary duty claims are derivative, and hence plaintiffs lack

26 standing to bring them.  The first is that on a continuum, the

27 present case falls far closer to <u>Big Lots</u> (defendants' primary

28 support) than it does to <u>Production Resources</u>. Just as in <u>Big Lots</u>,

1  plaintiffs' "fundamental complaint" here is that the defendants

2  caused LeapSource "to become insolvent through what amounted to

3  breaches of fiduciary duty."  See Big Lots, 2006 WL 846121, at *7.

4  The present case is no different than Big Lots where the court

5  soundly reasoned:

6              [T]he underlying infirmity of the
              complaint is that the unavoidable effect
7              of granting relief would be to unfairly
              advantage the plaintiff, an unsecured
8              creditor, over any number of other unsecured
              creditors having claims in the bankruptcy.
9              Simply put, this case stands for the well-
              established proposition that derivative
10             claims cannot be used by a single creditor to
              upset the structured bankruptcy process.
11             That principle equally applies when a plaintiff
              has erroneously characterized various derivative
12             claims as direct, in the hope of escaping the
              broad jurisdiction of the bankruptcy court and
13             the proceedings therein.

14  Id.  This is precisely what the individual plaintiffs are seeking

15  to do through their fiduciary duty claims in this case. They are

16  seeking to circumvent the bankruptcy process.  The court cannot

17  condone this strategy.  On this point, the court agrees with the

18  GTCR defendants.  These "employee/creditor claims belong . . . in

19  the bankruptcy court, where the . . . plaintiffs can recover

20  alongside other creditors in the bankruptcy process."  Resp. (doc.

21  470) at 2.

22      Application of the two prong Tooley test provides further

23  support for a finding that plaintiffs' fiduciary duty claims are

24  not direct.  Their claimed injuries are not independent of the

25  alleged injuries to LeapSource.  Indeed the alleged fiduciary

26

27

28

1   duties, with one exception,[11] all pertain directly to LeapSource.

2   Those alleged breaches run the gamut from defendants "refus[al] to

3   fully fund LeapSource with $65 million, as promised[]" to

4   "preventing LeapSource from meeting its budgetary and business plan

5   objectives[,]" culminating in an allegation that defendants

6   "plac[ed] [LeapSource] in bankruptcy liquidation." FAC (doc. 121)

7   at 96, ¶ 446.  Certainly plaintiffs' claimed direct injury, not

8   receiving their severance payments due to LeapSource's insolvency,

9   is not "independent of any alleged injury" to LeapSource, as Tooley

10  requires.  See Tooley, 845 A.2d at 1039.  Stated somewhat

11  differently, these plaintiffs cannot, as Tooley also requires,

12  demonstrate that they "can prevail without showing an injury to"

13  LeapSource.  See id. In short, these are "classically derivative"

14  claims "in the sense that they involve an injury to [LeapSource] as

15  an entity and any harm to the stockholders and creditors is purely

16  derivative of the direct financial harm to [LeapSource] itself."

17  Big Lots, 2006 WL 846121 at *7 n. 46 (internal quotation marks and

18  citation omitted).  These derivative claims, as the Big Lots court

19  cogently explained, "do not become direct simply because they are

20  raised by a creditor, who alleges that the breaches of fiduciary

21  duty caused it specific harm by preventing it from recovering a

22  debt outside of bankruptcy."  See  id. at *7.

23      To conclude, because plaintiffs have not shown a direct injury

24  independent of any injury to LeapSource, but instead have only

25  shown  a derivative loss, they do not have standing to pursue the

26

27      [11]    The exception is plaintiffs' claim that defendants breached their
        fiduciary duties "by terminating [them] and by refusing to fully pay each of them
28      annual severance upon their terminations without cause[.]" FAC (doc. 121) at 96,
        ¶ 446; and at 99, ¶ 459.

1   breaches of fiduciary duty claims alleged in counts 17 and 19.   It

2   stands to reason then, that if plaintiffs lack standing to pursue

3   those counts, they also lack standing to pursue the counts for

4   aiding and abetting those breaches (counts 18 and 20).   Therefore,

5   the court grants the GTCR defendants' motion for summary judgment

6   as to counts 17-20.

7       ***C.  Duty of Loyalty***

8       With one exception,[12] it is impossible to discern from the 106

9   page, 486 paragraph FAC exactly what transaction or transactions

10  form the basis for the alleged duty of loyalty breaches.

11  Therefore, as a consequence, the GTCR VI Entities looked to

12  plaintiffs' answers to interrogatories.   Based upon those answers,

13  the Entities identified "four areas of alleged misconduct . . . :

14  (1) nondisclosure[13] regarding the funding cutoff; (2) interference

15  with management; (3) interference with the company's sale; and (4)

16  improper disposition of company assets." Mot. (doc. 347) at 14-15

17  (footnote added).   Plaintiffs disagree with this

18  "characterization" as to "nondisclosure[,]" but not with the fact

19  that they are claiming that the GTCR Entities breached their duty

20  of loyalty by deciding to discontinue funding LeapSource.   See

21  Resp. (doc. 417) at 17.   Likewise, plaintiffs agree that the other

22

23  [12]   Count 2 (the trustee's breach of fiduciary duty claim against the GTCR entities) specifically alleges that those Entities "breach[ed] their duty of loyalty by dissipating or diverting assets of LeapSource for the benefit of themselves, other Defendants, or certain preferred creditors[.]" FAC (doc. 121) at 75, ¶ 327.

26  [13]   Under some circumstances Delaware law recognizes a fiduciary duty of disclosure, although as previously mentioned, not independent of the duties of due care and loyalty.  Malpiede, 780 A.2d at 1086.   Thus, to avoid confusion, because what plaintiffs are actually claiming is that the GTCR Entities breached their duty of loyalty by discontinuing funding, when analyzing this particular claim, the court will not refer to "non-disclosure," even though the parties do.

1    alleged areas of misconduct just enumerated constitute the bases

2    for their breach of the duty of loyalty counts.  The court will

3    limit its analysis accordingly.

4        Delaware law does not permit "[c]orporate officers and

5    directors . . . to use their position of trust and confidence to

6    further their private interests." In re Greater Southeast Community

7    Hospital Corp., 353 B.R. 324, 344 (Bankr. D.C.C. 2006) (internal

8    quotation marks and citation omitted) (applying Delaware law).

9    "Instead, the best interest of the corporation and its shareholders

10   [must] take precedence over any interest possessed by a director,

11   officer[,] or controlling shareholder and not shared by the

12   shareholders generally."  Id. (internal quotation marks and

13   citation omitted).  "For that reason, Delaware law distinguishes

14   between the duty of loyalty and the duty of care."  Id. (internal

15   quotation marks and citation omitted).

16       "[C]lassic example[s]" of breaches of the duty of loyalty are

17   "when a fiduciary either appears on both sides of a transaction or

18   receives a personal benefit not shared by all shareholders."  Id.

19   (internal quotation marks and citation omitted).  However, "the

20   fiduciary duty of loyalty is not limited to cases involving a

21   financial or other cognizable fiduciary conflict of interest."

22   Stone, 911 A.2d at 370(emphasis added); see also In re Walt Disney

23   Company Derivative Litigation, 906 A.2d 27, 66 (Del. 2006) ("[T]he

24   universe of fiduciary misconduct is not limited to either

25   disloyalty in the classic sense (i.e., preferring the adverse self

26   interest of the fiduciary or of a related person to the interest of

27   the corporation) or gross negligence.")  The duty of loyalty is not

28   so limited because, as the Delaware Supreme Court explained in

1  Disney:

2              Cases have arisen where corporate directors
               have no conflicting self-interest in a decision,
3              yet engage in misconduct that is more culpable
               than simple inattention or failure to be informed
4              of all facts material to the decision.  To protect
               the interests of the corporation and its shareholders,
5              fiduciary conduct of this kind, which does not
               involve disloyalty (as traditionally defined)but is
6              qualitatively more culpable than gross negligence,
               should be proscribed.

7

8  Disney, 906 A.2d at 66.  The "doctrinal vehicle" to address "such

9  violations . . . is the duty to act in good faith."  Id.  Thus, the

10 duty of loyalty "also encompasses cases where the fiduciary fails

11 to act in good faith."  Stone, 911 A.2d at 370.   The rationale, as

12 set forth by the Stone Court is that "[a] director cannot act

13 loyally towards the corporation unless she acts in the good faith

14 belief that her actions are in the corporation's best interest."

15 Id. (internal quotations and citation omitted).

16      The Delaware Supreme Court has "identified the following

17 examples of conduct that would establish a failure to act in good

18 faith[,]" and in turn a breach of the duty of loyalty:

19              'where the fiduciary intentionally acts with a
               purpose other than that of advancing the best
20              interests of the corporation, where the fiduciary
               acts with the intent to violate applicable positive
21              law, or where the fiduciary intentionally fails to
               act in the face of a known duty to act, demonstrating
22              a conscious disregard for his duties.'

23 Stone, 911 A.2d at 369 (quoting Disney, 906 A.2d at 67).   The

24 Disney Court acknowledged that "[t]here may be other examples of

25 bad faith . . . , but these three are the most salient." Disney,

26 906 A.2d at 67 (footnote omitted).

27      Basically, the GTCR Entities are taking the position that the

28 business judgment rule presumption, discussed below, entitles them

to summary judgment on the breach of loyalty counts.  Although not
articulated in precisely this way, plaintiffs respond that they
have successfully rebutted that presumption because they have shown
genuine issues of material fact as to whether defendants acted in
good faith.  Regardless of which of the purported breaches of
loyalty is at issue, GTCR counters that "[b]ecause neither GTCR nor
any of its director designees stood on both sides of a challenged
transaction, and because GTCR – LeapSource's single largest
shareholder – stood to gain or lose in the same way as all other
shareholders did from LeapSource's success or failure, plaintiffs
cannot satisfy their burden" of rebuttal.  Reply (doc. 449) at 13
(citation omitted).

     After _Disney_, GTCR's counter-argument is unavailing.  A breach
of loyalty claim is not dependent upon a showing of self-dealing or
a showing that a fiduciary "received a personal benefit not shared
by all shareholders."  See _Greater Southeast Community Hospital_,
353 B.R. at 344 (internal quotation marks and citation omitted).
_Disney_ leaves no room for doubt; it is possible under Delaware law
to find a lack of good faith, and in turn a violation of the duty
of loyalty, even outside the "classic" breach of loyalty situations
just described.  Therefore, the court will turn to the remaining
and critical issue  -- whether plaintiffs have successfully
rebutted the business judgment rule with respect to each of the
alleged breaches of loyalty.  Before engaging in such an analysis,
however, it is necessary to define the contours of that rule, which
at times is easier stated than applied.

### 1.  Business Judgment Rule

     Essentially the GTCR defendants' position is that the business

judgment rule entitles them to summary judgment as to the fiduciary
duty counts.   The business judgment rule is "[t]he default
standard" of judicial review "[w]hen directors are subjected to
litigation for breach of the duties owed a corporation or, by
virtue of insolvency, its creditors[.]" <u>Growe v. Bedard</u>, 2004 WL
2677216, at *8 (D.Me. Nov. 23, 2004) (applying Delaware law).   The
business judgment "rule" actually "'is a presumption that in making
a business decision the directors [and officers] of a corporation
acted on an informed basis, in good faith and in the honest belief
that the action taken was in the best interest of the company [and
its shareholders].'" <u>Greater Southeast Community Hospital</u>, 353
B.R. at 343 n. 26 (quoting, <i>inter alia</i>, <u>Emerald Partners v. Berlin</u>,
787 A.2d 85 90 (Del. 2001)).   As with most rules of law, there are
exceptions to the business judgment rule.   First, it does not apply
if "directors . . . appear on both sides of a transaction [] or
expect to derive any personal financial benefit from it in the
sense of self-dealing, as opposed to a benefit which devolves upon
the corporation or all stockholders generally." <u>Aronson v. Lewis</u>,
473 A.2d 805, 812 (Del. 1984) (citations omitted), <u>overruled</u> <u>on</u>
<u>other</u> <u>grounds</u>, <u>Brehm v. Eisner</u>, 746 A.2d 244 (Del. 2000).

       Second, as its name indicates, the business judgment rule only
applies where a judgment has been made.   "Technically speaking, it
has no role where directors have either abdicated their functions,
or absent a conscious decision, failed to act." <u>Id.</u> at 813
(footnote omitted).   By the same token though, "a conscious
decision to refrain from acting may . . . be a valid exercise of
business judgment and enjoy the protections of the rule." <u>Id.</u>
Third, and perhaps most significant in terms of the present motion,

1  the business judgment rule will not shield a director from

2  liability if that director did not act in good faith.  See Grobow

3  v. Perot, 539 A.2d 180, 187 (Del. 1988)(citations omitted) ("[G]ood

4  faith and the absence of self-dealing are threshold requirements

5  for invoking the [business judgment] rule."), overruled on other

6  grounds, Brehm, 746 A.2d 244.

7       The business judgment rule has both a procedural and a

8  substantive component.  "As a procedural rule, the business

9  judgment presumption is a rule of evidence that places the *initial*

10  *burden of proof* on the *plaintiff*."   Emerald Partners, 787 A.2d at

11  90 (internal quotation marks and footnote omitted) (emphasis

12  added).  "To rebut the rule, a plaintiff must provide evidence that

13  the directors, in reaching a challenged decision, breached their

14  fiduciary duties to the corporation or its shareholders."  Growe,

15  2004 WL 2677216, at *8 (citing Cede, 634 A.2d at 361).  "Among the

16  kind of evidence that may suffice to rebut the business judgment

17  rule is evidence that the defendant directors abdicated their

18  duties."  Id. (citing, *inter alia*, Cede, 634 A.2d at 363).  Because

19  the business judgment rule is a "powerful presumption," Cede, 634

20  A.2d at 361, it can only be "rebutted in those *rare* cases where the

21  decision under attack is so far beyond the bounds of reasonable

22  judgment that it seems essentially inexplicable on any ground other

23  than bad faith."  Parnes v. Bally Entertainment Corp., 722 A.2d

24  1243, 1246 (Del. 1999) (internal quotations and citation omitted)

25  (emphasis added).

26       "The Delaware Supreme Court has defined 'bad faith' as 'not

27  simply bad judgement or negligence, but rather it implies the

28  conscious doing of a wrong because of dishonest purpose or moral

1   obliquity; it is different from the negative idea of negligence in
2   that it contemplates a state of mind affirmatively operating with
3   furtive design or ill will.'" <u>Roselink Investors, L.L.C. v.</u>
4   <u>Shenkman</u>, 386 F.Supp.2d 209, 221 (S.D.N.Y. 2004) (quoting <u>Desert</u>
5   <u>Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.</u>,
6   624 A.2d 1199, 1208 n. 16 (Del. 1993)).  A presumption of good
7   faith may be created by "the absence of significant financial
8   adverse interest . . ., although the good faith requirement further
9   demands an *ad hoc* determination of the board's motives in making
10  the business decision."  <u>Id.</u> (internal quotation marks and citation
11  omitted).  Stated somewhat differently, "[i]rrationality is the
12  outer limit of the business judgment rule."  <u>Brehm</u>, 746 A.2d at
13  264.  "Irrationality may be the functional equivalent of the waste
14  test or it may tend to show that the decision is not made in good
15  faith, which is a key ingredient of the business judgment rule."
16  <u>Id.</u> (footnote omitted).

17      "If a shareholder plaintiff fails to meet this [initial]
18  evidentiary burden, the business judgment rule operates to provide
19  substantive protection for the directors and for the decisions that
20  they have made."  <u>Emerald Partners</u>, 787 A.2d at 91 (footnote
21  omitted).  As the foregoing shows, the business judgment  "'rule
22  posits a powerful presumption in favor of actions taken by the
23  director [and officers] in that a decision made by a loyal and
24  informed board [and the corporation's officers] will not be
25  overturned by the courts unless it cannot be 'attributed to *any*
26  rational business purpose.''" <u>Greater Southeast Community Hospital</u>,
27  353 B.R. at 343 n. 26 (quoting <u>Cede</u>, 634 A.2d at 361) (emphasis
28  added).  Or, as this court succinctly observed in its September 30,

1  2003 dismissal order: The business judgment "presumption is a

2  hurdle that must be cleared before a court will second-guess the

3  corporate decisionmaking of officers and directors." Mann I (doc.

4  72) at 43.  "Thus, directors' decisions will be respected by courts

5  unless the directors are interested or lack independence relative

6  to the decision, do not act in good faith, act in a manner that

7  cannot be attributed to a rational business purpose or reach their

8  decision by a grossly negligent process that includes the failure

9  to consider all material facts reasonably available." Brehm, 746

10 A.2d at 264 n. 66. As the foregoing demonstrates, "[o]vercoming the

11 presumptions of the business judgment rule on the merits is a near

12 Herculean task." In re: Tower Air, Inc., 416 F.3d 229, 238 (3d

13 Cir. 2005) (applying Delaware law).

14     On the other hand, "[i]f the presumption of the business

15 judgment rule is rebutted, . . . , the burden shifts to the

16 director defendants to prove to the *trier of fact* that the

17 challenged transaction was 'entirely fair' to the shareholder

18 plaintiff." Emerald Partners, 787 A.2d at 91 (internal quotation

19 marks and footnote omitted).  This  "[b]urden shifting does not

20 create *per se* liability[.]" Cinerama Inc. v. Technicolor, Inc., 663

21 A.2d 1156, 1162 (Del. 1995)(citation omitted).  "Rather, it is a

22 procedure by which Delaware courts of equity determine under what

23 standard of review director liability is to be judged." Id.

24 (internal quotation marks and citation omitted).  A logical

25 corollary of the foregoing is that in the context of a summary

26 judgment motion such as this, if the plaintiffs do not successfully

27 rebut the business judgment rule, which includes rebutting the

28 presumption of good faith, summary judgment should be granted. See

1   McGowan v. Ferro, 859 A.2d 1012, 1030-32 (Del.Ch. 2004) (granting

2   summary judgment to defendant directors who approved an extension

3   of a merger agreement where plaintiff did not "raise a genuine

4   issue of material fact on the issue of bad faith"), aff'd without

5   pub'd opinion, 873 A.2d 1099 (Del. 2005); see also Gaylord

6   Container, 753 A.2d at 487 (granting summary judgment in favor of

7   defendant directors where "plaintiffs . . . failed to produce

8   evidence creating a genuine issue of material fact regarding

9   whether the board's actions [were] entitled to the protection of

10  the business judgment rule[]").  With these principles firmly in

11  mind the court will next examine each of the acts supposedly

12  constituting breaches of the duty of loyalty.

13          **_2.  "Funding Cutoff"_**

14      One way in which the GTCR VI Entities allegedly breached the

15  duty of loyalty is by "deciding to cease further purchases of

16  LeapSource preferred stock."  See Mot. (doc. 347) at 17.  The

17  Entities maintain that in making that decision they were simply

18  exercising their contractual rights under the September 27, 1999,

19  Purchase Agreement with LeapSource.  More specifically, the

20  Entities point to that part of the Agreement identifying three

21  conditions to their stock purchase obligations thereunder:

22          [GTCR's] obligation to purchase any stock
            of . . . [LeapSource] . . . will be conditioned
23          on [LeapSource's] [1] not being in default under
            any of its material agreements, [2] adequate debt
24          financing being available to fund any proposed
            acquisition or other Approved Use on terms
25          satisfactory to . . . [GTCR], and [3] . . .
            [LeapSource's] operations and the acquisition
26          or other use of proceeds being satisfactory to [GTCR].

27  Doc. 345, Vol. 2, exh. 21 thereto at EX0833-002 (brackets, numbers

28  and emphasis added).  By its terms, the third condition in

1  particular gave the GTCR VI Entities considerable leeway in
2  deciding whether or not to purchase LeapSource stock.  The Entities
3  did not have to continue funding LeapSource through stock purchases
4  unless LeapSource's "operations" were "satisfactory" to them.
5  Adding to the GTCR VI Entities' discretion in this respect is the
6  fact that the Purchase Agreement does not define either
7  "operations" or "satisfactory."  Obviously both terms are fairly
8  expansive.

9       In Mann I this court held that that language  was "not
10  ambiguous[]" because there was "no doubt whatsoever that the
11  agreement provides for a conditional obligation on the part of the
12  GTCR entities to finance" LeapSource.  Mann I (doc. 72) at 8 and 6.
13  If any one of those conditions was not satisfied, the Entities did
14  not have an obligation to provide additional funding to LeapSource.
15  Furthermore, this court in Mann I explicitly "note[d] that the
16  Purchase Agreement  governs the duty of any shareholder to purchase
17  stock in LeapSource." Id. at 52 (emphasis added).  It is
18  undisputed that GTCR was LeapSource shareholder in that it "owned
19  approximately 70% of LeapSource's common stock and 100% of its
20  preferred stock."  DSOF (doc. 348) at 6, ¶ 30 (citations omitted);
21  see also PSOAF (doc. 417, pt.2) at 12, ¶ 30.

22       In addition to that broad discretion as to funding, the
23  Purchase Agreement gave the GTCR VI Entities a fair amount of
24  latitude in terms of investigating and inspecting LeapSource
25  operations.  In particular, that Agreement required LeapSource to
26  "permit any representatives designated" by the GTCR VI Entities to
27  "visit and inspect any" LeapSource  property.  Doc. 345, vol. 2,
28  exh. 21 thereto at EX0083-006 at ¶ 3B.  The GTCR VI Entities also

had the express right under the Purchase Agreement to "examine the corporate and financial records" of LeapSource, and to "discuss the affairs, finances and accounts of [LeapSource] corporations with the directors, officers, key employees and independent accountants of . . . [LeapSource][.]" <u>Id.</u>

There is proof in the record that "GTCR's concerns regarding LeapSource's performance, including cash burn rate and its ability to generate revenue and control costs, escalated during the latter half of 2000." <u>See</u> DSOF(doc. 348) at 9, ¶ 57 (citing references). Plaintiffs do not dispute this fact, except  "to the extent that it is implied that these concerns were discussed among LeapSource board members[.]" PSOAF (doc. 417, pt.2) at 34, § VI, ¶ 57. Whether these concerns were discussed among LeapSource board members is irrelevant and not material at this point given the unilateral and conditional nature of the GTCR VI Entities' funding obligations under the Purchase Agreement.  Hence this claimed "factual dispute" does not factor into the court's analysis at this juncture.  <u>See</u> <u>Anderson</u>, 477 U.S. at 248, 106 S.Ct. 2505 (citation omitted) ("Factual disputes that are irrelevant or unnecessary will not be counted[]" in opposing a summary judgment motion.)

In any event, based upon the GTCR VI Entities' escalating concerns as to, among other things, LeapSource's financial condition, the Entities exercised their rights under the Purchase Agreement by designating defendant Yih and Sean Cunningham, two GTCR employees, "to investigate [those] concerns."  DSOF (doc. 348)

1  at 9, ¶ 58 (citations omitted).[14]  Messrs. Yih and Cunningham were

2  on site at LeapSource in December 2000 and January 2001.  While

3  there, they "interviewed management, [and] reviewed data[,]"

4  including financial data.  DSOF (doc. 348) at 9, ¶ 59 (citations

5  omitted).  Based partially upon that investigation, in a February

6  27, 2001 letter the GTCR Entities advised LeapSource of its

7  decision to stop funding,  explicitly indicating its

8  "dissatis[faction]" with "[t]he continued level of expenses

9  incurred by [LeapSource] which greatly exceed [LeapSource's]

10 revenues, resulting in continuing negative cash flows."  Id.

11      As the foregoing demonstrates, the GTCR VI Entities' concerns

12 about LeapSource's strained financial condition, together with the

13 considerable leeway they had under the Purchase Agreement in terms

14 of their stock purchase obligations, provided more than adequate

15 justification for their decision to discontinue funding LeapSource

16 in February 2001.

17      Against this backdrop plaintiffs are attempting to rebut the

18 business judgment rule presumption.  Plaintiff's refer to a

19 February 24, 2001, "confidential memorandum" from plaintiff Gilman

20 to LeapSource board members, which evidently they believe shows

21 that the GTCR VI Entities did not act in good faith in deciding to

22 discontinue funding LeapSource.  They also cite to seven paragraphs

23 in their SOAF which purports to summarize this memorandum.  This

24 "proof" is defective in at least two ways.  First, plaintiff's

25 memorandum did not include a cite to the record so that the Gilman

26

27      [14]    Plaintiffs counter that Yih and Cunningham were not sent "merely to
   'investigate GTCR's concerns[.]'"  PSOAF (doc. 417, pt. 2) at 35, ¶ 58.
28 Importantly, they do not dispute that that was at least one reason for Yih and
   Cunningham's visits to LeapSource in late 2000 and January 2001, however.

1   memorandum, which is the sole factual basis for plaintiffs'

2   opposition to this aspect of defendants' summary judgment motion,

3   could be located in this vast record.[15]

4       The second and more significant weakness in plaintiffs' proof

5   is the form in which it was submitted.  The paragraphs to which

6   plaintiffs cite in their SOAF do not "set forth, by affidavit or as

7   otherwise provided in Rule 56, *specific facts* showing that there is

8   a genuine issue for trial."  See Horphag, 475 F.3d at 1035

9   (internal quotation marks and citations omitted) (emphasis added).

10  Instead, those paragraphs appear to be broad generalizations by

11  plaintiffs' counsel as to the contents of the Gilman memorandum.

12  To illustrate,  as plaintiffs' counsel depicts it, the Gilman

13  memorandum "itemize[s] numerous acts by GTCR and by principals of

14  GTCR that were harmful to LeapSource and have been alleged as

15  breaches of fiduciary duties in this action." PSOAF (doc. 417, pt.

16  2) at 73, ¶ 145 (citation omitted).  Even assuming the

17  admissibility of this memorandum, plaintiffs have not specifically

18  directed the court to anywhere in this ten page, single-spaced

19  document which shows a genuine issue of material fact as to whether

20  the GTCR VI Entities lacked good faith when they decided to

21  discontinue funding LeapSource.  That memorandum is fairly

22

23  _____

        [15]   This failure to cite to the record in this instance was compounded by
24  the fact that in referring to the Gilman memorandum in their SOAF, plaintiffs seem
    to cite to exhibit 6 thereto.  But plaintiffs' exhibit six is a document entitled
25  "'Lessons Learned' Summary," which on the face of it has nothing to do with GTCR's
    funding decision.  The court then looked to defendants' exhibit six but it, too,
26  is irrelevant to this funding decision.  Evidently plaintiffs are referring to
    exhibit six filed as part of their response in opposition to a 2005 motion for
    summary judgment as to aiding and abetting and tortious interference claims.
27      The court's file in this action consists of well over 400 docketed items.
    Although the court was under no obligation to do so, it did retrieve the Gilman
28  memorandum which was filed in connection with a 2005 summary judgment motion.  See
    Doc. 292, attachment 3 thereto.

detailed, covering a variety of topics.  The court declines to
speculate as to exactly what parts of that memorandum are, from
plaintiffs' perspective, relevant to the funding decision.

In short, the Gilman memorandum, the only evidence in this
voluminous record upon which plaintiffs are relying, is
insufficient to defeat this aspect of GTCR's summary judgment
motion.  The broad generalizations by plaintiffs' counsel fall well
short of   "designat[ing] *specific facts* showing that there is a
genuine issue for trial[]" as to whether GTCR lacked good faith in
deciding to cease purchase of LeapSource stock, which is
plaintiff's burden in opposing this summary judgment motion.  <u>See</u>
<u>Celotex</u>, 477 U.S. at 324, 106 S.Ct. 2548 (internal quotations
omitted) (emphasis added).  Thus, because plaintiffs have not
identified any specific facts showing that there is a genuine issue
for trial as to whether defendants "intentionally act[ed] with a
purpose other than that of advancing the best interests of"
LeapSource, or, for that matter, specific facts to support a
finding of any other form of lack of good faith, defendants are
entitled to summary judgment insofar as plaintiffs' breach of
loyalty counts are predicated upon GTCR's decision to stop funding
LeapSource.

A finding that defendants are entitled to summary judgment on
this narrow breach of loyalty claim pertaining to the funding
decision is bolstered by the fact that  "absent a showing of
culpability," Delaware law "does not . . . require that directors
or controlling shareholders sacrifice their own financial interest
in the enterprise for the sake of the corporation or its minority
shareholders."  <u>Jedwab v. MGM Grand Hotels, Inc.</u>, 509 A.2d 584, 598

1  (Del.Ch. 1986); see also Next Level Communications, Inc. v.
2  Motorola, Inc., 834 A.2d 828, 854 and n.100 (Del.Ch. 2003)
3  (observing that it did not "appear [that majority stockholder]
4  ha[]d [any] further obligation, fiduciary or otherwise to continue
5  to fund" corporation "in its current business configuration[]").
6  In a similar vein, in Odyssey Partners, L.P. v. Fleming Companies,
7  Inc., 735 A.2d 386 (Del.Ch. 1999), the court held that the refusal
8  by the largest shareholder of a holding company to "waive its
9  preemptive rights" and its refusal "to assume further financial
10 obligations on behalf [of the corporation] without adequate
11 compensation cannot seriously be thought to have been a breach of
12 its fiduciary duties."  Id. at 411.  Controlling shareholders are
13 under no obligation to provide further financing in part because
14 they "are not required to act altruistically towards" minority
15 shareholders.  Thorpe v. CERBCO, 1993 WL 443406, at *7 (Del.Ch.
16 1993).  In short, as noted earlier, although the fiduciary duties
17 of due care and loyalty encompass a variety of obligations, self-
18 sacrifice is not among them.  As an aside, the court observes that
19 had the GTCR VI Entities continued to fund LeapSource under its
20 then existing unstable financial condition, arguably that decision
21 would have been tantamount to a lack of good faith in that it could
22 have been viewed, colloquially speaking, as  "throwing good money
23 after bad."
24            *3.  "Interference with Management"*
25      To define the contours of plaintiffs' claim that GTCR breached
26 its duty of loyalty by interfering with management, GTCR looked to
27
28

1  the plaintiff Kirk's answers to interrogatories.[16]  Plaintiff Kirk

2  verifies that the "GTCR . . . Entities interfered with [her]

3  authority to act as CEO of LeapSource in December 2000 and

4  continuing into 2001, when Dan Yih and other GTCR representatives

5  began conducting interviews and discussions with employees at all

6  levels of the LeapSource organization, including secret

7  negotiations with Mr. Makings, in a manner that severely disrupted

8  management."  Doc. 345, vol. 1, exh. 2 thereto at 10, ¶ C.

9  According to Ms. Kirk, "[t]hese discussions undermined management,

10 were damaging to [LeapSource], and distracted the corporate focus

11 from client-based services to internal power and control."  Id.

12     As to the GTCR principals, as distinguished from the GTCR VI

13 Entities, plaintiff  Kirk verifies that they "repeatedly interfered

14 with and undermined LeapSource management[.]" Id. at 9.  Citing to

15 allegations in the complaint, plaintiff Kirk lists a number of ways

16 in which the principals allegedly did that.[17]  There is no need to

17 recite that entire litany.   Suffice it to say for now that, among

18 other things, supposedly the GTCR principals  "direct[ed] Ms.

19 Kirk's time and efforts to sales[,]" while at the same time "re-

20 directing [her] time and efforts to a second round of financing[.]"

21 Id.  Additionally, the principals "direct[ed]" her to "execute

22 employee layoffs" and "reductions in compensation[.]" Id.

23

---

24     [16]   Interestingly, the interrogatory itself and hence the answer pertain
    *only* to count 17 which does *not* allege a breach of the duty of loyalty; and which
25 the court has determined plaintiffs lack standing to pursue.

26     [17]   The court observes that these conclusory statements, citing as they do
    to the FAC, are not sufficient to overcome a summary judgment motion.  Alvarado v.
27 Fedex Corporation, 2006 WL 644875, at *1 (N.D.Cal. March 13, 2006) (citing
    Thornhill, 595 F.2d at 738) ("Conclusory, speculative testimony in affidavits and
28 moving papers is insufficient to raise genuine issue of fact and defeat summary
    judgment. ")

GTCR does not dispute that any of the alleged acts occurred. Instead, GTCR posits that it had broad statutory and contractual oversight and monitoring authority, and thus "each of the challenged acts [wa]s within the business judgment of the board and majority shareholders of LeapSource."  Mot. (doc. 347) at 22. Plaintiffs discount GTCR's reliance upon its statutory and contractual oversight authority, reasoning that GTCR has not pointed to any "act or resolution of the board" authorizing the complained of conduct.  Resp. (doc. 417) at 18.  Although unstated, evidently plaintiffs are contending that the absence of a board resolution or act constitutes lack of good faith sufficient to overcome the business judgment rule presumption.

Plaintiffs' argument is not persuasive either in terms of the GTCR VI Entities or the GTCR principals.  The broad oversight and monitoring authority which the Purchase Agreement accorded the GTCR VI Entities significantly undermines their contention that those Entities lacked good faith with respect to the Yih investigation because there was no board resolution or act allowing that investigation.  As previously noted, the Purchase Agreement required LeapSource to "permit *any* representatives designated by [the GTCR entities]" to (1) "visit and inspect" LeapSource "properties[;]" (2) "examine [LeapSource's] corporate and financial records[;]" and (3) "discuss the affairs, finances and accounts . . . with [LeapSource's] directors, officers, key employees and independent accountants[.]" Doc. 345, vol. 2, exh. 21 thereto  at EX0083-006, ¶ 3B.  Thus, even without a board resolution or some other affirmative act by the board, the GTCR VI Entities had contractual rights to investigate LeapSource's operations, as they

1  did in late 2000 and early 2001.

2      With the advantage of hindsight, plaintiffs may regret this

3  provision.  In addition, as defendants put it, the Yih

4  investigation "may well have been disruptive to [plaintiff] Kirk's

5  CEO authority[.]"  Reply (doc. 449) at 15.  The fact remains,

6  however, that such investigations were "part of the bargain under

7  the Purchase Agreement."  See id.  Thus, the court concludes that

8  plaintiffs have not met their initial burden of rebutting the

9  business judgment rule as to the claim that the GTCR VI Entities

10  breached their duty of loyalty by conducting the Yih investigation.

11      Nor have plaintiffs rebutted the business judgment rule

12  presumption insofar as the GTCR principals are concerned.

13  Plaintiffs baldly assert in their response  memorandum that "[t]he

14  GTCR defendants were *not* 'authorized to take these acts' as

15  directors, because in fact the board of directors did not authorize

16  them and individual directors have no such authority on their own."

17  Resp. (doc. 417) at 18.  Plaintiffs do not cite to any "specific

18  facts" in the record  to support this assertion, however.

19  Likewise, they have not provided any legal analysis to support

20  their position.

21      It is well settled in this Circuit that "the arguments and

22  statements of counsel are not evidence and do not create issues of

23  material fact capable of defeating an otherwise valid motion for

24  summary judgment.'"  Barcamerica Intern. v. Tyfield Importers, Inc.,

25  289 F.3d 589, 593 n.4 (9th Cir. 2002) (quoting Smith v. Mack Trucks,

26  505 F.2d 1248, 1249 (9th Cir. 1974)).  Indeed, the Ninth Circuit in

27  Mack Truck explicitly recognized that "[l]egal memoranda . . . , in

28  the summary-judgment context, are not evidence, and do not create

1   issues of fact capable of defeating an otherwise valid motion for

2   summary judgment."  505 F.2d at 1249 (citation omitted).  What is

3   more, plaintiffs have not come forth with any evidence to support a

4   finding here that the GTCR principals "intentionally act[ed] with a

5   purpose other than that of advancing the best interests of

6   [LeapSource][,]" one way to establish a failure to act in good

7   faith.  See Stone, 911 A.2d at 369 (internal quotation marks,

8   citation and footnoted omitted).[18]

9            ### _4.  "Interference with the Company's Sale"_

10          Another way in which GTCR allegedly breached the duty of

11  loyalty is by interfering with the sale of LeapSource.  In the

12  "summer [of] 2000 LeapSource began interviewing various

13  underwriters to discuss potential financial alternatives for the

14  company."  PSOAF (doc. 417, pt. 2) at 40, ¶ 68.  As part of that

15  process, "[i]n August 2000, GTCR sent [plaintiff] Kirk a list of

16  investment banking firms to consider." DSOF (doc. 348) at 11, ¶ 69

17  (citations omitted); and PSOAF (doc. 417, pt. 2) at 40, ¶ 69.

18  "After presentations by a number of investment bankers, LeapSource

19  selected a team from Salomon Smith Barney ("SSB") to explore three

20

21          [18]       There is a fundamental flaw, which the court cannot overlook, in the
22  manner in which plaintiffs have presented their claim that the GTCR principals did
    not act in good faith because allegedly they interfered with LeapSource management.
23  The problem is that when plaintiff Kirk was asked about this theory of liability
    in interrogatories, rather than describe the supposedly offending conduct based
24  upon her personal knowledge of events, Ms. Kirk specifically referred to
    allegations in the FAC.  See Doc. 345, vol. 1, exh. 2 thereto at 9.  In the summary
    judgment context, however, a nonmovant cannot defeat a Rule 56 motion by merely
25  "replac[ing] conclusory allegations of the complaint . . . with conclusory
    allegations of an affidavit."  Lujan, 497 U.S. at 889, 110 S.Ct. 3177.  Yet that
26  is what plaintiffs are attempting to do herein.  Rather than submitting an
    affidavit or a declaration from someone with personal knowledge of the alleged
27  interference with LeapSource management, such as presumably Ms. Kirk, she has
    simply reiterated conclusory allegations in the FAC.  Therefore, arguably there is
28  no admissible proof in the record as presently constituted to support this
    particular aspect of plaintiffs' breach of loyalty claim.

alternatives: an initial public offering, finding an investor
willing to supply second-round financing, or finding a potential
buyer for the company." DSOF (doc. 348) at 11, ¶ 70 (citations
omitted); and PSOAF (doc. 417, pt. 2) at 40, ¶ 70.  "SSB,
[plaintiffs] Gilman and Kirk solicited numerous prospective
investors or buyers between October 2000 and March 20001 in an
effort to locate another source of private capital for LeapSource."
DSOF (doc. 348) at 11, ¶ 72 (citations omitted); PSOAF  (doc. 417,
pt. 2) at 41, ¶ 72.   For different reasons, in the end, none of
these efforts were fruitful.

     Rather than explaining, with cites to the record, how GTCR
purportedly "disrupt[ed] efforts to sell" LeapSource, plaintiffs
cite to five paragraphs in their 216 paragraph SOFA.  See Resp.
(doc. 417) at 19.  They then state that that "*handful of paragraphs
. . . suggest[s]* GTCR's role in disrupting efforts to sell the
company and to preserve its value for the benefit of the
shareholders and LeapSource creditors[.]" Id. (emphasis added)
This approach is problematic for two reasons.  The first is that
obviously a "suggestion" that GTCR interfered with the sale of
LeapSource is not sufficient to rebut the business judgment rule.
Similarly, a "suggestion" does not create a genuine issue of
material fact so as to defeat a summary judgment motion.

     More compellingly, however, a  second problem is that despite
what plaintiffs imply, a careful examination of the cited
paragraphs does not suggest, much less show, that GTCR interfered
with or impeded the sale of LeapSource.  Plaintiffs rely upon three
incidents which they claim show interference by GTCR.   First, they
rely upon a transaction involving EDS.  Plaintiffs note that on

- 42 -

1  February 27, 2001, GTCR faxed a letter to plaintiff Kirk.  See

2  PSOAF(doc. 417, pt. 2) at 104, ¶ 251 (citing exh. 30).  As

3  previously discussed, in that letter GTCR advised LeapSource of its

4  decision to stop funding.[19]  Plaintiffs indicate that that letter

5  was faxed to Ms. Kirk  "while she was in meetings with EDS

6  executives interested in buying LeapSource."  Id.

7      Evidently the inference which plaintiffs believe should be

8  drawn from the foregoing is that the "stop funding" letter[20]

9  impacted EDS' decision not to buy LeapSource.  This is *not* a

10  reasonable inference, however.  And on a motion for summary

11  judgment only *reasonable* inferences may be drawn from specific

12  facts in the record as designated by the parties.  See Horphag, 475

13  F.3d at 1035 (citation omitted); cf. Devereaux v. Abbey, 263 F.3d

14  1070, 1081  n. 3 (9th Cir. 2001) ("[T]enuous inferences, standing

15  alone, do not constitute sufficient evidence to survive summary

16  judgment.").  It cannot reasonably be inferred that the February

17  27, 2001, letter impacted EDS' decision not to buy LeapSource

18  because, as GTCR notes, plaintiffs have "not cite[d] any evidence

19  that anyone from EDS saw or read the fax, . . . let alone . . .

20  that the fax had any impact whatsoever on ay discussions with EDS.

21  Reply (doc. 449) at 16 (citing PSOAF (doc. 417, pt.2) at 104, ¶¶

22  251-253).  Moreover, plaintiffs have not cited to any evidence that

---

23

24  [19]     In their SOAF, plaintiffs assert that the February 27, 2001, letter "said that GTCR would not be funding the Cargill deal."  PSOAF (doc. 417, pt. 2) at 104, ¶ 253 (citing exh. 30). Even assuming, as the court does, that that was

25  simply an inadvertent misrepresentation, such inaccuracies, including wrong cites to the record, are unnecessarily distracting, and obfuscate rather than clarify

26  what might be an otherwise valid point.  Plaintiffs were not alone in this regard.

27  [20]     The record is ambiguous in terms of whether this letter was faxed to Ms. Kirk while she was at EDS.  Plaintiffs contend that it was, but there is no

28  indication on the face of the letter that that is so.  GTCR does not dispute that it faxed that letter, but it is silent as to where the letter was faxed.

1   EDS was a potential buyer.

2       Plaintiffs' reliance upon a prospective transaction with

3   Computer Horizons Corporation ("CHC"), to show interference by GTCR

4   is, if possible, even more attenuated than the EDS evidence.  As

5   plaintiffs depict it, GTCR also interfered with the sale of

6   LeapSource because CHC "pulled out of their potential deal with

7   LeapSource immediately after LeapSource executed its first

8   reduction in force at the direction of GTCR." PSOAF (doc. 417, pt.

9   2) at 104, ¶ 254.  Even assuming that there is admissible proof to

10  support this statement, plaintiffs have not pointed to any specific

11  facts in the record showing that "a prospective purchaser would

12  have come forth because CHC had become a LeapSource customer."  See

13  Reply (doc. 449) at 16.  Therefore, it is difficult if not

14  impossible to see how the fact that LeapSource *may* have lost a

15  customer because of a LeapSource reduction-in-force, supposedly

16  done at GTCR's behest, constitutes interference by GTCR with the

17  sale of LeapSource.

18      Third, plaintiffs claim that GTCR interfered with the sale of

19  LeapSource to Exult.  To support this contention plaintiffs rely

20  solely upon roughly a half page quote from the deposition of Mr.

21  Campbell, Exult's Chief Operating Officer.  Mr. Campbell testified

22  that Exult "found [it] odd" that LeapSource was not "interested in

23  continuing discussions" about selling LeapSource to Exult.  Resp.

24  (doc. 417) at 20 (citation omitted).  When asked why he found "that

25  odd[,]" Campbell candidly responded:

26              Because, . . . [Exult] thought [it] had some
                interest in [LeapSource] and we would have
27              thought that they  would have pursued those
                discussions.  So again, pure -- it was *pure*
28              *speculation* on [Exult's] part, but what [Exult]

- 44 -

w[as] wondering  was why wouldn't they have
considered [Exult's] alternative to closing down
[LeapSource].

Id. (citing Deposition of Kevin Campbell at 37:11-38:3) (emphasis

added); see also PSOAF (doc. 417, pt. 2) at 105-106, ¶ 255

(citation omitted) (same).  Obviously "[p]ure speculation" as to

why LeapSource "wouldn't . . . have considered" being bought by

Exult is not sufficient to meet plaintiffs' burden in terms of

rebutting the business judgment rule, and hence averting summary

judgment on this particular duty of loyalty claim.

     Not only that, even according to plaintiffs, it is

"[u]ndisputed that Exult's CEO . . . did not believe that Exult

would have consummated the contemplated transaction with LeapSource

because Exult was not looking at taking on a company with a

negative cash flow." PSOAF (doc. 417, pt.2) at 43, ¶ 76.  Thus,

plaintiffs all but concede that there is no merit to their

allegations that GTCR interfered with the sale of LeapSource to

Exult.  Due to what Exult perceived to be LeapSource's precarious

financial situation, the Exult transaction was not going to be

consummated, regardless of any actions by GTCR.

     As the foregoing discussion shows, standing alone or taken

together, the evidence upon which plaintiffs are relying to support

their theory that GTCR lacked good faith because it interfered with

the sale of LeapSource is not sufficient to defeat the defendants'

summary judgment motion as to this particular claim.

               ***5.  "Improper Disposition of Company Assets"***

     According to plaintiffs, the fourth way in which GTCR breached

its duty of loyalty is by improperly disposing of assets during

1  LeapSource's wind-down period.   Plaintiffs are challenging the

2  propriety of three separate transactions: (1) the sale of the ICG

3  Division of LeapSource to ICG Group, Inc. ("the ICG asset sale");

4  (2) customer asset sales; and (3) the LeapSource employee

5  severance/release agreements.   The court will address each of these

6  asset dispositions in turn.

7                          a.  ICG Asset Sale

8       Two earlier decisions in this action, provide fairly detailed

9  accounts of the relationship between the "ICG business" and

10  defendant Michael Makings, as well as LeapSource's sale of that

11  business to Makings.   See Mann v. GTCR Golder Rauner, L.L.C., 351

12  B.R. 708, 709-710 (D.Az. 2006); and Mann v. GTCR Golder Rauner,

13  L.L.C., 351 B.R. 714, 717-718 (D.Az. 2006)  The court assumes

14  familiarity with these prior decisions.   For purposes of the

15  present motion, a few of those facts are worth highlighting:

16                  It is undisputed that, prior to his
                    resignation, Makings began planning a
17                  reacquisition of the ICG-9 Asset and began
                    negotiating with [LeapSource] for such
18                  reacquisition. In relation to this planning,
                    Makings incorporated a new entity, ICG Group,
19                  for the purpose of reacquiring and operating
                    the ICG business. Furthermore, it is undisputed
20                  that Makings formally resigned as the CEO
                    and as a director of [LeapSource] on March 20,
21                  2001. The Agreement, which was drafted by
                    [LeapSource's] attorneys, was entered into
22                  between three and ten days later, on either
                    March 23, 2001 (the date on the Agreement) or
23                  March 30, 2001 (the alleged date that the Agreement
                    was signed),and the ICG Asset was transferred
24                  to Makings on March 30, 2001.

25  Mann II, 351 B.R. at 713 (citation omitted).

26       The terms of the ICG asset purchase agreement, as this court

27  has previously found, were as follows, and also have some bearing

28  on the present motion:

                                - 46 -

> [T]he 'purchase price' for the transfer
> consisted of ICG Group's forgiveness of
> the Note that [LeapSource] owed to Makings,
> which he had assigned to ICG Group. . . .
> Additionally, ICG Group also agreed to assume
> several third party liabilities owned by
> LeapSource, including telephone lease payments,
> building lease payments, copier lease payments,
> various accounts payable, and past and future
> payroll expenses.

Id. at 710 (citations omitted).

To the extent plaintiffs are suggesting that there was a conflict arising from the ICG asset sale because Makings was a former LeapSource officer and board member, GTCR asserts that this conflict argument is without merit.  First, of all, as this court has previously recognized, "Makings was no longer an officer of director of LeapSource." Mot. (doc. 347) at 27 (citations omitted). Second, as GTCR points out, Makings was not at the March 30, 2001, board meeting where the ICG asset sale was approved.  Id. at 27-28 (citing Doc. 345, vol 3, exh. 73 thereto).  GTCR hastens to add that LeapSource's Chief Restructuring Officer, David Eaton, recommended the ICG asset sale to the board; the board approved it; and "none of [the] board members had an interest in the transaction or stood to gain from its approval." Id. at 28.  Lastly, GTCR adds that to the extent plaintiffs theorize that the GTCR defendants had an "improper motive" for the ICG asset sale in that they "approved [that sale] . . . to avoid liability on a supposed guarantee of Makings' $2.5 million note[,]" this theory "collapses."  It "collapses," GTCR asserts, "because it is . . . uncontested that GTCR did not guarantee Makings' note." Mot. (doc. 347) (citing DSOF (doc. 348) at ¶ 32; see also PSOAF (doc. 417, pt. 2) at 13, ¶ 32).

On the face of it, these arguments carry substantial weight.

1   The ICG asset sale cannot be viewed in isolation though. As

2   reflected in the March 30, 2001 "Minutes of Special Meeting of" the

3   LeapSource Board of Directors, Mr. Eaton "recommended the proposal"

4   for the sale of LeapSource's ICG Division to ICG Group, of which

5   defendant Makings was president.   Doc. 345, vol. 3, exh. 73

6   thereto at LS-91-0295.   The directors who were present at that

7   meeting were defendants Nolan and Yih, both GTCR principals, as

8   well as LeapSource's counsel and Mr. Eaton.   See id.

9        After presenting the proposed terms of that purchase

10  agreement, according to the board meeting minutes, Mr. Eaton "noted

11  . . . that [LeapSource] [wa]s unable to effectively shop the ICG

12  Division to other potential buyers." Id. at 2, LS-91-0296.

13  Further, Mr. Eaton "noted" that if LeapSource "decided not to

14  accept the" ICG Group proposal, it "would be forced to shut down

15  the ICG Division and terminate 20 or more employees." Id.

16  "[S]hut[ting] down [LeapSource] would also result in a breach of

17  the release related to the ICG Division and severance issues with

18  its employees[,]" Mr. Eaton reported.   Id.

19       Plaintiffs describe Eaton's reasons for recommending the ICG

20  asset sale as "self-serving characterization[s][.]" Resp. (doc.

21  417) at 21.   From plaintiffs' standpoint, Eaton's reasons for

22  recommending the sale are nothing more than "retroactive

23  justifications for a transaction that was made because GTCR wanted

24  it done, to hasten the disposition of the pieces of LeapSource and

25  to put the company into bankruptcy[.]" Id. at 21-22.   Plaintiffs

26  then direct the court to a document which reads in its entirety:

27            •         1st cut - ICG 2001

28            •         Free Cash Flow Excludes Changes in Working

                          Capital

●            At              Value

            5x Free Cash    3,987K
            6x Free Cash    4,785K
            7x   "          5,582K
            8x   "          6,380K

Resp. (doc. 417) at 22 (citing PSOAF (doc. 417, pt.2) at ¶ 219).

Plaintiffs maintain that this document represents "GTCR's own

preliminary evaluation show[ing] that they still believed the

business was worth approximately $4-6.4 million in early 2001[.]"

PSOAF (doc. 417, pt. 2) at 94, ¶ 219.

        Aside from authentication problems, it is not readily apparent

from the face of this document the significance of these words and

figures, except that it apparently relates to the value of the ICG

asset.  A reasonable inference can be drawn from this document,

however, that sometime near the ICG asset sale, that asset had a

value greater than the "sale price" to ICG Group.  From that and

all of the circumstances surrounding that sale, there is evidence,

albeit scant, which at least at this juncture creates a genuine

issue of material fact.  Consequently, the court denies GTCR's

summary judgment motion insofar as it is based upon a breach of the

duty of loyalty arising out of the ICG asset sale.  However, the

denial of this motion is without prejudice to renew by appropriate

motion.

### b.  Customer Asset Sales

        As part of winding down its operations, in a March 19, 2001,

letter, the GTCR VI Entities advised LeapSource that it would

provide additional funding, "up to $750,000 purely to allow

LeapSource to provide for an orderly transition of the outsourced

accounting operations back to their clients with minimal disruption

as possible." Doc. 345, vol. 3, exh. 66. To that end,

approximately six weeks later, LeapSource entered into "Settlement

and Asset Purchase Agreements" with two of its clients, COMSYS

Information Technology Services, Inc. and Heritage Golf Group, Inc.

Id., vol. 3, exh. 72 thereto at LS-91-0120 and LS-91-0098.

LeapSource entered into a similar agreement with another one of its

clients, Xpedior Incorporated. Id. at LS-91-0098. In addition to

transitioning back the accounting operations which had previously

been outsourced to LeapSource, under these agreements the former

clients purchased hard assets such as office furniture, fixtures

and equipment. See id., exh. 72 thereto. "The LeapSource board

was not asked to approve any of these transactions." DSOF (doc.

348) at 14, ¶ 92; PSOAF (doc. 417, pt. 2) at 50-51, ¶ 92.

        In their answers to interrogatories, plaintiffs indicate that

the COMSYS transaction was "disadvantageous . . . to LeapSource[,]"

and that the sale of the hard assets to Xpedior and Heritage Golf

was "for a price that was not fair and reasonable." Doc. 345, vol.

1, exh. 1 thereto at 13. In responding to this aspect of GTCR's

motion, plaintiffs focus *exclusively* on the sale to COMSYS (a GTCR

portfolio company), of what they term "LeapSource's intellectual

property[.]" Resp. (doc. 417) at 22. With absolutely no cites to

the record, and no analysis of waste, which has a specific meaning

in this context, plaintiffs suggest that "intellectual property,

including the CxO Desktop interface, was wasted." Id. at 23

(footnote omitted).

        By responding in this way, it appears to the court that

plaintiffs have abandoned their position that any aspect of the

transition back agreements amounted to a breach of the duty of
loyalty.  The court will not speculate as to what "intellectual
property" plaintiffs are referring, let alone what the value of
that property was and how that value should be measured.  At a
minimum, the court finds that plaintiffs have not met their initial
burden of rebutting the business judgment rule in connection with
these customer asset sales.  Thus, the court finds that defendants
are entitled to summary judgment as to this aspect of plaintiffs'
breach of loyalty claims as well.

### c.  Employee Severance/Release Agreements

On March 2, 2001, in a cost-cutting effort, LeapSource
"terminated virtually all the headquarters staff[,]" which included
the individual plaintiffs.  See DSOF(doc. 348) at 15, ¶ 99
(citations omitted); PSOAF (doc. 417, pt.2) at 55, ¶ 99.  "In March
2001, Rhodes [LeapSource's then Vice President of Finance and
Accounting] and Eaton [LeapSource's Chief Restructuring Officer]
attempted to negotiate reductions in severance obligations for
terminated employees."  Id. at 15, ¶ 100 (citations omitted); and
PSOAF (doc. 417, pt.2) at 55, ¶ 100.  In keeping with its cost-
cutting goal, LeapSource offered to pay its employees "33% of
[their] total severance payments, in a lump sum, rather than the
full amount over an extended period of time[.]" Doc. 345, vol. 3,
exh. 62 thereto.

In offering that severance payment, LeapSource advised its
employees: "Regardless of your acceptance or declination of this
offer, as set forth in your employment agreement and enclosed
amendment, you are required to sign the enclosed release in order
to obtain any form of severance payment."  Id. (emphasis added).

1  The referenced "Waiver and Release of Claims" was fairly broad,
2  although it did exclude severance payments and "vested stock rights
3  previously granted by [LeapSource][.]" Id. at CKDQ-0288.  It is
4  undisputed that "[n]one of the individual plaintiffs reached
5  agreement with LeapSource on their severance."  DSOF (doc. 348) at
6  15, ¶ 101 (citation omitted); PSOAF (doc. 417, pt.2) at 55-56, ¶
7  101.

8      Plaintiffs dispute that those Agreements required "the release
9  that GTCR demanded."  See Resp. (doc. 417) at 23. The court has
10  carefully reviewed the Senior Management Agreements and Employment
11  Agreements which GTCR indicates "all" contain an "explicit
12  'condition precedent'" in the form of requiring a release from
13  employees in connection with receiving lump sum severance payments.
14  See Mot. (doc. 347) at 31 (citing Doc. 345, vol. 2, exhs. 20, 25-30
15  thereto.)  The court's review revealed that while the Employment
16  Agreements did include a release as an explicit "condition
17  precedent" to GTCR's obligation to provide "any severance payments
18  pursuant to th[at] Agreement," the Senior Management Agreements did
19  not.  Compare Doc. 345, vol. 2, exhs. 27-30 thereto at ¶ 6(e)(iv);
20  with Doc. 345, vol. 2, exhs. 20, 25-26.

21      Regardless, the court is fully aware that from plaintiff's
22  standpoint  LeapSource's request for a release as a quid pro quo to
23  receiving severance pay meant "that money otherwise available for
24  the payment of former employee's wage or severance claim on an
25  equitable basis went only to those former employee who would agree
26  to release GTCR from any potential claim of liability."  Resp.
27  (doc. 417) at 23 (footnote omitted).  Without more, the court is at
28  a loss to see how that result rebuts the business judgment rule

1   presumption here.  Even without an express contractual right to do

2   so, which evidently GTCR did not have with respect to some of the

3   plaintiffs, requesting a release under these circumstances is

4   nothing more than the exercise of business judgment.  Put somewhat

5   differently, the decision to require a release as a condition to

6   making lump sum severance payments, when a business is in a

7   compromised financial condition, is not "so far beyond the bounds

8   of reasonable business judgment that it seems essentially

9   inexplicable on any ground other than bad faith."  See Parnes, 722

10  A.2d at 1246.  Therefore, because plaintiffs have not met their

11  burden of rebutting the business judgment rule as to the employee

12  releases, defendants are entitled to summary judgment insofar as

13  the breach of loyalty counts are premised upon defendants requiring

14  those releases.

15       To summarize with respect to plaintiffs' breach of loyalty

16  counts, with the exception of the ICG asset sale, summary judgment

17  is proper.  As should be abundantly clear by now, for the most part

18  plaintiffs have failed to meet their burden of "establish[ing]

19  facts necessary to negate any element of the business judgment

20  rule, and thus defendants are 'entitled to summary judgment as a

21  matter of law'" as to those counts alleging a breach of the duty of

22  loyalty, except to the extent the ICG asset sale forms the basis

23  for this alleged breach.  See Roselink, 386 F.Supp.2d at 224

24  (quoting Fed. R. Civ. P. 56).

25       **_D.  Duty of Due Care_**

26       At the outset it is necessary to clarify the scope of

27  plaintiffs' duty of care claim.  In the September 30, 2003

28  dismissal order,  among other things, this court dismissed such

1  claims to the extent that plaintiffs were seeking recovery against

2  GTCR directors and officers.  See Mann I (doc. 72) at 49-50.  Thus,

3  the only remaining substantive duty of care claim is the Trustee's

4  claim against the GTCR VI Entities, "[a]s majority shareholders of

5  LeapSource[.]" FAC (doc. 121) at 75, ¶¶ 325 and 326.

6      The Entities advance three separate arguments as to why

7  summary judgment is appropriate as to the breach of the duty of

8  care alleged in count two of the FAC.  First, relying upon Official

9  Comm. of the Unsecured Creditors of Color Tile, Inc. v. Investcorp

10  S.A., 137 F.Supp.2d 502 (S.D.N.Y. 2001), they contend that in the

11  absence of a breach of the duty of loyalty, "Delaware law does not

12  recognize a duty of care claim against a controlling

13  shareholder[.]" Mot. (doc. 347) at 12.  And, because, according to

14  the GTCR VI Entities the "plaintiffs cannot establish any breach of

15  the duty of loyalty," their duty of care claim necessarily fails as

16  a matter of law.  Id.  The denial of GTCR's summary judgment motion

17  as to one aspect of the alleged breach of the duty of loyalty, i.e.

18  the ICG asset sale, forecloses this argument however.

19      Second, again relying upon Color Tile, the GTCR VI Entities

20  argue that this duty of care claim is "an impermissible effort to

21  circumvent the exculpatory provision in LeapSource's certificate of

22  incorporation." Mot. (doc. 347) at 12.  In particular, they argue

23  that "[p]laintiffs cannot avoid" that provision "simply by

24  asserting the same alleged misconduct against the shareholders who

25  designated those directors." Id.  To support this argument, the

26  GTCR VI Entities rely upon the Color Tile court's reasoning that:

27              Enabling plaintiff to sue the shareholder
              defendants for acts of [their director and
28              officer] for which [the director and

- 54 -

officer] personally cannot be held liable
would provide an illogical end-run around
the protections of § 102(b)(7).

Id. (quoting Color Tile, 137 F.Supp.2d at 515).

The court does not read Color Tile as broadly as the GTCR VI
Entities urge.  As this court interprets Color Tile, it is limited
to a situation where there are no allegations that the shareholder
defendants "individually took any specific actions to breach a duty
of care[.]" See Color Tile, 137 F.Supp.2d at 515.  Rather, the
plaintiff's theory in Color Tile was "that the shareholder
defendants [we]re vicariously liable for breach of their duty of
care by [their director and officer] as their agent." Id. The
court is not persuaded by the GTCR VI Entities' attempt to downplay
the significance of this agency theory.  Indeed it was the "agency
theory" which the court expressly found led to "an anomalous
result" in that case.  See id.

In contrast, as plaintiffs are quick to point out, they are
suing the GTCR VI Entities for their "own misconduct[.]" See Resp.
(doc. 417) at 11.  The plaintiffs herein are not suing the GTCR VI
Entities on a theory of vicarious liability.  Thus, the court finds
that Color Tile does not govern the duty of care claim which
plaintiffs allege against the GTCR VI Entities.

The GTCR VI Entities' third argument is that summary judgment
is warranted on the duty of care claim because plaintiffs have not
met the high standard of showing gross negligence.  "To establish a
breach of the duty of due care, a plaintiff must ordinarily
establish gross negligence on the part of the directors." Growe,
2004 WL 2677216, at *7 (citing, inter alia, Emerald Partners, 787

1   A.2d at 90).   "This standard appears to be synonymous with engaging

2   in an irrational decisionmaking process."   Greater Southeast

3   Community Hosp., 353 B.R. at 339 (internal quotation marks and

4   citation omitted).   "It signifies more than ordinary inadvertence

5   or inattention[,] . . . but is nevertheless a degree of negligence,

6   while recklessness connotes a different type of conduct akin to the

7   intentional infliction of harm."   Id. (internal quotation marks and

8   citations omitted).   Thus, "[i]t has been said that 'Delaware

9   courts tolerate ordinary negligence from corporate fiduciaries.'"

10  Growe, 2004 WL 2677216 at *7 (quoting In re United Artists Theatre

11  Co., 315 F.3d 217, 231 (3d Cir. 2003)).

12       It is important to clarify the scope of due care owed under

13  Delaware law.   "In Delaware, the merits of a business decision are

14  considered separately from the process used to reach that

15  decision."   Greater Southeast Community Hosp., 353 B.R. at 339

16  (internal quotation marks and citation omitted).   "Due care in the

17  decisionmaking context is *process* due care only."   Id. (internal

18  quotation marks and citation omitted) (emphasis in original).   "The

19  [threshold] question is whether the process employed [in making the

20  decision] was either rational or employed in a *good faith* effort to

21  advance corporate interests."   Id. (internal quotation marks and

22  citations omitted) (emphasis in original).

23       The difficulty in the present case is two-fold.   The GTCR VI

24  Entities believe that the only decision at issue with respect to

25  the duty of care claim is the decision to stop funding LeapSource.

26  See Mot. (doc. 347) at 13; and Reply (doc. 449) at 12.   It is not

27  entirely clear, however, that plaintiffs' duty of care claim is so

28  limited.   See Resp. (doc. 417) at 13-14.   Second, because of their

1    narrow focus, defendants have not met their initial burden as the

2    moving party "the absence of any genuine issue of material fact[]"

3    as to the duty of care claim.    See Horphag Research, 475 F.3d at

4    1035 (citation omitted).    Accordingly, the court denies this aspect

5    of the GTCR Entities' motion without prejudice to renew by

6    appropriate motion.

7              ***E. Aiding and Abetting Breaches of Fiduciary Duty***

8         Three of the remaining counts (4, 6 and 7) allege the aiding

9    and abetting of breaches of fiduciary duty against various

10   defendants.    "A claim for aiding and abetting a breach of

11   fiduciary duty requires . . . (1) the existence of a fiduciary

12   relationship; (2) a *breach* of that *duty*; (3) knowing participation

13   by *the non-fiduciary*; and (4) damages."    In re American Business

14   Financial Services, Inc., 2007 WL 510094, at *6 (Bankr. D.Del. Feb.

15   13, 2007) (citation omitted) (emphasis added).    For the reasons set

16   forth below, summary judgment is proper as to each of these aiding

17   and abetting counts because plaintiffs have not met their burden of

18   proof.

19        Count four alleges that GTCR alone aided and abetted breaches

20   of fiduciary duties "by majority shareholders and by professional

21   advisers and consultants[.]" FAC (doc. 121) at 77.    In an August

22   28, 2006, order, *inter alia*, this court granted summary judgment in

23   favor of defendant Kirkland & Ellis, alleging breach of fiduciary

24   duties by "professional advisers and consultants[.]" See Mann, 351

25   B.R. at 707.    Further, Eaton and AEG entered into a stipulation of

26   dismissal with prejudice as to all claims against them, including

27   count three.    See id.    In light of the foregoing, GTCR is entitled

28   to summary judgment as to this count insofar as it is based upon

claimed breaches of fiduciary duties by "professional advisers and consultants."

Summary judgment in GTCR's favor on this count is also proper to the extent it is based upon breaches of fiduciary duties by "majority shareholders."  That is so because, as set forth above, aiding and  abetting a breach of fiduciary duty requires a showing of, among other things, "knowing participation in the breach by the *non-fiduciary defendant*[.]" See Wallace v. Cencom Cable Income Partners II, L.P. v. Wood, 752 A.2d 1175, 1184 (Del. Ch. 1999) (emphasis added).  GTCR is not, however, a "non-fiduciary defendant."  Indeed, the crux of plaintiffs' theory of liability against GTCR, as with the other defendants, is that it owed fiduciary duties to plaintiffs.

Plaintiffs readily concede "that a person who himself owes a fiduciary duty with respect to a transaction or course of conduct cannot be liable for aiding and abetting a breach of that same fiduciary duty by another because the same facts that would otherwise constitute aiding and abetting would constitute a 'primary breach of fiduciary duty." Resp. (doc. 417) at 24. The flaw with this argument, as plaintiffs view it, is that not "every one of the defendants . . . *admit*[s] that they were fiduciaries and were *at all times* acting in a role that imposed upon them fiduciary duties toward the plaintiffs[.]" Id. (emphasis in original). Plaintiffs have not cited to any specific facts in the record showing that GTCR was a "non-fiduciary" with respect to any given alleged breach of fiduciary duty, however.  Similarly, plaintiffs have not designated any specific facts creating a genuine issue of material fact as to GTCR's asserted "non-fiduciary" status.  Thus,

1  the court also grants GTCR's summary judgment motion as to count
2  four which alleges aiding and abetting breaches of fiduciary duties
3  by majority shareholders.

4       For the reasons just discussed, summary judgment in favor of
5  defendants GTCR and the GTCR VI Entities is appropriate with
6  respect to count six, which alleges aiding and abetting breaches of
7  fiduciary duties by "directors and officers[.]" FAC (doc. 121) at
8  79.  Again, plaintiffs have not come forth with any evidence that
9  these defendants were acting in anything other than a fiduciary
10 capacity.

11      Finally, count seven alleges "aiding and abetting breach of
12 fiduciary duties by professional advisers and consultants: against
13 the GTCR Entities and four GTCR principals.[21] FAC (doc. 121) at 81.
14 As discussed above, count seven, which is predicated upon count
15 three, necessarily fails as a matter of law because without the
16 underlying breach of fiduciary duty, there can be no claim for
17 aiding and abetting that purported breach. See McGowan, 859 A.2d at
18 1041 (granting summary judgment as to aiding and abetting breach of
19 fiduciary duty count after granting summary judgment as to the
20 underlying  breach of duty of loyalty count).  Consequently, the
21 court grants defendants' motion for summary judgment as to aiding
22 and abetting as alleged in count seven.

23 **_III.  Other Remaining Counts_**

24      **_A.  Misappropriation of Trade Secret_**

25      Because plaintiffs are not opposing GTCR's motion with respect
26 to count 13, misappropriation of trade secrets, the court grants

27 

28       [21]  Mr. Makings also is named as a defendant in this count, but as
previously mentioned, he has separately moved for summary judgment.

1   this aspect of GTCR's summary judgment motion.  <u>See</u> Resp. (doc.

2   417) at 23, n. 6.

3      **_B.   Aiding and Abetting Fraudulent Transfer_**

4      In count 8 of the FAC, the plaintiff trustee alleges that

5   GTCR, Nolan, Rauner, Yih and the GTCR Entities aided and abetted a

6   fraudulent transfer, that is the ICG asset sale.  Plaintiffs

7   further allege that that sale was a fraudulent transfer "in

8   violation of applicable state law[.]"[22] FAC (doc. 121) at 82, ¶¶ 366

9   and 367; at 83, ¶ 368.

10      The GTCR defendants are moving for summary judgment as to this

11  count on several grounds.  Their primary argument is that "[n]o

12  Arizona court has recognized a cause of action for 'aiding and

13  abetting a fraudulent conveyance,' and this Court should not be the

14  first." Mot. (doc. 347) at 36.  If the court is inclined to

15  recognize the existence of such a cause of action, the GTCR

16  defendants believe that they still would be entitled to summary

17  judgment because plaintiffs lack evidence of any of the three

18  elements necessary to prove aiding and abetting under Arizona law:

19   (1) an underlying tort; (2) knowledge of tortiousness; and (3)

20  substantial assistance/encouragement.

21      Plaintiffs do not deny defendants' primary contention: There

22  is no cause of action under Arizona law for aiding and abetting a

23  fraudulent conveyance.  Instead, they urge this court to recognize

24

25

26

27      [22]   Under Arizona's Uniform Fraudulent Transfer Act ("AUFTA"), a transfer
    "is fraudulent as to a creditor whose claim arose before the transfer" if, as a
    result of the transfer, the debtor becomes insolvent and the transfer was not made
28  in exchange for "reasonably equivalent value."  A.R.S. § 44-1005 (2003).

1    such a cause of action against these non-transferee defendants[23]

2    based upon section 876(b) of Restatement (Second) of Torts.  Under

3    that section, "a person who aids and abets a tortfeasor is himself

4    liable for the resulting harm to a third person." Wells Fargo Bank

5    v. Arizona Laborers, Teamsters, 201 Ariz. 474, 485, 38 P.3d 12, 23

6    (2002) (citations omitted).

7        Additionally, plaintiffs rely upon Banco Popular North America

8    v. Gandi, 184 N.J. 161, 876 A.2d 253 (2005), wherein the Court held

9    that plaintiff stated a cause of action for conspiracy to violate

10   New Jersey's UFTA.  There, an attorney supposedly advised his

11   client to transfer all of the client's assets into his wife's name

12   to avoid having those assets attached by the creditor bank.

13   Plaintiffs argue for an expansion of Gandi, reasoning that "if

14   there is liability for conspiring to assist a fraudulent transfer,

15   there may also be liability for aiding and abetting a fraudulent

16   transfer."  See Resp. (doc. 417) at 28.  This liability attaches,

17   from plaintiffs' standpoint, because the UFTA expressly provides

18   that it is not abrogating other well-established common law causes

19   of action or bases of liability – such as liability for conspiracy

20   and aiding and abetting."  Id.  Then, turning to the merits,

21   plaintiffs strenuously contend that they have "more than sufficient

22   evidence of the value of the ICG Assets" to support a fraudulent

23   transfer, and hence a claim for aiding and abetting such a

24   transfer.  Id. at 29.

25       Where, as here, a federal court is interpreting state

26

27       [23]   Defendant Makings, the transferee, is also named in this count, but as
28   mentioned at the outset, he has separately moved for summary judgment.  Therefore,
     the issue here is framed strictly in terms of the non-transferee defendants.

1  substantive law, such as the UFTA, it "is bound by decisions of the
2  state's highest court."  Vestar Development II v. General Dynamics
3  Corp., 249 F.3d 958, 960 (9th Cir. 2001) (internal quotation marks
4  and citation omitted).  However, "[i]n the absence of such a
5  decision, a federal court must predict how the highest state court
6  would decide the issue using intermediate appellate court
7  decisions, *decisions from other jurisdictions*, statutes, treaties,
8  and restatements as guidance."  Id. (internal quotation marks and
9  citation omitted) (emphasis added).  Arizona, like numerous other
10  jurisdictions,[24]  has adopted the UFTA.  See A.R.S. §§ 44-1001 - 44-
11  1010 (2003). But unlike other jurisdictions, Arizona courts have
12  not yet spoken to the issue of whether a cause of action is
13  cognizable against a non-transferee for aiding and abetting a
14  fraudulent transfer.  Therefore, this court will look to the law of
15  other jurisdictions which have adopted the UFTA in a form
16  substantially similar to that of Arizona's.
17      When it does that, the court is convinced that Arizona's
18  Supreme Court would adopt the majority view; there is no
19  independent cause of action for aiding and abetting a fraudulent
20  transfer under the AUFTA.   Plaintiffs did not cite to any
21  particular section of AUFTA in arguing for aiding and abetting
22  liability thereunder.  Based upon their assertion that the AUFTA
23  did not abrogate any common law causes of action, it can easily be
24  inferred that plaintiffs are relying upon that Act's "catch-all"
25  provision.  That provision governs "[r]emedies of creditors[,]" and
26  permits courts to award "[a]ny other relief the circumstances may

27
28      [24]      "In 1996, Delaware became one of forty-two jurisdictions to adopt the
     [UFTA][.]" Drenis v. Haligiannis, 452 F.Supp.2d 418, 426 (S.D.N.Y. 2006).

1  required."  A.R.S. § 44-1007(A)(4)(c) (2003).  Faced with the

2  argument that this catch-all provision permits a claim for aiding

3  and abetting under the UFTA, however, courts have uniformly

4  rejected it as a matter of statutory construction.  <u>See</u>, <u>e.g.</u>,

5  <u>Magten Assets Management Corporation v. Paul Hastings Janofsky &</u>

6  <u>Walker LLP</u>, 2007 WL 129003, at *3 (D.Del. Jan. 12, 2007)

7  (surveying several cases  court followed the "majority approach,"

8  finding that  "liability cannot  be imposed [based on an alleged

9  fraudulent transfer under the UFTA] on non-transferees under aiding

10  and abetting or conspiracy theories[]"); and <u>Trenwick America</u>

11  <u>Litigation Trust  v. Ernst & Young, L.L.P.</u>, 906 A.2d 168, 203 and

12  n. 97 (citing cases)  (Del. Ch. 2006) ("Despite the breadth of

13  remedies available under state and federal fraudulent conveyance

14  statutes, those laws have not been interpreted as creating a cause

15  of action of 'aiding and abetting.'")

16      When scrutinizing the plain language of the UFTA, courts agree

17  that it is unambiguous in that it does not "suggest[] an intent to

18  create an independent tort for damages [for aider-abettor

19  liability]."  <u>Freeman v. First Union National Bank</u>, 865 So.2d 1272,

20  1277, 29 Fla. L. Weekly S36  (Fla. 2004). The <u>Freeman</u> court

21  provided the following rationale for finding no ambiguity in

22  Florida's UFTA ("FUFTA"):

23          On the face of the statute, there is no
        ambiguity with respect to whether FUFTA
24          creates an independent cause of action
        for aiding-abetting liability.  There
25          simply is no language in FUFTA that
        suggests the creation of a distinct cause
26          of action for aiding-abetting claims against
        non-transferees. Rather, it appears that
27          FUFTA was intended to codify an existing but
        imprecise system whereby transfers that were
28          intended to defraud creditors could be set aside.

1  Id. at 1276.

2  Stated somewhat differently:

3              At most, [the] []UFTA's 'catch-all' provision
             gives a court flexibility to fashion remedies
4            not explicitly provided for in the statute.
             The provision does not permit the court to
5            assign liability where the Act did not, or to
             create out of whole cloth 'substantive rights
6            of action with accompanying damages which are
             not otherwise implied or stated in the statute.

7

8  Ernst & Young LLP v. Baker O'Neal Holdings, Inc., 2004 WL 771230,

9  at *14 (S.D.Ind. March 24, 2004) (quoting FDIC v. White, 1998 WL

10 120298, *2 (N.D.Tex. March 5, 1998)).

11      This court sees no reason to deviate from this well-reasoned

12 line of cases, and plaintiffs certainly have not provided any.

13 Neither the Restatement (Second) Torts nor the New Jersey Supreme

14 Court's Gandi decision provide an adequate basis for recognizing a

15 cause of action for aiding and abetting a fraudulent transfer under

16 the AUFTA. Plaintiffs' argument that section 876(b) of the

17 Restatement provides a basis for imposing such liability misses the

18 mark.  Liability under that section is limited to those who aid and

19 abet "tortfeasors."  It does not apply to those who aid and abet

20 statutory violations such as the AUFTA.

21      Plaintiffs' reliance upon Gandi is equally unavailing.

22 Obviously the issue before the Gandi court was whether to recognize

23 a cause of action for conspiring to facilitate a transfer in

24 violation of New Jersey's UFTA, not aiding and abetting a UFTA

25 violation.  It is axiomatic that conspiracy and aiding and abetting

26 are two separate and distinct causes of action.  For all of these

27 reasons, the court finds that summary judgment should be granted in

28 defendants' favor as to count 8, alleging aiding and abetting

- 64 -

1  fraudulent transfers.

2      ***C.   Trust Fund Doctrine***

3      In count nine of the FAC plaintiffs invoke the trust fund

4  doctrine, which "was judicially created to ensure that all

5  creditors' claims are first equitably satisfied before stockholders

6  may claim their rights upon the assets of an insolvent

7  corporation."  <u>A.R. Teeters & Associates, Inc. v. Eastman Kodak</u>

8  <u>Company</u>, 172 Ariz. 324, 331, 836 P.2d 1034, 1041 (Ct. App. 1992)

9  (citations omitted).  The trust fund doctrines provides that

10 "[i]ndependently of statute, if corporate officers divide the

11 assets among stockholders when the corporation is insolvent or

12 where the corporation is thereby rendered insolvent, such officers

13 are personally liable for corporate debts, or at least to the

14 extent of the amount of assets received by them."  <u>Realty Exchange</u>

15 <u>Corporation v. Cadillac Land and Development Company</u>, 13 Ariz. App.

16 232, 234, 475 P.2d 522, 524 (1970) (internal quotation marks and

17 citation omitted); <u>see also</u> <u>Southern Arizona Bank and Trust Co. v.</u>

18 <u>U.S.</u>, 386 F.2d 1002, 1005 (U.S. Ct. Cl. 1967) (citation omitted)

19 (emphasis added) ("Arizona follows the . . . rule that where

20 *stockholders* of a corporation *receive* its *assets* on liquidation and

21 leave it without sufficient property to pay its creditors, then

22 those *stockholders* are *required to respond* to creditors up to the

23 full value of the assets received.") The theory underlying  the

24 trust fund doctrine "is that all of the assets of a corporation,

25 immediately on its becoming insolvent, exist for the benefit of all

26 of its creditors and that thereafter no liens nor rights can be

27 created either voluntarily by operation of law whereby one creditor

28 is given an advantage over others."  <u>Teeters</u>, 836 P.2d at 1041

1  (internal quotation marks and citations omitted).

2       After setting forth the elements necessary for a plaintiff to

3  successfully invoke the trust fund doctrine,[25] the <u>Teeters</u> court

4  unequivocally stated, "[l]iablty, if established, is limited to

5  the value of the assets received by the director, officer or

6  stockholder."  <u>Id.</u> (citations omitted).  Based upon that

7  unequivocal language, defendants contend that to prevail on their

8  trust fund doctrine claim, plaintiffs  must show that the asset was

9  transferred to a "'director, officer or stockholder.'"  <u>See</u> Reply

10 (doc. 449) at 25 (quoting <u>Teeters</u>, 836 P.2d at 1041).  Because the

11 transfer at issue here, the ICG asset sale, was to defendant

12 Makings, who was not a director, officer or shareholder at the time

13 of that transfer, defendants assert that they are entitled to

14 summary judgment with respect to the trust fund doctrine count(9).

15      Citing to case law outside this jurisdiction, apparently it is

16 plaintiff's position that they can invoke the trust fund doctrine

17 even where the challenged transaction is *not* to a director, officer

18 or stockholder.   The court will ignore the fact that the cases to

19 which plaintiffs cite do not apply Arizona law.  Even when it does

20 that, however, a careful reading of those cases shows that as in

21 Arizona, the courts invoked the trust fund doctrine only when a

22 director, officer or shareholder received a corporate asset during

23 the insolvency of their corporation.  <u>See</u> <u>In re Jacks</u>, 266 B.R. 728

24 (B.P. 9th Cir. 2001) (California trust fund doctrine applies to

25

26      [25]      "To prevail on its trust fund doctrine claim, Kodak first must prove
27 that (1) corporate assets were transferred to Teeters, (2) the transfer of
   corporate assets occurred while the corporation was insolvent, and (3) the transfer
28 preferred Teeters to the disadvantage of other creditors of the same priority."
   <u>Teeters</u>, 172 Ariz. at 331.

1 self-dealing corporate president, chief financial officer, director

2 and shareholder of insolvent corporation); <u>In re Kallmeyer</u>, 242

3 B.R. 492 (B.P. 9th Cir. 1999) (Oregon trust fund doctrine applied to

4 sole director, officer and shareholder of corporation where she

5 caused payments to be made to her or taxing authority while

6 corporation was insolvent); and <u>In re Linderman</u>, 20 B.R. 826

7 (Bankr. W.D. Wa. 1982) (Washington trust fund doctrine invoked to

8 establish voidable preference under bankruptcy law where sole

9 stockholders retained proceeds from the sale of insolvent

10 corporation's real property).  Therefore, plaintiffs' reliance upon

11 the foregoing cases is misplaced for two reasons.  First of all,

12 those cases are not applying Arizona law.  Second, they are

13 factually distinguishable from the present case where the

14 transferee, defendant Makings, was not a director, officer or

15 shareholder of LeapSource at the time of transfer.  Accordingly,

16 the court finds that defendants are entitled to summary judgment

17 with respect to count nine of the FAC.  Bolstering this conclusion

18 is the fact that as the party opposing summary judgment on this

19 count, plaintiffs have failed to establish a *prima facie* trust fund

20 doctrine claim in that they have not pointed to any specific facts

21 in the record to support such a claim.  <u>See</u> <u>Celotex</u>, 477 U.S. at

22 322 ("[T]he plain language of Rule 56(c) mandates the entry of

23 summary judgment, . . . , against a party who fails to make a

24 showing sufficient to establish the existence of an element

25 essential to that party's case, and on which that party will bear

26 the burden of proof at trial.")

27      ***D.  Count 21 -  "Tortious Interference with Contract"***

28      Count 21 of the FAC generally alleges that defendants GTCR,

1    Rauner, Nolan and Yih intentionally interfered with the individual

2    plaintiffs' "Senior Management Agreements and "Employment

3    Agreements" (the "employment contracts") with LeapSource.  It

4    appears from plaintiff Kirk's answers to interrogatories that this

5    claimed interference resulted in plaintiffs not receiving severance

6    pay[] or other compensation[]" to which they believe they are

7    entitled under those contracts.  See  Doc. 345, vol. 1, exh. 2

8    thereto at 22.

9         In Mann I, this court enumerated the elements of tortious

10   intentional interference with contractual relations under Arizona

11   law:

12                    (1) existence of a valid contractual
                      relationship or business expectancy;
13                    (2) knowledge of the relationship or
                      expectancy on the part of the
14                    interferor; (3) intentional interference
                      inducing or causing a breach or termination
15                    of the relationship or expectancy; and  (4)
                      resultant damage to the party whose relationship
16                    or expectancy has been disrupted.

17   Mann I, (doc. 72) at 32 (quoting Wagenseller v. Scottsdale Memorial

18   Hospital, 147 Ariz. 370, 386, 710 P.2d 1025, 1041 (1985) (citing in

19   turn Antwerp Diamond Exchange v. Better Business Bureau of Maricopa

20   County, 130 Ariz. 523, 530 (1981)).  "In addition to proving the

21   four elements stated in Antwerp Diamond Exchange, the plaintiff

22   bringing a tortious interference action must show that the

23   defendant acted improperly." Wagenseller, 710 P.2d at 1043.  The

24   GTCR defendants devote this part of their  summary judgment motion

25   to this last element, improper conduct.  Engaging in a fairly in-

26   depth analysis, defendants  urge this court to find that the

27   alleged acts of interference were not improper as a matter of law

28   primarily because "GTCR had a contractual right to cease funding if

1   it was not satisfied[;]" and GTCR simply exercised that contractual

2   right.  See Mot. (doc. 347) at 44.

3        In a conclusory manner, plaintiffs respond that "GTCR's

4   breaches of fiduciary duty constitute sufficient evidence that GTCR

5   acted improperly toward the plaintiffs[.]" Resp. (doc. 417) at 34.

6   This  assertion, which plaintiffs did not support either factually

7   or legally, is insufficient to defeat this summary judgment motion.

8   Thus, the court grants summary judgment in favor of the GTCR

9   defendants as to count 21 as well.

10       ***E.  Count 22 - "Breach of Purchase Agreement"***

11       When the GTCR defendants filed this summary judgment motion,

12  they did not have the advantage of this court's  March 29, 2006,

13  decision wherein the court, *inter alia*, granted summary judgment in

14  favor of these defendants as to count 22.  See Doc. 356 at 41.

15  That decision renders moot the GTCR defendants' summary judgment

16  motion insofar as it pertains to count 22.

17       ***F.  count 23 - "Tortious Interference with Contract"***

18       Count 23 of the FAC again alleges tortious interference with

19  contract by GTCR, Nolan, Rauner and Yih, but this time in

20  connection with the Stockholder Agreements and the Purchase

21  Agreement.  See FAC (doc. 121) at 103, ¶¶ 482-485.  The defendants

22  are seeking summary judgment on this count in its entirety.

23       Plaintiffs did not respond with respect to the Purchase

24  Agreement.  By their silence the court assumes plaintiffs have

25  abandoned this aspect of count 23.  In any event, the court's

26  ruling in Mann I dismissing plaintiffs' claim for tortious

27  interference with the Purchase Agreement, mandates the conclusion

28  that plaintiffs are not, and indeed cannot be, pursuing this aspect

of count 23.  See Mann I (doc. 72) at 31-33; and 69.  In light of
the foregoing, the court will next consider whether summary
judgment is proper with respect to the remaining aspect of count 23
– tortious interference with the Stockholder Agreements.

According to defendants, there are "two fundamental defects"
with this tortious interference claim. Mot. (doc. 347) at 47.
First, there was no underlying breach of the Stockholder
Agreements; and in fact, plaintiffs have identified none.
Defendants accurately note that when asked in an interrogatory to
"[d]escribe with full particularity the factual basis" for this
claimed tortious interference with the Stockholder Agreements,
plaintiffs simply refer to the alleged breaches of fiduciary duty
and the aiding and abetting of those duties.  See Doc. 345, vol. 1,
exh. 2 thereto at 26.  In a conclusory manner, plaintiffs go on to
state that such conduct "contributed to the destruction of
LeapSource and of the value of the Individual Plaintiffs' interest
in LeapSource acquired pursuant to the Stockholder Agreements,
which denied the Individual Plaintiffs the benefit of what they had
bargained for under those [A]greements."  Id. Although phrased
slightly differently, this is plaintiffs' response to defendants'
summary judgment motion as well.  Nowhere, for example, do
plaintiffs specify any particular clause in the Stockholder
Agreements which defendants allegedly breached.

The second "fundamental defect" here,  from defendants'
standpoint, is that there was no "'improper' interference" with the
Stockholder Agreements. Mot. (doc. 347) at 48.  As plaintiffs'
answers to interrogatories show, and their motion response
confirms, this purported improper interference is predicated solely

upon defendants' alleged breaches of fiduciary duties.  See Doc.
345, vol. 1, exh. 2 thereto at 26; see also Resp. (doc. 417) at 40
("The other wrongful conduct alleged in the FAC, including the
breach of fiduciary and  other duties . . . , will satisfy the
requirement of . . . 'improper' conduct.") Defendants reason,
however, that because plaintiffs have not shown any such breaches
on this record, they cannot meet their burden of proving "improper
conduct," a necessary element of a claim for tortious interference
with contract.

     Putting aside for the moment the issue of  "improper conduct,"
the parties have opposing views as to whether a breach of contract
must be shown to prevail on this tortious interference claim.
Defendants vigorously maintain that prove of a breach is essential
to a claim of tortious interference with contract.  See  Reply
(doc. 449) at 30.  On the other hand, plaintiffs contend that "the
law does not necessarily require that the contract be breached."
Resp. (doc. 417) at 39.  Rather it is enough, they believe, to show
that "a contract relationship has been destroyed by wrongful
interference[.]" Id. (emphasis added).

     The flaw in plaintiffs' argument is that they are conflating
two distinct causes of action – tortious interference with contract
and tortious interference with a business relationship. See
Southern Union Company v. Southwest Gas Corporation, 180 F.Supp.2d
1021, 1047 n. 41 (D.Az. 2002) (although the elements are "virtually
identical . . . a claim for tortious interference with contract is
distinct from a claim of tortious interference with a business
relationship").  Plaintiffs specifically designated count 23 of the
FAC as  "tortious interference with contract[.]"  See FAC (doc.

121) at 103 (emphasis added).  They have never defined this tortious interference claims as anything other than being contract based , as is evidenced in part by the court's discussion in <u>Mann</u> <u>I</u>.  <u>See</u> <u>Mann I</u> (doc. 72) at 31-34.  Despite the foregoing, now, for the first time, plaintiffs are attempting to recast this claim in terms of  tortious interference with a business relationship, a claim distinct from tortious interference with contract.  After roughly four years of litigation, a complaint which has been amended four times,  and in response to a summary judgment motion, it is simply too late in the day for  plaintiffs to change their theory of liability.  <u>See</u> <u>Eagle v. American Tel. and Tel. Co.</u>, 769 F.2d 541, 548 (9th Cir. 1985) (finding that "[i]t would be unfair to the defendant to permit the plaintiff"  to articulate a new damage theory for first time in summary judgment motion when that theory was not mentioned in the pre-trial status conference order or in the original or amended complaints).  Therefore, the court grants defendants' motion for summary judgment as to count 23.

      For the reasons set forth above, except as previously discussed, the court finds that none of the defendants breached the fiduciary duties of loyalty and due care which, undisputably, are the touchstone of corporate governance.  At the end of the day, it appears that plaintiffs were displeased because at nearly every step of the way, from negotiating the original Purchase Agreement, to the wind-down operations, defendants chose to "play hard ball." Undoubtedly it would have been preferable to plaintiffs if defendants had comported themselves with an "[a]spirational ideal of good corporate governance practices for boards of directors that go beyond the minimal legal requirements of . . . corporate law[.]"

1    See Disney, 907 A.2d at 745 n. 399.  Such ideals, as the Disney

2    Court stated so well, are "highly desirable often tend[ing] to

3    benefit stockholders, sometimes reduce litigation and can usually

4    help directors avoid liability."  Id.  At the same time though,

5    those "aspirational ideals . . . are not required by the

6    corporation law and do not define the standards of liability[.]"

7    See id.

8                          ***Conclusion***

9         IT IS ORDERED that the motion for summary judgment by

10   defendants GTCR Golder Rauner, L.L.C., GTCR Fund VI, L.P., GTCR VI

11   Executive Fund, L.P., GTCR Associates VI, Joseph P.  Nolan, Bruce

12   V.  Rauner, Daniel David A. Donnini and Philip A. Canfield (doc.

13   347) is GRANTED in part and DENIED in part, as hereinafter ordered.

14        IT IS FURTHER ORDERED that the motion by the GTCR Entity

15   defendants for summary judgment as to count 2, "Breach of Fiduciary

16   Duties By Majority Shareholders[,]" is GRANTED; except it is DENIED

17   without prejudice to renew by appropriate motion to the extent

18   count 2 alleges a breach of the duty of loyalty arising out of the

19   ICG asset sale, and to the extent count 2 alleges a breach of the

20   duty of due care.

21        IT IS FURTHER ORDERED that the motion by defendant GTCR for

22   summary judgment as to count 4, "Aiding and Abetting Breach of

23   Fiduciary Duties by Majority Shareholders and By Professional

24   Advisers and Consultants[,]" is GRANTED.

25        IT IS FURTHER ORDERED that the motion by defendants Nolan,

26   Rauner, Donnini, and Yih for summary judgment as to count 5,

27   "Breach of Fiduciary Duties By Directors and Officers[,]" is

28   GRANTED; except it is DENIED without prejudice to renew by

1  appropriate motion to the extent count 5 alleges a breach of the
2  duty of loyalty arising out of the ICG asset sale.

3      IT IS FURTHER ORDERED that the motion for summary judgment by
4  defendants GTCR and the GTCR Entities for summary judgment as to
5  count 6, "Aiding and Abetting Breach of Fiduciary Duties by
6  Directors And Officers[,]" is GRANTED.

7      IT IS FURTHER ORDERED that the motion for summary judgment by
8  defendants the GTCR Entities, Nolan, Rauner, Donnini and Yih as to
9  count 7, "Aiding and Abetting Breach of Fiduciary Duties By
10 Professional Advisers and Consultants[,]" is GRANTED.

11     IT IS FURTHER ORDERED that the motion for summary judgment by
12 defendants GTCR, Nolan, Rauner, Yih and the GTCR Entities as to
13 count 8, "Aiding and Abetting Fraudulent Transfers[,]" is GRANTED.

14     IT IS FURTHER ORDERED that the motion for summary judgment by
15 defendants Nolan, Rauner, Yih and the GTCR Entities as to count 9,
16 "Trust Fund Doctrine[,]" is GRANTED.

17     IT IS FURTHER ORDERED that the motion for summary judgment by
18 defendants GTCR, Nolan and Rauner for summary judgment as to count
19 13, "Misappropriation of Trade Secret," is GRANTED.

20     IT IS FURTHER ORDERED that the motion for summary judgment by
21 defendants the GTCR Entities as to count 17, "Breach of Fiduciary
22 Duty" is GRANTED.

23     IT IS FURTHER ORDERED that the motion for summary judgment by
24 the defendants GTCR, Rauner, Nolan, Yih, Donnini, and Canfield as
25 to count 18, "Aiding and Abetting Breach of Fiduciary Duty[,]" is
26 GRANTED.

27     IT IS FURTHER ORDERED that the motion for summary judgment by
28 the defendants Nolan, Rauner and Yih as to count 19, "Breach of

Fiduciary Duty[,]" is GRANTED.

IT IS FURTHER ORDERED that the motion for summary judgment by defendants GTCR and the GTCR Entities as to count 20, "Aiding and Abetting Breach of Fiduciary Duty[,]" IS GRANTED.

IT IS FURTHER ORDERED that the motion for summary judgment by defendants GTCR, Rauner, Nolan, and Yih as to count 21, "Tortious Interference with Contract[,]" is GRANTED.

IT IS FURTHER ORDERED that the motion for summary judgment by defendants the GTCR Entities for summary judgment as to count 22, "Breach of Purchase Agreement and Duty of Good Faith and Fair Dealing Arising from Purchase Agreement[,]" is DENIED as moot.

IT IS FINALLY ORDERED that the motion for summary judgment by defendants GTCR, Nolan, Rauner, and Yih as to count 23, "Tortious Interference With Contract[,]" is GRANTED.

DATED this 30th day of March, 2007.

_____
Robert C. Broomfield
Senior United States District Judge

1   Copies to counsel of record

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28